IN THE UNITED STATED DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE


RICHARD SLUSHER, D.O.,          )
                                )
        Plaintiff,              )
                                )
vs.                             )    Civil Action No.:
                                )    4:12-CV-00060
                                )
SHELBYVILLE HOSPITAL            )
CORPORATION d/b/a HERITAGE      )
MEDICAL CENTER AND DAN          )
BUCKNER, Individually,          )
                                )
        Defendants.             )
                                )
---------------------------


Deposition of:


DANIEL ANDREW BUCKNER


Taken on behalf of the Plaintiff


March 24th, 2014


--------------------------------------------------
        CASSANDRA M. BEILING, CCR, LCR# 371
           STONE & GEORGE COURT REPORTING
                2020 Fieldstone Parkway
                 Suite 900 - PMB 234
              Franklin, Tennessee 37069
                    615.221.1089

EXHIBIT A

```
 1    APPEARANCES:

 2
      For the Plaintiff:
 3
              RHODE & JACKSON, P.C.
 4            Attorneys at Law
              By:  Shari R. Rhode, Esq.
 5            1405 West Main Street
              P.O. Box 99
 6            Carbondale, Illinois 62903

 7

 8

 9
      For the Defendants:
10
              BRADLEY ARANT BOULT CUMMINGS, LLP
11            Attorneys at Law
              By:  Matthew C. Lonergan, Esq.
12            1600 Division Street, Suite 700
              P.O. Box 340025
13            Nashville, Tennessee 37203

14

15

16
      Also Present:
17
              Rob Thorne, HR Director
18            Heritage Medical Center

19

20

21

22

23

24

25
```

EXHIBIT A

1                    I N D E X

2                                              PAGE

    Direct Examination by Ms. Rhode              6

3

    Cross-examination by Mr. Lonergan          128

4

    Redirect Examination by Ms. Rhode          142

5

6

7

8                  E X H I B I T S
    No. 1:  Resume                               18

9

    No. 2:  Resignation memo                     19

10

    No. 3:  Physician Employment Agreement       37

11

    No. 4:  Heritage Medical Center Employee     46

12          Handbook

13  No. 5:  Policy E.3, Military Leave           56

14  No. 6:  Deployment notice                    59

15  No. 7:  Release from Active Duty             60

16  No. 8:  Termination of Employment Agreement  61

17  No. 9:  7/27/11-7/28/11 Email string between 66
            Dr. Slusher and Tisha Rader

18

    No. 10: 9/7/11 email regarding Return to Work 69

19

    No. 11: 9/8/11 email from Tisha Rader to     72

20          Dr. Slusher regarding space rented by
            Dr. Mosley

21

    No. 12: 10/4/11 email string between Tisha   73

22          Rader and Dr. Slusher

23  No. 13: Handwritten doctors schedule         74

24  No. 14: 8/30/11 email from Martine Jackson to 75
            Mr. Buckner

25

1   (Exhibits continued)                          PAGE

2   No. 15: 8/30/11 letter from Martine Jackson    76
            to Mr. Buckner and Ms. Rader
3
    No. 16: 10/26/11 letter from Dan Buckner to    78
4           Richard Slusher

5   No. 17: 10/20/11 HMC Medical Executive         79
            Committee/Quality Improvement Council
6
    No. 18: 9/7/11 email from Dr. Slusher to       86
7           Mr. Buckner re: Return to Work

8   No. 19: 5/16/11 Recruitment Agreement for      94
            E. Wayne Mosley, MD
9
    No. 20: Defendant Dan Buckner's Responses to   109
10          Plaintiff's First Set of Interrogatories

11  No. 21: 11/8/10 CHS Confidential Physician      128
            Agreement Terms for Dr. Slusher
12
    No. 22: List of doctors with Locum Privileges  131
13
    No. 23: Lead Sheet for Emmett Wayne Mosley, MD 132
14
    No. 24: Contract Concerns                      135
15
    No. 25: Defendant Shelbyville Hospital          148
16          Corporation's Responses to Plaintiff's
            First Interrogatories

17

18

19

20

21

22

23

24

25

EXHIBIT A

1          The deposition of DANIEL ANDREW BUCKNER

2    was taken by counsel for the Plaintiff, pursuant

3    to notice, at the offices of Bradley, Arant,

4    Boult, Cummings, LLP, 1600 Division Street,

5    Nashville, Tennessee, on March 24th, 2014, for all

6    purposes under the Federal Rules of Civil

7    Procedure.

8

9          It is agreed that Cassandra M. Beiling,

10   being a licensed court reporter in the state of

11   Tennessee, may swear the witness, and that the

12   reading and signing of the completed deposition by

13   the witness are not waived.

14

15

16

17                    *   *   *

18

19               DANIEL ANDREW BUCKNER

20   was called as a witness, and after having been

21   first duly sworn, testified as follows:

22

23

24

25

Case 4:12-cv-00060-HSM-SKL  Document 27-1  Filed 05/30/14  Page 5 of 150  PageID #:
398

EXHIBIT A

1              *   *   *   *   *   *   *   *

2                    DIRECT EXAMINATION

3    QUESTIONS BY MS. RHODE:

4        **Q.**   State your full name for the record,

5    please.                                          09:33

6        **A.**   Daniel Andrew Buckner.

7        **Q.**   Mr. Buckner, where do you currently

8    reside?

9        **A.**   202 High Street, Bell Buckle, Tennessee.

10       **Q.**   And how are you currently employed?    09:33

11       **A.**   I am a farmer and a medical consultant.

12       **Q.**   And for whom are you a medical

13   consultant at this time?

14       **A.**   I have a practice that I consult with in

15   Tullahoma, Tennessee.                            09:33

16       **Q.**   What kind of practice?

17       **A.**   Family practice.

18       **Q.**   And what kind of consulting -- I won't

19   ask you about any specifics --

20       **A.**   Yeah, that's okay.                    09:33

21       **Q.**   -- of this, but what kind of consulting

22   do you do for them?

23       **A.**   I help them learn about their billing

24   processes, learn about how to engage in their

25   coding process, efficient staffing, kind of      09:34

**EXHIBIT A**

1    whatever they ask.                                    09:34

2        Q.   Okay.  Before we go on, have you ever

3    been deposed before?

4        A.   No, I haven't.

5        Q.   Gone through this process?                    09:34

6        A.   No.

7        Q.   Okay.  And you sat in when Dr. Slusher

8    was deposed.

9        A.   Right.

10       Q.   All right.  Let me just give you the          09:34

11   same kind of basic overview of the rules.

12       A.   Okay.

13       Q.   I'm just going to ask you some

14   questions.  If at any point my question is not

15   clear, please just tell me.  I'll be happy to         09:34

16   rephrase it.

17       A.   Okay.

18       Q.   Because if you answer the question, I'm

19   going to assume that you understood it; is that

20   fair?                                                  09:34

21       A.   That's fair.

22       Q.   Okay.  And I'll ask you to keep your

23   answers verbal, just as you've been doing --

24       A.   Okay.

25       Q.   -- to make it easy for the court             09:34

Stone & George Court Reporting
615.221.1089
Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 7 of 150   PageID #:
400

EXHIBIT A

1   reporter.  And if you'll let me finish my          09:34

2   question, I'll give you whatever time you want to

3   respond.  If we talk over each other, it makes it

4   difficult for the court reporter.

5       **A.**   Sure.                                      09:34

6       **Q.**   Okay?

7       **A.**   Okay.

8       **Q.**   Great.  Thank you.  What's your date of

9   birth, Mr. Buckner?

10      **A.**   April 4th, 1960.                           09:34

11      **Q.**   Happy almost birthday.

12      **A.**   Yeah.

13      **Q.**   And could you give me your educational

14  background, please.  Start from college.

15      **A.**   From college?  Okay.                       09:35

16      **Q.**   Yeah.  Where you went, degrees and

17  years, please.

18      **A.**   I've got a bachelor's degree from the

19  University of the South in Sewanee, Tennessee.

20      **Q.**   Okay.                                      09:35

21      **A.**   And I've got a master's degree from

22  Georgia State University.

23      **Q.**   In Atlanta?

24      **A.**   In Atlanta.  Master's in counseling,

25  counseling and psychology.                          09:35

1    **Q.**   Did you have a special modality?                    09:35

2    **A.**   Counseling and psychology.  Is that what

3   you're asking?

4    **Q.**   Were you a Rogerian, a --

5    **A.**   I was -- if anything, I was a Jungian.          09:35

6    **Q.**   Okay.  And what year did you get your

7   bachelor's?

8    **A.**   If anything, I still am a Jungian.

9    **Q.**   I'm a Gestalt, so...

10   **A.**   All right.  '82.                                 09:35

11   **Q.**   And your master's?

12   **A.**   I don't know.

13   **Q.**   About?

14   **A.**   About '87 or '8, maybe.

15   **Q.**   Do you have any other degrees beyond the        09:35

16   master's degree?

17   **A.**   No.

18   **Q.**   Do you have any certifications or

19   special licenses?

20   **A.**   Not necessarily, no.                             09:36

21   **Q.**   Okay.  Do you have any professional

22   licenses at all?

23   **A.**   No.

24   **Q.**   Okay.  Would you tell me your work --

25   did you go straight from your bachelor's into your       09:36

Stone & George Court Reporting
615.221.1089
Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 9 of 150   PageID #:
402

EXHIBIT A

1   master's program?                                    09:36

2       **A.**   No.  There's several years in between.

3       **Q.**   Okay.  What did you -- what kind of work

4   did you do between 1982 and the time you began

5   your master's?                                       09:36

6       **A.**   The majority of the time I was a

7   counselor for adolescents and a program-director

8   type -- program-administrator type for psychiatric

9   hospitals.

10      **Q.**   Where?                                  09:36

11      **A.**   Frank Luton Mental Health Center,

12  Nashville, Tennessee, and Anneewakee, which is now

13  called Inner Harbour, in Douglasville, Georgia.

14      **Q.**   Okay.  Where are you originally from?

15      **A.**   I'm originally from New Mexico.  Born in  09:36

16  Carlsbad, lived in Arizona for awhile.  My

17  formative years, though, in Murfreesboro,

18  Tennessee.

19      **Q.**   After you got your master's degree,

20  could you give me your employment history from      09:37

21  then to today, where you worked, the years if you

22  can recall --

23      **A.**   Yeah.  I can give it to you very

24  loosely.

25      **Q.**   Fair enough.                            09:37

**EXHIBIT A**

1      A.    Let's see.  After my master's degree, I        09:37

2   would have -- I got my master's while I was at

3   Anneewakee, so I continued working there with my

4   master's.  Then I went to Bradenton, Florida, to

5   be a program administrator for a psychiatric        09:37

6   hospital that was owned by either PIA or Charter

7   at the time.  Both companies are defunct now.

8           I went from there to a hospital named

9   Kingwood Psychiatric Hospital in Michigan City,

10  Indiana, as a program administrator.                09:37

11          I went from Kingwood to Ocala, Florida,

12  Charter Hospital, Charter Psychiatric Hospital, as

13  the clinical director, and ended up there as the

14  COO.

15          I went from there to a hospital named       09:38

16  Charlotte Regional Medical Center that had a

17  behavioral unit attached called Riverside.  And it

18  was that 60-bed geriatric psych facility which I

19  ran as the CEO.

20          I went from there -- this is all in the     09:38

21  same company.  I worked for a company called HMA.

22      Q.   Okay.

23      A.   I went from there to Haines City,

24  Florida, a med/surg hospital.  That's where I

25  first broke away from the psychiatric world and     09:38

EXHIBIT A

1   went into the med/surg world.  I was a CEO there.        09:38

2          I went from CEO -- what did I just say?

3   What town am I in now?

4                  MR. LONERGAN:  Haines City.

5                  THE WITNESS:  Haines City?              09:38

6   BY MS. RHODE:

7      **Q.**   Haines City.

8      **A.**   Haines City, okay.  I was the COO at

9   Haines City.  And then I went to Hamlet, North

10  Carolina, as a CEO of the med/surg hospital,           09:38

11  Sandhills Regional Medical Center.

12         I went from there to Lehigh Acres,

13  Florida, as a CEO for a med/surg hospital.  Same

14  company all this time.

15         I went from there as CEO to Charlotte         09:39

16  Regional Medical Center, which was a med/surg open

17  heart -- medical/surgical hospital.

18         I went from there to Cleveland,

19  Tennessee, as a COO at SkyRidge Medical Center.

20  That's a change in companies.  I went from HMA to     09:39

21  CHS, Community Health Systems --

22     **Q.**   Was that your first --

23     **A.**   -- in Chattanooga.

24     **Q.**   I'm sorry.

25     **A.**   It was, yeah.  And then went from there    09:39

EXHIBIT A

1   to the hospital here in Shelbyville -- or there in          09:39

2   Shelbyville where I was CEO for five years.  I

3   retired from there a year ago.  Dates, I just

4   would be guessing.  I don't know.

5        Q.   No.  That's okay.  Can you recall the            09:39

6   date of your retirement from Shelbyville?

7        A.   It was January a year ago, so January of

8   '13, I guess.

9        Q.   In what city is Lehigh Acres, the

10  med/surg hospital?                                          09:40

11       A.   Lehigh Acres is close to Fort Myers.

12  It's a city that's close to Fort Myers, Florida.

13       Q.   Is that the name of the city, is Lehigh

14  Acres?

15       A.   It's called Lehigh Acres.                        09:40

16       Q.   Were you in the hospital in Punta Gorda

17  at any time?

18       A.   Yeah.  That's the hospital that was the

19  med/surg hospital.  Did I not say that?

20       Q.   I don't remember you mentioning Punta            09:40

21  Gorda.

22       A.   Okay.

23       Q.   That's --

24       A.   Yeah, Punta Gorda.  Punta Gorda --

25       Q.   Is that a different hospital than Lehigh         09:40

EXHIBIT A

1   Acres?                                              09:40

2        **A.**   It is.

3        **Q.**   Okay.  Was that before or after --

4        **A.**    That was after.  That was one hospital

5   after Lehigh Acres.  It was a 300-bed med/surg,      09:40

6   open heart hospital.  It's the same hospital that

7   I was the psychiatric administrator for at one

8   point, and I circled back to it as med/surg

9   administrator years later.

10       **Q.**   Okay.  From the time you were in         09:40

11  Cleveland, Tennessee, until your retirement, were

12  you always with CHS hospitals?

13       **A.**   Yes.

14       **Q.**   Were you ever in the military --

15       **A.**   No.                                      09:40

16       **Q.**   -- Mr. Buckner?

17       **A.**   I wish I had been.

18       **Q.**   Why is that?

19       **A.**   I think it is a good way to live,

20  teaches a good, organized mind.                     09:41

21       **Q.**   Let me ask you about your departure from

22  Shelbyville.

23       **A.**   Okay.

24       **Q.**   Tell me the circumstances that led to

25  your separation from Shelbyville.                   09:41

EXHIBIT A

1    A.    Okay.  It was kindly separation on both         09:41

2  sides, mutual respect.  My entire career I've been

3  a turnaround hospital CEO.

4    Q.    And what do you mean by a turnaround --

5    A.    I would take hospitals that were losing         09:41

6  money and make them profitable.  And that's

7  typically, in my life, been about a two-year run

8  that it took me to do that, and got very good at

9  that and liked that.

10          I was at the hospital in Shelbyville for         09:41

11  five years and started getting annoyed with

12  things.  And I could blame that on the company or

13  they could blame that on me.  I was bored.  And

14  mainly because when you're used to doing

15  turnarounds, it's different stuff and it's all         09:42

16  exciting.  And then at Shelbyville I just decided

17  I didn't want to do it anymore, and left.

18    Q.    Did it take you the four or five years

19  to turn Shelbyville around, or was there a

20  different reason that you stayed longer at that         09:42

21  location?

22    A.    I turned Shelbyville around in two

23  years.

24    Q.    Okay.

25    A.    My parents live in Murfreesboro, and         09:42

1    this is the part of the country that I was trying    09:42

2    to migrate back to regardless.  So it was a good

3    location for me.  It was a good hospital.  It had

4    good staff -- has good staff, has good doctors.

5        Q.   Is that Murphy -- the town I live in, in    09:42

6    Illinois, is Murphysboro, and so you're talking

7    about Murfreesboro --

8        A.   Murfreesboro, right.

9        Q.   -- Tennessee?

10       A.   Yeah.  It's -- from Shelbyville --          09:42

11       Q.   You may not pronounce it that way down

12   here, but I just want to make sure we're in the

13   same place.

14       A.   From Shelbyville, it's 20 miles away.

15       Q.   Okay.  So who initiated any -- strike        09:42

16   that.

17            Was it ever suggested to you that it was

18   time for you to move on to another turnaround by

19   anybody with CHS or the hospital?

20       A.   No.                                          09:43

21       Q.   Did you initiate the discussions for

22   your departure?

23       A.   Yes.

24       Q.   And what, if anything, were the terms of

25   your departure?  I mean -- by that I mean were you    09:43

EXHIBIT A

1    going to be brought back as a consultant?  Did you          09:43

2    have a contract after you retired?  Or did you

3    just submit a resignation?

4        **A.**    Submitted a resignation.  It was a

5    30-day resignation, but I gave the -- told the               09:43

6    company I would stay on for as long as six months

7    if they needed me to, to be able to find somebody

8    else and be as helpful as I could be.

9        **Q.**    Okay.

10       **A.**    They elected to make that -- I think it        09:43

11   turned into, like, a 60- or a 90-day resignation.

12       **Q.**    And the effective date of your

13   resignation, then, was in January of 2013?

14       **A.**    My last paycheck was in January, right,

15   of 2013.                                                     09:43

16       **Q.**    Okay.  Have you done any work for any

17   CHS -- for CHS or any of its facilities since your

18   resignation in January of 2013?

19       **A.**    The only work I've done for them is to

20   represent them for this lawsuit.  Not paid work              09:44

21   but --

22       **Q.**    No consulting?

23       **A.**    -- whatever you call this.  No, not for

24   them.

25                        THE WITNESS:  Am I speaking             09:44

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 17 of 150   PageID #: 410

EXHIBIT A

1    clearly enough for you?                          09:44

2                      THE REPORTER:  You're fine.

3    Thank you.

4                      MS. RHODE:  And I'll do this

5    (indicating) if she needs you to slow down.      09:44

6                      THE WITNESS:  Okay.  All

7    right.  Thank you.

8    BY MS. RHODE:

9        Q.   I'm going to hand you some exhibits.

10   And whenever I hand you something, please take   09:44

11   whatever time you want to look at it.

12       A.   Okay.

13       Q.   And in some cases, like, for what I'm

14   about to hand you now, I just want you to look at

15   it and tell me if that looks to be the correct   09:44

16   document.  I'm not going to get into any specifics

17   about this particular -- so I'm going to hand you

18   what I am marking as Exhibit 1 --

19                (Whereupon, Exhibit Number 1 was

20   marked for identification.)                      09:45

21                      MR. LONERGAN:  Thank you,

22   Shari.

23                      MS. RHODE:  You're welcome.

24   BY MS. RHODE:

25       Q.   -- and ask you if that is your resume or  09:45

EXHIBIT A

1    a resume.                                                09:45

2         **A.**   It is a resume, and it appears to be

3    mine.

4         **Q.**   Okay.  And I don't know who made the

5    little sticker over it, but this appears to take         09:45

6    us to 2007?

7         **A.**   Yes, it does.

8         **Q.**   But if you'll take just a moment, does

9    it appear, to the best of your knowledge, true and

10   correct as of that date?                                 09:45

11        **A.**   Not being able to read beyond the sticky

12   note that was printed here, it appears that it

13   would be correct.

14        **Q.**   Do you have a more current resume,

15   Mr. Buckner?                                             09:46

16        **A.**   I may, but I'm not sure.

17        **Q.**   Okay.

18             (Whereupon, Exhibit Number 2 was

19   marked for identification.)

20   BY MS. RHODE:                                            09:46

21        **Q.**   I'm going to hand you what I've marked

22   as Exhibit 2.

23                  MR. LONERGAN:  You can just

24   put that down.

25                  THE WITNESS:  Okay.                       09:46

EXHIBIT A

1          MS. RHODE:  I'll leave that                09:46

2   stack in front of you.

3               THE WITNESS:  Okay.

4               MS. RHODE:  Mr. Thorne, do you

5   need a set?                                        09:46

6               MR. THORNE:  No, thank you.

7   BY MS. RHODE:

8       **Q.**   I'm handing you what I've marked as

9   Exhibit 2.  Is that the resignation that you

10  submitted from your position at Shelbyville?       09:46

11      **A.**   It is.

12      **Q.**   Mr. Buckner, tell me the organizational

13  structure of Shelbyville when you were just at the

14  point of your resignation or during your tenure as

15  CEO, if it's different, in terms of to whom you    09:46

16  reported.

17      **A.**   Okay.  I reported to Neal Heatherley

18  directly.

19      **Q.**   I'm sorry?

20      **A.**   I was the CEO of the hospital.  I       09:47

21  reported to the vice president of operations.

22  There are several vice presidents of operations,

23  but the gentleman I reported to was Neal, N-E-A-L,

24  Heatherley.

25      **Q.**   What's the last name?  I'm sorry.       09:47

Stone & George Court Reporting
615.221.1089
Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 20 of 150   PageID #: 413

EXHIBIT A

1    **A.**   Heatherley, H-E-A-T-H-E-R-L-E-Y, I          09:47

2    think.

3    **Q.**   Okay.  And he was the vice president of

4    operations for whom?

5    **A.**   For CHS, Community Health Systems.          09:47

6    **Q.**   Okay.  And where was he located?

7    **A.**   He was located in Nashville, Tennessee.

8    **Q.**   Okay.

9    **A.**   He reported directly to the president of

10   operations, who was Marty Smith, Nashville.  And     09:47

11   Marty Smith reported directly to Wayne Smith, who

12   is the president and big gun of the company.

13   **Q.**   Okay.

14   **A.**   He has several titles.  I'm not sure

15   what they all are.                                   09:48

16   **Q.**   But you are the top administrator for

17   Heritage Medical Center?

18   **A.**   Correct.

19   **Q.**   Okay.  And is Heritage Medical Center --

20   or I'll call it HMC --                               09:48

21   **A.**   Okay.

22   **Q.**   -- is that a standalone corporation or

23   entity, if you know?

24   **A.**   It is.

25   **Q.**   Is --                                       09:48

**EXHIBIT A**

1      **A.**    It is actually Shelbyville Hospital          09:48

2    Corp., is the official title.

3      **Q.**    So it's a d/b/a?

4      **A.**    Right.

5      **Q.**    And is Shelbyville Hospital Corp., then,     09:48

6    one of the hospitals owned by CHS?

7      **A.**    Correct.

8      **Q.**    Was Tisha Rader employed all the time

9    that you were the CEO of Shelbyville?

10     **A.**    Not the whole time but for a period of        09:49

11   time she was.

12     **Q.**    Did you hire her?

13     **A.**    I did.

14     **Q.**    And could you tell me her position?

15     **A.**    She was hired in as the director of           09:49

16   employed physicians.  I don't know if that's the

17   exact title, but that was a title that defines her

18   responsibilities.

19     **Q.**    Okay.  Does director of physician

20   practice management sound right?                          09:49

21     **A.**    Sounds good.  Yeah, I'll take that.

22     **Q.**    Okay.  And can you tell me what her

23   duties were while she was employed as the director

24   of physician practice management.

25     **A.**    Her duties were to assist in the              09:49

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 22 of 150   PageID #: 415

EXHIBIT A

1  recruitment of physicians, to help in the          09:49

2  communication with physicians, and to oversee the

3  individual practices of our employed physicians.

4       **Q.**   Did she have any role in recruiting

5  doctors?                                            09:50

6       **A.**   Her role was to assist me in that

7  regard.

8       **Q.**   Okay.  Did she have any role in the

9  contracting process for a physician that you

10 recruited?                                          09:50

11      **A.**   She would have a double role there.  One

12 role would be working with me on those contracts

13 as well as being the go-between between our

14 recruiters and contract writers, et cetera, that

15 worked out of the corporate headquarters.          09:50

16      **Q.**   Contract writers?

17      **A.**   Writers.

18      **Q.**   Okay.  And when you say "contract

19 writers," what do you mean?

20      **A.**   That's the legal team that is expert in   09:50

21 handling contracts.

22      **Q.**   Okay.  And that's handled out of CHS

23 corporate?

24      **A.**   Correct.

25      **Q.**   Okay.  And although specific terms like   09:50

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 23 of 150   PageID #: 416

EXHIBIT A

1    salaries or maybe amounts of vacation or benefits    09:50

2    may be different from physician to physician, was

3    there during the time that you were CEO a standard

4    type of contract that CHS prepared for the

5    physicians that were hired for Shelbyville?    09:51

6        **A.**    There was a platform contract that you

7    would begin with --

8        **Q.**    Okay.

9        **A.**    -- but could be modified, sometimes

10    substantially, sometimes not so substantially,    09:51

11    depending on the circumstances and the doctor.

12        **Q.**    Okay.  Tell me how Dr. Richard Slusher

13    was recruited, your understanding of how he was

14    recruited to come to work for HMC.

15        **A.**    Okay.  We had an orthopod at the    09:51

16    hospital named Dr. Elizondo, an orthopaedic

17    surgeon, orthopod, who left our hospital under

18    immediate circumstances.

19        **Q.**    I'm sorry, immediate?

20        **A.**    Who left under immediate circumstances.    09:51

21        **Q.**    What does that mean?

22        **A.**    That means he was there one day and gone

23    the next.

24        **Q.**    Okay.  And without getting in minute

25    detail, can you kind of explain why he was there    09:51

EXHIBIT A

1    one day and gone the next?  By his choice or the          09:51

2    hospital's choice?

3         A.    By the hospital's choice.

4         Q.    Okay.  Fair enough.  And could you spell

5    Elizondo for the court reporter, please.                 09:52

6         A.    E-L-I-Z-O-N-D-O.

7         Q.    Okay.  Go ahead.  I'm sorry.  He was --

8         A.    So we contracted with a locums

9    company -- I believe it was Weatherby Locums -- to

10   fill those slots, as well as they contracted with        09:52

11   some local physicians -- local meaning Tullahoma,

12   which is 20 miles south of Shelbyville -- to help

13   us fill slots on an emergency nature while we

14   recruited for another orthopaedic surgeon.

15            In that period of time, we recruited,           09:52

16   over time, four or five people from Weatherby that

17   came in to do a month here or two weeks there or

18   whatnot.  One of those people that we recruited

19   from Weatherby was Dr. Slusher that you mentioned.

20            Dr. Slusher worked for us for three             09:52

21   months, 90 days, as a locums.  At a 90-day slot --

22   I think it's Medicare -- but at a 90-day slot,

23   Medicare stops paying for a locums.  So I went to

24   Dr. Slusher and asked him if he would work for us

25   on a bridge basis until we found a new person, as        09:53

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 25 of 150   PageID #:
418
EXHIBIT A

1   well as offered him the position -- or I guess I          09:53

2   didn't offer -- asked him if he would be

3   interested in taking the full-time position as an

4   orthopaedic surgeon at the hospital.

5       Q.   Okay.  Can I stop you for just a second?          09:53

6       A.   Yeah.

7       Q.   Could you explain the term "bridge

8   physician" for me.

9       A.   Okay.  A bridge physician would be a

10  physician --                                             09:53

11                 MR. LONERGAN:  Position, not

12  physician.

13                 MS. RHODE:  I'm sorry?

14                 MR. LONERGAN:  Bridge

15  position.                                                09:53

16  BY MS. RHODE:

17      Q.   I'm sorry.  A bridge position.

18      A.   Okay.

19                 MS. RHODE:  Thank you.

20                 THE WITNESS:  A bridge                    09:53

21  position would be a person that for a length of

22  time -- in this particular case, a physician -- in

23  this particular case would bridge a potential

24  length of time while I continued to recruit for a

25  full-time person.                                        09:53

1        They would say, "Yeah, I'll do the          09:53

2   part-time role until which time you find someone

3   that's going to be full time."  So they're

4   bridging a gap for me while I recruit.

5   BY MS. RHODE:                                     09:54

6       **Q.**   Okay.  So let me just follow up on

7   something you said.

8       **A.**   Okay.

9       **Q.**   You said a part-time role.

10      **A.**   Right.                                09:54

11      **Q.**   Was Dr. Slusher hired into a bridge

12  position as a part-time physician or just for a

13  short time period?

14      **A.**   He was hired in as a bridge -- well,

15  both of those are true -- as a bridge position for  09:54

16  a short time period.

17      **Q.**   Okay.  And how long was that period?

18      **A.**   His contract was a one-year contract.

19      **Q.**   So the bridge position he filled was for

20  one year?                                          09:54

21      **A.**   Right.  Which was the shortest term

22  that, I'm told by the legal eagles, I was allowed

23  to do with a physician.

24      **Q.**   Okay.  And how was Dr. Slusher's

25  position part-time?                                09:54

Stone & George Court Reporting
615.221.1089
Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 27 of 150   PageID #:
420

EXHIBIT A

1      **A.**   Part-time in that it was never meant to      09:54

2  go -- to be a community physician in Shelbyville,

3  Tennessee.

4      **Q.**   Okay.

5      **A.**   He was meant to fill a gap until we had      09:54

6  a real full-time position.

7      **Q.**   All right.  And here is the reason I

8  ask.

9      **A.**   Okay.

10      **Q.**   When you say part-time to me, I'm      09:54

11  thinking less than 40 hours a week --

12      **A.**   Okay.

13      **Q.**   -- less than a full-time on a weekly

14  basis.  You're talking --

15      **A.**   No.  On a weekly basis, he was full      09:55

16  time.

17      **Q.**   Okay.  Got it.  But just for a one-year

18  term period.

19      **A.**   One year or less, right.

20      **Q.**   Okay.  Go ahead.  I'm sorry.  You were      09:55

21  talking about how he was recruited.

22      **A.**   Right.  So I asked him if he would come

23  in on a full-time basis.  He had a family in

24  Pinehurst, Tennessee.  Or maybe it was Southern

25  Pine, something relative to Pinehurst.      09:55

EXHIBIT A

1        MR. LONERGAN:  Not Tennessee.        09:55

2   Excuse me.  North Carolina.

3               THE WITNESS:  All right.

4   Thank you.  North Carolina.  Yeah.

5               MR. LONERGAN:  If Pinehurst        09:55

6   was in Tennessee, I would be --

7               THE WITNESS:  You would be on

8   a golf course right now.  Yeah.

9               MS. RHODE:  And I would not.

10              MR. LONERGAN:  Sorry to        09:55

11  interrupt.

12              MS. RHODE:  No.  Feel free.

13              THE WITNESS:  He had a wife

14  and family there in the Pinehurst area, as well as

15  had a job opportunity with a local orthopod, whose        09:55

16  name I don't recall, that had made him some kind

17  of practice offer.  Whether it was official or

18  not, I don't know.  And his intentions were to go

19  back to his wife and family, live in Pinehurst,

20  and start a practice up with that particular        09:55

21  doctor.  So he was not interested in taking up my

22  offer on a full-time position.  He was --

23  BY MS. RHODE:

24      **Q.**  Let me --

25      **A.**  Okay.        09:56

EXHIBIT A

1    Q.   Sorry for the interruption.  But when      09:56

2    you said he wasn't interested in taking up your

3    offer of a full-time position, this was a

4    discussion you were having with him at the

5    beginning of his interactions with HMC?        09:56

6    A.   At the beginning of his interactions

7    post-locums --

8    Q.   Okay.

9    A.   -- when we were moving him up to the new

10   position.                                      09:56

11   Q.   Okay.  Before the -- when you were

12   getting ready to have the one-year contract --

13   A.   Right.

14   Q.   -- you talked to him.  And that was

15   probably in the early part of 2011?            09:56

16   A.   Yes.

17   Q.   Okay.

18   A.   In addition to that I, I mean -- I'll

19   jump ahead in my story a little bit -- but I --

20   Q.   Okay.                                      09:56

21   A.   -- I asked Slusher, Dr. Slusher, a

22   number of times while I was in the recruitment

23   process, "Are you sure you're not interested?"

24   Because the community and the other physicians on

25   staff liked him.  He was a good doctor.  And it's  09:56

EXHIBIT A

1   easier to recruit somebody that's in your hand          09:56

2   than it is somebody you don't know, right?

3       **Q.**   Let me -- was there ever anything

4   problematic about Dr. Slusher's performance as an

5   orthopaedic surgeon from your perspective as CEO        09:57

6   at HMC during the time he worked for you?

7       **A.**   Clinically, he was a perfectionist and a

8   very good surgeon.

9       **Q.**   Okay.  So we can eliminate any issues

10  about clinically, were there any other performance      09:57

11  or behavioral problems that you had with

12  Dr. Slusher during the period of time that he

13  worked for HMC?

14      **A.**   Dr. Slusher has a very gregarious

15  personality and is very loud, and so there were a       09:57

16  few times that I -- I use the word "coached"

17  lightly -- but talked to him about those issues.

18  Which he was very -- he knew that about himself so

19  those weren't -- on a scale of 1 to 10, those

20  were, like, five issues, right?  There was an           09:58

21  issue where his staff had complained of hostile

22  work environment through -- I believe that came

23  through Tisha to me.

24          I went to investigate that by talking

25  with each member, each staff member in his office.      09:58

EXHIBIT A

1    They denied that they had said that to Tisha.  And          09:58

2    I went to Dr. Slusher to make him aware that I had

3    investigated.  There had been a complaint

4    supposedly.  I had investigated it.  There was

5    nothing to it from what I could tell.  He told me          09:58

6    that -- and this is close to a quote.  He said,

7    "All I told them last Friday was, 'You bitches

8    have a nice weekend.'"

9         I explained to him that calling the

10   staff "bitches" was inappropriate.  It shouldn't          09:58

11   happen again.  He was very frustrated that he

12   couldn't be on a friendly basis with the staff and

13   use, you know -- he thought words like that were

14   more of "We're buddies.  See you on Monday."

15        But nonetheless, he -- I never had any          09:59

16   issues since then with him, and he never used that

17   language, and I never counted that as any hostile

18   work environment.  That was just a mistake that a

19   physician used when he was talking to his staff

20   one time.          09:59

21       Q.   Any other circumstances that led you to

22   investigate the behavior of Dr. Slusher while he

23   was employed by HMC?

24       A.   I don't think so.

25       Q.   You were talking about recruiting.          09:59

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 32 of 150   PageID #:
425
EXHIBIT A

| | | |
|---|---|---|
| 1 | **A.**   Okay. | 09:59 |
| 2 | **Q.**   Go back to you had had discussions with | |
| 3 | him.  Now, get me to the point -- you get an | |
| 4 | agreement for him to come to accept a bridge | |
| 5 | position; is that correct? | 09:59 |
| 6 | **A.**   Right. | |
| 7 | **Q.**   Okay.  Tell me, was it just a discussion | |
| 8 | between you and he, or were there other people | |
| 9 | involved when you came to an agreement in | |
| 10 | principle to have him accept a bridge position at | 09:59 |
| 11 | HMC? | |
| 12 | **A.**   There would be a number of people | |
| 13 | involved.  The main negotiations would be between | |
| 14 | he and I. | |
| 15 | **Q.**   Okay. | 10:00 |
| 16 | **A.**   But Tisha would be involved mainly as a | |
| 17 | helpful memory component to me.  I have an up-line | |
| 18 | that I would go through on issues like that.  Ed | |
| 19 | Corn -- it's either Corn or Corns with an "S."  I | |
| 20 | don't recall. | 10:00 |
| 21 |                    THE WITNESS:  Do you know? | |
| 22 |                    MR. THORNE:  It's Corn. | |
| 23 |                    THE WITNESS:  Okay.  Sorry. | |
| 24 |                    MS. RHODE:  It's all right. | |
| 25 | Your lawyer is going to smack you. | 10:00 |

EXHIBIT A

1    MR. LONERGAN: You can't get                10:00

2  outside help.  Sorry about that.

3              MS. RHODE:  You can't ask him.

4              THE WITNESS:  Sorry about

5  that.  My apologies.                          10:00

6              MR. LONERGAN:  It's not a

7  major issue for that question, but you have to go

8  on your memory the best you can.

9              MS. RHODE:  Yeah.  And if you

10  don't recall something that's perfectly fine.   10:00

11              THE WITNESS:  Okay.

12              MS. RHODE:  Okay.

13  BY MS. RHODE:

14     Q.   But you --

15     A.   Ed Corn is the director of physician   10:00

16  relations at the corporate office.  And he would

17  be involved in approving and assisting with any

18  negotiations with a physician for a contract.

19     Q.   Do you recall any specific involvement

20  that Mr. Corn had in the negotiation with        10:00

21  Dr. Slusher?

22     A.   I suspect he probably would have had to

23  sign off on a final contract at a minimum.

24     Q.   Okay.  Let me change this.  Who, to the

25  best of your recollection, had any actual verbal  10:01

1   discussions with Dr. Slusher, face to face or on   10:01

2   the phone?

3      **A.**   All right.  Myself, Tisha Rader, Sarah

4   Smith --

5      **Q.**   And who is Ms. Smith?   10:01

6      **A.**   Sarah Smith is a physician recruiter

7   that works for the corporate office.

8      **Q.**   Okay.  And what role did she have, if

9   you know?

10      **A.**   She assists in the recruitment of any   10:01

11   physician that was going to be coming to my

12   hospital.  She was my regions recruiter with the

13   company.

14      **Q.**   Okay.  Anyone else?

15      **A.**   Those would have been the three   10:01

16   people -- my CFO.

17      **Q.**   Who is that?

18      **A.**   I don't know who it was at the time.

19      **Q.**   Okay.

20      **A.**   But they may have had a discussion with   10:01

21   him.  But it would mainly be those three people.

22      **Q.**   Okay.  Tell me the process -- would you

23   agree with me that you were probably the primary

24   negotiator with Dr. Slusher?

25      **A.**   Yes.   10:01

EXHIBIT A

1    Q.   And tell me just generally the kind of          10:01

2   discussion you had about salary and benefits.

3    A.   I don't recollect anything specifically

4   about that being on -- "Here is the salary we're

5   going to pay you."  And I don't remember what it       10:02

6   was.

7    Q.   Okay.  But was it, "Here is what we're

8   going to pay you," or "This is what we're thinking

9   about paying you"?  Was there any kind of going

10  back and forth about the particular number, or did     10:02

11  you make an offer and he just accept?

12   A.   Oh, I don't recall.  I know that we

13  landed on a number.  Typically, it's a back-and-

14  forth process.

15   Q.   Okay.  What about any other benefits?        10:02

16  Did you negotiate that specifically, or is that

17  pretty well just set out?

18   A.   That is pretty much defined.  We may

19  have negotiated the length of vacation, but the

20  benefits, as far as health benefits and sick pay       10:02

21  and stuff like that, would be the normal employee

22  benefits.

23   Q.   Did HMC have a set of employee policies

24  set out in a handbook?

25   A.   Correct.                                     10:02

EXHIBIT A

1    Q.   And was that handbook part of the          10:03

2    contract -- incorporated into the contract, as you

3    understand it, for Dr. Slusher?

4    A.   Well, as an employee of the hospital, he

5    certainly would have had to go through that          10:03

6    process.

7    Q.   When you say "go through that process,"

8    what do you mean?

9    A.   New employee training.

10   Q.   Okay.  But the -- for example, the          10:03

11   hospital has leave policies, correct?

12   A.   Correct.

13   Q.   And so would the hospital's leave

14   policies, would those have applied to Dr. Slusher?

15   A.   Yes.                                         10:03

16        (Whereupon, Exhibit Number 3 was

17   marked for identification.)

18   BY MS. RHODE:

19   Q.   I'm going to hand you what I've marked

20   as Exhibit 3.  Is that the -- again, take whatever    10:03

21   time you would like.  Is that the contract that

22   you negotiated with Dr. Slusher for his employment

23   at HMC?

24   A.   It appears to be.

25   Q.   Is that your signature on page 1 of          10:04

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 37 of 150   PageID #: 430

EXHIBIT A

1    Exhibit 3?                                            10:04

2         **A.**   It is.

3         **Q.**   And you signed this on February 2nd,

4    2011, correct?

5         **A.**   I did.                                  10:04

6         **Q.**   And this contract began February 2nd,

7    2011, is that correct, when it says "date of

8    agreement"?

9         **A.**   It says on or before February 28th.

10        **Q.**   Okay.                                   10:04

11        **A.**   And my recollection is that it was

12   February 28th when he actually started, but I'm

13   not sure.

14        **Q.**   Okay.  And that's fine.  And so the

15   one-year -- and this was a one-year term?           10:04

16        **A.**   Correct.

17        **Q.**   And so it would have gone until

18   February 28th of 2012, if you're correct about his

19   start date.

20        **A.**   That's right.                          10:04

21        **Q.**   Okay.  So let me ask you some things

22   about this contract.  Was there some -- there was

23   some going back and forth between you and

24   Dr. Slusher when this contract was -- before this

25   contract was finally signed, correct?              10:04

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 38 of 150   PageID #: 431

EXHIBIT A

1    **A.**   I can only assume there was.          10:05

2    **Q.**   Okay.  And you signed on behalf of HMC?

3    **A.**   I did.

4    **Q.**   And that was -- and you had the

5    authority to do that because you were the CEO?    10:05

6    **A.**   Correct.  Now, there are two

7    corporations here.

8    **Q.**   Okay.

9    **A.**   There's the Shelbyville Hospital Corp.,

10   and there's a Shelbyville Clinic Corp.            10:05

11   **Q.**   Okay.  So tell me the difference.

12   **A.**   The Shelbyville Clinic Corp, I am also

13   the president -- or I was also the president of,

14   and had the authority to sign on their behalf.

15   **Q.**   Well, what was the Shelbyville Clinic     10:05

16   Corp. versus the Shelbyville Hospital?

17   **A.**   Shelbyville Clinic Corp. was the

18   corporation that employed physicians.  Shelbyville

19   Hospital Corporation ran a hospital and employed

20   everybody else related to hospitals.             10:05

21   **Q.**   Okay.  So what's the relationship

22   between Shelbyville Hospital Corporation and

23   Shelbyville Clinic Corp.?

24   **A.**   The relationship is a dotted line, as

25   far as relationships go.  We both work together    10:05

EXHIBIT A

1    and hold hands. I'm the CEO of one and president   10:06

2    of the other. And doctors that are recruited

3    through the hospital that land over in the clinic

4    corp. are there to mutually benefit the community

5    and the hospital.   10:06

6    Q.  So while you're holding hands, the same

7    employee policies, such as the leave policies,

8    apply to the doctors and everybody else in either

9    corporation?

10    A.  That's correct.   10:06

11    Q.  Okay. Now, if you'll look at the next

12    page, on page 2, it says "Standard Terms and

13    Conditions." This is kind of the one we were

14    talking about, the corporate attorneys. And I

15    don't want -- I'm not asking you about any   10:06

16    specific discussions, but they sort of have a

17    template that they'll start preparing, a contract.

18    Is that how you understand it?

19    A.  Sure.

20    Q.  And so how many physician employee   10:06

21    agreements, roughly, do you think that you

22    negotiated during your period as CEO at HMC?

23    A.  Oh, I would say 50 to 70.

24    Q.  Okay. And would you agree with me that

25    most of those physician employment agreements look   10:07

EXHIBIT A

1    somewhat similar to the one that is Exhibit 3, in        10:07

2    terms of being a standard -- same basic format?

3        A.    No, but yes.  If I can explain that.

4        Q.    Sure.

5        A.    The templates changed throughout time,           10:07

6    right?

7        Q.    Yes.

8        A.    So at one year it might be one template;

9    the next year it might have changed a little bit,

10   or maybe it changed a lot.                                10:07

11       Q.    Okay.

12       A.    But in general, the fact that we used a

13   template appears to be the same.

14       Q.    And to the best of your recollection,

15   the physician employee agreements that you helped         10:07

16   negotiate would set out the basic term of the

17   contract?

18       A.    Right.

19       Q.    And then the representations and

20   warranties of the physician?                              10:08

21       A.    It would be in there somewhere on each

22   one, right.

23       Q.    And some section that would deal with

24   the duties of the physician?

25       A.    Correct.                                        10:08

EXHIBIT A

1    Q.   And if he or she was going to have                10:08

2  office space and support staff, there would be a

3  section dealing with that?

4    A.   Uh-huh.  Yes.

5    Q.   And do you recall whether in other              10:08

6  physician employment agreements it was the

7  responsibility of the hospital, or the employer,

8  rather, to schedule the physicians' patients?

9    A.   If they were an employed position, it

10 would be the responsibility of the Clinic Corp. to    10:08

11 schedule the patients.

12   Q.   And Dr. Slusher was a corporate

13 employee?

14   A.   He was.

15   Q.   So the corporation -- the clinic or the       10:08

16 corporation would schedule his patients.

17   A.   Right.

18   Q.   And that was true before he was deployed

19 and after he was deployed?

20   A.   Yes.                                            10:09

21   Q.   Do you know if any patients were

22 scheduled for surgeries for Dr. Slusher after he

23 came back from deployment in late February -- I'm

24 sorry -- in late October of 2011?

25   A.   Did he...                                       10:09

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 42 of 150   PageID #:
435

EXHIBIT A

1    **Q.**   Were any patients scheduled to have          10:09

2    surgery --

3    **A.**   You mean on day one, when he came back?

4    **Q.**   No.

5    **A.**   Okay.                                         10:09

6    **Q.**   Would you agree with me that when

7    Dr. Slusher came back from being deployed in

8    Iraq --

9    **A.**   Right.

10   **Q.**   -- in October of 2011, he was there for       10:09

11   less than a month, correct?

12   **A.**   There at the hospital.

13   **Q.**   Yes, as an employed physician of the

14   hospital or the corporation.

15   **A.**   When he came back from Iraq the first         10:09

16   time?

17   **Q.**   The second time.

18   **A.**   The second time.

19   **Q.**   The last time.

20   **A.**   The last time.  Yes.  He was -- oh, he         10:09

21   was there for less than a month after his return

22   from Iraq.

23   **Q.**   Okay.  And do you know if the hospital

24   scheduled any patients for him to perform surgery

25   on?                                                    10:10

EXHIBIT A

1    **A.**   During that time period?                          10:10

2    **Q.**   During that time period?

3    **A.**   I don't know, but I certainly -- I don't

4    know how they got scheduled, but yes, I'm aware

5    that he performed surgeries and they wouldn't be      10:10

6    done unless they were scheduled.

7    **Q.**   And who would know what surgeries, if

8    any, were performed -- scheduled for and performed

9    by Dr. Slusher in October of 2011, after he

10   returned from Iraq, the second time?                  10:10

11   **A.**   The hospital would have to pull those

12   records.

13   **Q.**   Is there a person or a physician that

14   you could direct me to who could pull that record,

15   those kinds of records?                               10:10

16   **A.**   When I was CEO there, I would have

17   directed you toward the operating room director.

18   I am unsure of how that procedure works now.

19   **Q.**   Now, if you'll turn to page 6 of

20   Exhibit 3, please, sir.                               10:11

21   **A.**   Okay.

22   **Q.**   In Compensation and Benefits --

23   **A.**   Okay.

24   **Q.**   -- look at that page along with the

25   cover sheet of Exhibit 3.  Dr. Slusher had a base     10:11

EXHIBIT A

1    salary of $450,000 a year; is that right?          10:11

2       **A.**    That's correct.

3       **Q.**    He also had the ability to earn

4    additional coverage -- additional compensation,

5    and those specific details are set out on the      10:11

6    front page of Exhibit 3 under Additional

7    Compensation, correct?

8       **A.**    Yes.

9       **Q.**    So for each day of clinic coverage and

10   emergency department call provided Monday through   10:11

11   Friday, the physician shall receive a flat rate of

12   $2,000 a day?

13      **A.**    Correct.

14      **Q.**    And for ED or the emergency department

15   call coverage provided on a Saturday or Sunday      10:12

16   beginning at 7:00 a.m. and ending at 7:00 a.m. the

17   following day, that being defined as a shift, he

18   got a flat rate of $1,000 per shift, correct?

19      **A.**    Correct.

20      **Q.**    And that same language or similar       10:12

21   language setting out the basis for his additional

22   compensation is contained in paragraph 8.1(b); is

23   that right?

24      **A.**    It appears to be the same.

25      **Q.**    And in 8.2, the contract provides that  10:12

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 45 of 150   PageID #: 438

EXHIBIT A

1    the physician shall receive employee benefits in          10:12

2    accordance with the applicable employer policies

3    and benefits program and as listed in the

4    Attachment A?

5         **A.**   Exhibit A?                                  10:12

6         **Q.**   Exhibit A, I'm sorry.

7         **A.**   I don't think Exhibit A is here, but

8    I -- so I can't verify that for sure, but -- wait

9    a minute.  It might be here.  I see it.

10        **Q.**   It's on page 12.                             10:13

11        **A.**   Yeah.

12        **Q.**   Is that correct?

13        **A.**   It is correct.

14        **Q.**   Now if you'll turn to page 8 of

15   Exhibit 3.                                                10:13

16        **A.**   Okay.

17        **Q.**   You negotiated with Dr. Slusher in terms

18   of paragraph 10.4 that either he or the hospital

19   could give 90 days' notice and then this contract

20   would end.                                                10:13

21        **A.**   Correct.

22        **Q.**   And that could be with or without cause?

23        **A.**   Correct.

24             (Whereupon, Exhibit Number 4 was

25   marked for identification.)                               10:13

Stone & George Court Reporting
615.221.1089
Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 46 of 150   PageID #: 439

EXHIBIT A

1    BY MS. RHODE:                                          10:14

2       **Q.**   I'm going to hand you what's been marked

3    as Exhibit 4.

4       **A.**   Okay.

5       **Q.**   Are you familiar with Exhibit 4,           10:14

6    Mr. Buckner?

7       **A.**   I am.

8       **Q.**   And that is --

9                MR. LONERGAN:  Can we verify

10   for the record we're talking about a few pages         10:14

11   from --

12               MS. RHODE:  I'm sorry.

13               MR. LONERGAN:  Okay.

14               MS. RHODE:  Yes.

15   BY MS. RHODE:                                           10:14

16      **Q.**   I am talking about a few pages.  The

17   cover page of Exhibit 4 says Heritage Medical

18   Center Employee Handbook.  And the next pages,

19   which are numbered 35 through 38, are just the

20   section on Employee Leaves.                             10:15

21      **A.**   That appears to be true.

22      **Q.**   And to the best of your knowledge,

23   Mr. Buckner, is that the leave policy -- from the

24   Heritage Medical Center Employee Handbook, were

25   those the leave policies in place during the           10:15

EXHIBIT A

1  period that Dr. Slusher was employed with HMC?          10:15

2      A.   Knowing that our handbook changes from

3  time to time, it certainly appears to be what a

4  leave policy could have been.  I just can't

5  guarantee it.                                           10:16

6      Q.   Okay.  And during the entire period of

7  time that you were employed as the CEO of HMC,

8  there was a policy concerning military leave, was

9  there not?

10     A.   To my knowledge, yes.                          10:16

11     Q.   And were you aware, during the entire

12  period of time that you were employed as the CEO

13  of HMC, that federal law provided for certain

14  rights to individuals who had to give military

15  service during their employment with the hospital?  10:16

16     A.   Yes.

17     Q.   In fact, did you have a discussion with

18  Dr. Slusher before you finalized the contract with

19  him about his military service and possible

20  deployment?                                            10:16

21     A.   I did.  He made me aware there could be

22  a possibility.  I was -- I always have been and

23  still am happy to hire military people.

24     Q.   Okay.

25     A.   So although I wouldn't -- hoped it             10:17

EXHIBIT A

1    wouldn't happen for the hospital's sake, knew that          10:17

2    it could.

3        Q.   And how many times was Dr. Slusher

4    deployed during his employment with HMC?

5        A.   Oh, I think just the one time.                     10:17

6        Q.   I think you said the first time he came

7    back from Iraq or the second time he came back

8    from Iraq --

9        A.   Well, the first time he came back from

10   Iraq -- he was in Iraq before he became a locums          10:17

11   with us --

12       Q.   Okay.

13       A.   -- and told those stories since I was

14   aware of that.

15       Q.   Got it.                                           10:17

16       A.   And then went back again.

17       Q.   And how did you learn that Dr. Slusher

18   was being deployed back to what turned out to be

19   Iraq during his employment with HMC?

20       A.   He received notice from the army and            10:17

21   brought that to my attention relatively quickly

22   after he received notice.

23       Q.   Do you remember approximately how much

24   notice he gave you?

25       A.   Oh, a month and a half, maybe.  Does            10:18

EXHIBIT A

1    that sound reasonable?                              10:18

2        **Q.**   It does to me.

3        **A.**   It does to me.

4                    MR. LONERGAN:  Give your best

5    estimate.                                           10:18

6    BY MS. RHODE:

7        **Q.**   Yes.

8        **A.**   My best estimate is a month and a half.

9        **Q.**   Okay.  And as you said, that was

10   reasonable notice to you of his deployment?         10:18

11       **A.**   Right.

12       **Q.**   Did he indicate to you at the time he

13   gave you notice of his -- having notice of

14   impending deployment, did he indicate to you how

15   long he would be deployed or how long he thought    10:18

16   he would be deployed?

17       **A.**   He anticipated 90 days.

18       **Q.**   And how was his position covered during

19   the period of his deployment?

20       **A.**   While he was deployed, we covered his    10:18

21   positions through locum tenens including

22   physicians from the Tullahoma community that we

23   brought in to assist with call, et cetera, as well

24   as -- it was during that time period that we hired

25   a physician, an orthopaedic physician named Emmett   10:19

EXHIBIT A

1    Mosley.                                              10:19

2        Q.   At that point in time, were you also

3    attempting to recruit Dr. Mosley for a full-time

4    position with HMC?

5        A.   We had been working to recruit            10:19

6    Dr. Mosley -- we had been working to recruit an

7    orthopod ever since I started losing locum tenens

8    in the first place.  Right?  The first memorable

9    contact with Dr. Mosley was early April, I

10   believe, of 2011.  So yes, before Dr. Slusher left   10:19

11   for deployment, we were in touch with Dr. Mosley.

12   And Dr. Slusher was aware of that.

13       Q.   Okay.  Were you attempting to recruit

14   Dr. Mosley before you got notice that Dr. Slusher

15   was going to be deployed?                           10:20

16       A.   We were attempting to recruit a

17   physician.  And I think Dr. Mosley was in the

18   pipeline, one of the people in the pipeline, I

19   assume.

20       Q.   And who specifically was attempting --     10:20

21   the front line -- attempting to recruit

22   Dr. Mosley?  Would that have been Ms. Rader?

23       A.   It would have been a combination of

24   myself, Ms. Rader and Sarah Smith.

25       Q.   Okay.  Do you recall if you personally     10:20

EXHIBIT A

1    had any discussions with Dr. Mosley before you          10:20

2    received notice from Dr. Slusher that he was going

3    to be deployed?

4        A.   I suspect that I did.

5        Q.   Do you have a specific recollection            10:20

6    about whether that occurred?

7        A.   I have a recollection of a phone call

8    that Dr. Mosley made to me on April the 7th.

9        Q.   Okay.  Why does that date stick out in

10   your mind?                                              10:21

11       A.   In reading through notes on my

12   recruitment -- recruitment notes I have.

13       Q.   Okay.  Which leads me to another

14   question, totally different.  What, if anything,

15   did you do, Mr. Buckner, to prepare for your            10:21

16   deposition today other than speak with your

17   attorney?  And I'm not asking you about that.

18       A.   Okay.  Went through in my head to

19   prepare a mental timeline of what happened when so

20   that I could recall dates more easily.  My             10:21

21   attorney did give me a package on how to be a good

22   witness or something like that that I read

23   through.  And I've spoken with counsel for advice

24   on the issue a number of times.

25       Q.   Okay.  Yeah.  And that's fine.  I don't        10:21

EXHIBIT A

1    want --                                                          10:21

2        A.    Right.

3        Q.    I'm not getting into any of that.

4        A.    Okay.

5        Q.    Did you review any particular documents?                10:21

6        A.    Yes.  I had a package of documents that

7    were prepared, both of which -- some of which I'm

8    looking at now with you.

9        Q.    Okay.  Any other specific documents you

10   recall having looked at?                                          10:22

11       A.    I recall looking at his contract.

12       Q.    Dr. Slusher's contract?

13       A.    Right.  As well as looking at his

14   termination notice, as well as looking at his

15   records from the Army indicating when he was            10:22

16   leaving and when he was coming back, things like

17   that.

18       Q.    Anything else?

19       A.    Letters from you -- or from his attorney

20   at the time.                                                      10:22

21       Q.    My partner, Martine Jackson?

22       A.    Yeah, that's it.

23       Q.    Okay.

24       A.    That's what I recollect.

25       Q.    Okay.  And you said in your mind you           10:22

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 53 of 150   PageID #:
446

EXHIBIT A

1   prepared -- you were figuring out a timeline.                    10:22

2   Tell me that timeline that you --

3       A.   I wanted to get in my own head how the

4   process was all the way from when Dr. Elizondo

5   left immediately, through the locums period,                     10:22

6   through the Slusher period, through the Mosley

7   period.

8       Q.   Okay.  So recount that specifically.

9   Take me from the very beginning to the termination

10  of the contract with Dr. Slusher, as you prepared              10:22

11  this timeline in your head.

12      A.   All right.  Okay.  Well, I didn't

13  prepare it that well.  But we'll see --

14      Q.   As best you recall.

15      A.   Dr. Mosley -- excuse me -- Dr. Elizondo              10:23

16  abruptly had to leave the hospital in July of

17  2010.  It was at that point that I called

18  Weatherby.  And I'm sure I called other locums

19  agencies as well, but began an immediate search to

20  find locum tenens coverage for the hospital for               10:23

21  orthopaedic surgery.

22          I went through that process until at

23  some point during that locums period Dr. Slusher

24  came as a locums.  And then it was February 28th

25  that Dr. Slusher signed the contract -- either                 10:23

EXHIBIT A

1   signed or started on that date.  I don't recall.       10:23

2       Then it was April 7th that I got the

3   phone call from Mosley.  That was one record of

4   our discussions.  October 26, Slusher's -- no, no,

5   no.  What was Slusher's last day -- March, April,    10:24

6   May -- June 6th or something, I think, was his

7   last day.

8       Q.   Before deployment?

9       A.   Before deployment.  And then he came

10  back on October 26th.  Dr. Mosley started about a    10:24

11  month, month and a half before that.  I think

12  sometime in late August, early September.  So I

13  think that's the whole timeline.

14      Q.   And what was the call on April 7th of

15  2011 from Dr. Mosley?                                10:24

16      A.   That was a record -- a call that was on

17  the record as Dr. Mosley just calling me to have a

18  direct contact with the CEO at the hospital to

19  talk about recruitment.

20      There's two ways of -- well, nevermind.        10:25

21  Go ahead.

22      Q.   No.  Go ahead.  There were two ways

23  of...

24      A.   There's two ways doctors typically got

25  the CEO's attention.  One would be direct.  The     10:25

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 55 of 150   PageID #: 448

EXHIBIT A

1     other one would be through Sarah Smith or the        10:25

2     recruitment team at the corporate office.

3           Dr. Mosley had been on the corporate

4     radar for a number of years, as he had called CHS

5     on a number of occasions interested in various      10:25

6     opportunities.  So this note was just saying that

7     the baton had been passed, basically, from the

8     corporate office to the hospital.

9        Q.   Ideally, how many orthopaedic surgeons

10    did you hope to hire at HMC?                          10:25

11       A.   One.

12           (Whereupon, Exhibit Number 5 was

13    marked for identification.)

14    BY MS. RHODE:

15       Q.   I'm going to hand you what I have marked      10:26

16    as Exhibit 5.

17               MS. RHODE:  Off the record for

18    a second.

19           (Whereupon, a discussion off the

20    record occurred.)                                    10:26

21    BY MS. RHODE:

22       Q.   Mr. Buckner, I should have said if at

23    any point you need to take a break, just let me

24    know and we'll --

25       A.   We're going to do that after this            10:27

EXHIBIT A

1    exhibit.                                              10:27

2       **Q.**   Okay.  Fair enough.

3              MS. RHODE:  Would you want to

4    take it before we do this?

5              THE WITNESS:  Yeah, let's do          10:27

6    it.

7              MS. RHODE:  Okay.

8           (Recess observed.)

9              MS. RHODE:  Back on the

10   record.                                            10:34

11   BY MS. RHODE:

12      **Q.**   Mr. Buckner, you said you wanted to

13   correct something.

14      **A.**   I simply remembered, when I took the

15   break there, that I had been deposed before a long    10:34

16   time ago on a phone deposition.  And you had asked

17   me that earlier and I said no.

18      **Q.**   Okay.

19      **A.**   So big deal.

20      **Q.**   That's fine.  Thank you.  No problem.    10:35

21   Thank you.

22              I'm going to hand you what has been -- I

23   think you have Exhibit 5?

24      **A.**   I do.

25      **Q.**   And can you tell me if this appears to    10:35

Stone & George Court Reporting
615.221.1089
Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 57 of 150   PageID #: 450

EXHIBIT A

1    be the policy on military leave that was in effect    10:35

2    at HMC while you were the CEO?

3        **A.**    It does appear to be.

4        **Q.**    Okay.  This is a five-page document,

5    correct?    10:35

6        **A.**    It is.

7        **Q.**    Is this a CHS document, or is this

8    unique to HMC, or something else, if you know?

9        **A.**    I couldn't tell you.

10        **Q.**    But you can tell me that it is actually    10:35

11    the policy, military leave policy, that was in

12    place during the period of time that Dr. Slusher

13    was employed by HMC.

14        **A.**    I can tell you that it appears to be so.

15        **Q.**    And if it is in fact the policy, it took    10:36

16    effect -- it was effective since July 15th of

17    2007, according to the approval format at the

18    bottom of the page.

19        **A.**    Correct.

20        **Q.**    And is that the same kind of format that    10:36

21    generally was used by HMC?

22        **A.**    It would be.

23        **Q.**    I'm going to hand you what I've marked

24    as Exhibit 6 and ask you if that is --

25                    MR. LONERGAN:  I've got that    10:36

Stone & George Court Reporting
615.221.1089
Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 58 of 150   PageID #:
451

EXHIBIT A

1    at the back of Exhibit 5.                                    10:36

2                    MS. RHODE:  Is it on the back?

3    Okay.

4                    MR. LONERGAN:  I think it is.

5                    THE WITNESS:  Appears to be          10:37

6    the same.

7                    MS. RHODE:  Well, give that

8    one back to me and we'll not make this one an

9    exhibit.

10                   Off the record.                       10:37

11                   (Whereupon, a discussion off the

12   record occurred.)

13   BY MS. RHODE:

14      Q.   So on page 5 of Exhibit 5, that is the

15   table of benefits for individuals on military       10:37

16   leave of absence that was in effect during the

17   time that Dr. Slusher was employed by HMC?

18      A.   It appears to be.

19                   (Whereupon, Exhibit Number 6 was

20   marked for identification.)                          10:37

21   BY MS. RHODE:

22      Q.   I'm going to hand you what I've marked

23   as Exhibit 6 and ask you if Dr. Slusher provided

24   you with a copy of the orders that he received

25   dated April 20th, 2011, that's marked as            10:38

1    Exhibit 6.                                              10:38

2        **A.**   Yes.

3        **Q.**   Is that part of what -- when you were

4    saying he gave you notice that he was being --

5    that he was going to be deployed?  Is that part of    10:38

6    the notice you're referring to?

7        **A.**   May well have -- yes, this is the notice

8    I was referring to.

9        **Q.**   Okay.  Did Dr. Slusher also give you

10   written notice when he was going to be released       10:38

11   from his deployment to return to work?

12       **A.**   He did.

13            (Whereupon, Exhibit Number 7 was

14   marked for identification.)

15   BY MS. RHODE:                                          10:39

16       **Q.**   I'm going to hand you what I've marked

17   as Exhibit 7 and ask you if that's one of the

18   documents that you received from Dr. -- if that is

19   a document you received from Dr. Slusher

20   indicating he was going to be released from his       10:39

21   military service on September 23rd, 2011, or

22   thereabouts.

23       **A.**   I don't recall the specific document,

24   but this appears to be something that sure might

25   have been given to me.  I do remember I received a    10:39

Stone & George Court Reporting
615.221.1089
Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 60 of 150   PageID #:
453

EXHIBIT A

1   document.                                            10:39

2       Q.   Okay.  Is there any question in your

3   mind that you got timely notice of his intent to

4   return to HMC after he had been -- completed his

5   deployment?                                          10:39

6       A.   No.

7            (Whereupon, Exhibit Number 8 was

8   marked for identification.)

9   BY MS. RHODE:

10      Q.   I'm going to hand you what is marked      10:40

11  Exhibit 8 and ask you if you can tell me what this

12  document is.

13      A.   This is an agreement with Dr. Slusher

14  to --

15      Q.   And when you -- go ahead.  I'm sorry.     10:40

16      A.   -- to terminate his employment

17  agreement --

18      Q.   And is that --

19      A.   -- effective October 26, 2011.  It's

20  basically a 90-day notice.                           10:40

21      Q.   Is that your signature on Exhibit 8?

22      A.   It is.

23      Q.   Can you tell me how Exhibit 8 -- how the

24  preparation of Exhibit 8 came about?

25      A.   Sure.  Beginning with my -- one of my     10:41

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 61 of 150   PageID #:
454

EXHIBIT A

1    first conversations with Dr. Slusher, he was aware          10:41

2    that we were attempting to recruit a full-time

3    physician into the Shelbyville community, in the

4    hospital.  As I told you before, he was even asked

5    several times if he would be that full-time          10:41

6    physician.  "Full-time" not meaning 40 hours a

7    week, but meaning a long period of time.

8         **Q.**    A permanent position?

9         **A.**    Right.

10        **Q.**    Okay.          10:41

11        **A.**    And he declined.  He wasn't interested

12   in that opportunity.  So we continued to run our

13   search to find somebody.  Our community is a small

14   community and can support only one orthopaedic

15   surgeon.          10:41

16             So when we did locate and had signed

17   Dr. Mosley to be our full-time orthopaedic

18   surgeon, that search going on the whole time I

19   knew Dr. Slusher.  And he was well aware of it.

20   He was also well aware of it while he was on          10:42

21   leave, that we were looking for someone to take

22   over full time.

23             It's, in fact, why we put the year-long

24   contract together with a 90-day, no-fault out

25   clause, because there very likely and very          10:42

1    hopefully would be a need to end the contract          10:42

2    earlier.  It was okay with him because he always

3    wanted to get back to his roots in Pinehurst and

4    back to the practice that he was working on there

5    with some other orthopod.  So we had an agreeable      10:42

6    relationship and many conversations about this

7    throughout.

8           Dr. Mosley signed, so I knew I had a

9    doctor and could not afford to have two doctors on

10   staff at the same time, and so did the 90-day         10:42

11   notice and sent this to Dr. Slusher.  This would

12   have been worked through -- a notice of this

13   nature would have been worked through corporate

14   legal, Rhea Garrett specifically, who is our

15   USERRA rights kind of attorney.  Or maybe just        10:43

16   a -- maybe just a specialist employment.  I'm

17   really not sure about his legal role in this.

18                  MS. RHODE:  And Rhea is

19   R-H-E-A?

20                  MR. LONERGAN:  Correct.                 10:43

21   Double "R," double "T."

22   BY MS. RHODE:

23       Q.   But he's one of the corporate attorneys?

24       A.   Correct.

25       Q.   Is it your understanding that he drafted      10:43

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 63 of 150   PageID #:
456

EXHIBIT A

1    the document that is in front of you as Exhibit 8?          10:43

2        **A.**   He did.

3        **Q.**   So Dr. Mosley signed an agreement with

4    HMC in August of 2011?

5        **A.**   That is my recollection.                       10:43

6        **Q.**   Did you actually have any conversations,

7    either by phone, by email, by text, with

8    Dr. Slusher during the period of time he was

9    deployed in Iraq?

10       **A.**   I don't recollect that I did.  Tisha          10:44

11   Rader had several under my direction.

12       **Q.**   Okay.  Do you know, did Ms. Rader have

13   any phone conversations with Dr. Slusher, or was

14   it all by email or text?

15       **A.**   I don't recall any phone conversations,        10:44

16   but I wouldn't deny if they happened.  They

17   certainly could have happened.  But I do recall

18   many texts and emails.

19       **Q.**   Okay.  But there are no phone calls of

20   which you are personally aware?                              10:44

21       **A.**   None.  No.

22       **Q.**   Now, under Exhibit 3, which is the

23   contract -- I believe it's -- that.  Yes.

24   Exhibit 3.  Is there any requirement that there be

25   an amendment -- as you understand it -- any          10:45

Stone & George Court Reporting
615.221.1089
Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 64 of 150   PageID #:
457

EXHIBIT A

1   requirement that there be a written amendment to        10:45

2   the contract if the hospital wanted to give 90-day

3   notice?  Or could it just give written notice of

4   its intent to terminate the contract under

5   Section 10.4?                                           10:45

6       **A.**   Yeah.  It's a 90-day, no-fault

7   arrangement, so either party could just notify the

8   other one.

9       **Q.**   Okay.

10      **A.**   I believe it would have to be in          10:45

11  writing, but...

12      **Q.**   And to your knowledge, Mr. Buckner, was

13  there any monetary compensation or any other kinds

14  of compensation to Dr. Slusher for entering into

15  Exhibit 8?                                              10:45

16      **A.**   My understanding, per our employment

17  arrangements, that he was entitled to get paid for

18  vacation he hadn't used.

19      **Q.**   Okay.  But that was -- that was

20  something he was entitled to whether he had been      10:45

21  deployed or not?

22      **A.**   Correct.

23      **Q.**   Anything else?

24      **A.**   Not to my knowledge.

25      **Q.**   Okay.  During the time that Dr. Slusher    10:46

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 65 of 150   PageID #:
458

EXHIBIT A

1   was deployed while employed by HMC, he was not        10:46

2   paid his salary under the contract, correct?

3       **A.**   Correct.

4       **Q.**   But any discussions with Dr. Slusher

5   concerning the termination agreement, which is        10:46

6   Exhibit 8, would have occurred on behalf of HMC by

7   Ms. Rader, not you or anyone else that you're

8   aware of; is that right?

9       **A.**   Under my authority with Ms. Rader.

10      **Q.**   Absolutely.                              10:46

11      **A.**   Yes.

12      **Q.**   But in terms of who actually had any

13  discussion, Ms. Rader would have been acting on

14  your authority?

15      **A.**   Right.                                   10:47

16          (Whereupon, Exhibit Number 9 was

17  marked for identification.)

18  BY MS. RHODE:

19      **Q.**   Have you seen the emails -- strike that.

20          Were you copied on emails between             10:47

21  Ms. Rader and Dr. Slusher regarding this

22  termination agreement?

23      **A.**   Yes.

24      **Q.**   I'm going to hand you what's been marked

25  as Exhibit 9 --                                       10:47

EXHIBIT A

1                    MR. LONERGAN:  Thank you.          10:47

2    BY MS. RHODE:

3        Q.   -- which purports to be an email -- the

4    initial email from Ms. Rader to Dr. Slusher

5    regarding termination agreement on July 27, 2011.   10:48

6    Is that correct?

7        A.   It is.

8        Q.   And you were copied on this, were you

9    not?

10       A.   One way or another.  I don't see myself   10:48

11   on the copy line, but I know that I've seen it.

12       Q.   Well, if you look at --

13                    MR. LONERGAN:  Look at that

14   (indicating).

15   BY MS. RHODE:                                       10:48

16       Q.   If you look down, it says to

17   Dr. Slusher --

18       A.   Okay.  There you go.

19       Q.   Then danbuckner01 --

20       A.   Yeah.  I sure enough was.               10:48

21       Q.   Okay.  And also copied were Mr. Thorne

22   and Rhea Garrett, as well as a number of other

23   people, correct?

24       A.   Correct.

25       Q.   Okay.  Can you tell me who Leeanne Lane   10:48

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 67 of 150   PageID #:
460                                                              EXHIBIT A

1  is?                                                    10:48

2      **A.**   Leeanne Lane was the assistant

3  administrator of the hospital.

4      **Q.**   At HMC?

5      **A.**   At -- yes.  Yes, ma'am.                    10:48

6      **Q.**   And Mr. Thorne was the director of --

7      **A.**   Human resources.

8      **Q.**   -- human resources.  Thank you.  And

9  Rhea Garrett, we've talked about, was part of

10 corporate counsel.                                       10:49

11     **A.**   Right.

12     **Q.**   And Shannone Raybon, who is -- is that a

13 woman?

14     **A.**   It is.  And I believe she was my legal

15 counsel assigned to my division.                         10:49

16     **Q.**   Okay.  And is it your understanding that

17 Mr. Garrett prepared the document that's

18 Exhibit 8, the termination agreement?

19     **A.**   Yes.

20              MR. LONERGAN:  I'm sorry.  Did             10:49

21 I hear that correctly?  Referred to in Exhibit 8?

22              MS. RHODE:  Referred to as

23 Exhibit 8.

24              MR. LONERGAN:  Got you.  Thank

25 you.                                                     10:49

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 68 of 150   PageID #: 461

EXHIBIT A

1          (Whereupon, Exhibit Number 10 was          10:50

2    marked for identification.)

3    BY MS. RHODE:

4        **Q.**   Mr. Buckner, I'm going to hand you what

5    I've marked as Exhibit 10.  Is that an email that          10:50

6    you received from Dr. Slusher dated September 7,

7    2011, indicating his notice of release from active

8    service and his intent to complete his duties and

9    obligations under the employment agreement?

10       **A.**   It is.          10:50

11       **Q.**   And he indicated to you, in Exhibit 10,

12   that he would report to work at HMC on

13   October 3rd, 2011?

14       **A.**   Correct.

15       **Q.**   And he did in fact return to work at HMC          10:51

16   on October 3rd, 2011, did he not?

17       **A.**   He did.

18       **Q.**   And when he returned to work, did he

19   meet with you to receive any directions about what

20   he should do during the period of his remaining          10:51

21   employment with HMC?

22       **A.**   He did.

23       **Q.**   And can you tell me, was there anyone

24   else present when he met with you about that?

25       **A.**   I'm unaware.          10:51

EXHIBIT A

1      Q.   And tell me, as best as you can recall,          10:51

2    what that discussion was.

3      A.   Now that we had a new physician on duty,

4    Dr. Mosley -- and Dr. Mosley was not an employed

5    physician.  He was an independent physician.  And     10:51

6    he had leased the office space that previously

7    Dr. Slusher was in.  So we had to realign

8    Dr. Slusher's office space, where he would

9    practice out of.  We had to figure out his call

10   schedule.  We had to figure out specific duties      10:52

11   related to his coming back and that kind of thing.

12     Q.   Okay.  So Dr. Mosley -- what space that

13   previously had been used by Dr. Slusher was leased

14   by Dr. Mosley?

15     A.   The office space is in a building across     10:52

16   the parking lot from the hospital.  It's on the

17   bottom floor of the building.  And it is an office

18   space specifically set up for an orthopaedic

19   physician in that it has x-ray capabilities next

20   door as well as cast-making rooms and things of     10:52

21   that nature.

22          So when we hired Dr. Mosley -- the

23   hospital has a master lease on that space -- and

24   when I say "hospital," I actually don't know --

25   I'm probably talking the physician practice side.    10:52

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 70 of 150   PageID #: 463

EXHIBIT A

1    Q.   The corporation -- a corporation?                    10:53

2    A.   Exactly.

3    Q.   Okay.

4    A.   -- had a lease on that space.  So we

5  sublet that to Dr. Mosley for it to be his office       10:53

6  space.  We sublet that minus some space that

7  Dr. Mosley did not want.  He thought there was too

8  many square feet, so he nixed some out.

9         So we ended up putting Dr. Slusher in

10  some of the space that was in the same location       10:53

11  but not leased by Dr. Mosley, i.e., there were two

12  doctors' offices in the same space.  He only

13  leased the one --

14    Q.   Okay.

15    A.   -- which left us an empty box otherwise.     10:53

16    Q.   So the corporation leased the space from

17  a third party?

18    A.   Correct.

19    Q.   And then you subleased part of it to

20  Dr. Mosley?                                            10:53

21    A.   Right.

22    Q.   And part of that which was not subleased

23  to Dr. Mosley was -- is where you put Dr. Slusher

24  when he returned from his deployment?

25    A.   You said that much better than I did.        10:53

EXHIBIT A

1    Thank you.                                                      10:53

2        Q.   Okay.  But did I say it correctly?

3        A.   Yes, you did.  Yeah.

4        Q.   Okay.  And were there separate rooms,

5    examining rooms, that were used by Dr. Slusher as          10:54

6    opposed to Dr. Mosley?  Or did they use the same

7    examination rooms or casting rooms?

8        A.   There were some hallway areas and

9    reception areas that were shared.  As far as exam

10   rooms goes, there were separate exam rooms.               10:54

11       Q.   Okay.  Was the reception area part of

12   the space leased to Dr. Mosley?

13       A.   Yes, it was.

14       Q.   And the examining rooms that Dr. Slusher

15   used, was any of that leased to Dr. Mosley?  Or          10:54

16   was that --

17       A.   That would have been separate space not

18   leased by Dr. Mosley.

19       Q.   Okay.  Got it.

20            (Whereupon, Exhibit Number 11 was              10:54

21   marked for identification.)

22   BY MS. RHODE:

23       Q.   I'm going to hand you what I've marked

24   as Exhibit 11 which purports to be an email from

25   Ms. Rader to Dr. Slusher dated September 8, 2011.        10:55

EXHIBIT A

1   Have you ever seen this document?                          10:55

2       **A.**   I have.

3       **Q.**   And when she said that "We are still

4   researching where to place you as Dr. Mosley now

5   rents the space you were in and he's not our            10:55

6   employed physician which makes it more

7   complicated," do you have an understanding of what

8   was more complicated, what you meant by when --

9   her comment that it makes it more complicated?

10      **A.**   Yeah.  We weren't trying -- things like       10:55

11  sharing the same waiting room was not our original

12  plan.  Because one doctor leases it, it wasn't our

13  intention to have two doctors share it.  So some

14  things like that had to be negotiated with

15  Dr. Mosley or gotten around in one way or another.     10:55

16      **Q.**   Okay.  Got it.

17              (Whereupon, Exhibit Number 12 was

18  marked for identification.)

19  BY MS. RHODE:

20      **Q.**   I'm going to hand you what I have marked      10:56

21  as Exhibit 12.  It appears to be an email train

22  from Dr. Slusher to Ms. Rader, asking for being

23  provided with a schedule of where he's supposed to

24  be when he returns in October, correct, the one at

25  the bottom?                                             10:56

EXHIBIT A

1    **A.**   It does, uh-huh.                                    10:56

2    **Q.**   And then from Ms. Rader to Dr. Slusher

3    saying, "Please meet me at the office."  And

4    Dr. Slusher saying, "Got it," he'd do that,

5    correct?                                               10:57

6    **A.**   Uh-huh.  You're correct.

7    **Q.**   And would Ms. Rader have been the one to

8    prepare his calendar of --

9    **A.**   To some extent, yes.

10           (Whereupon, Exhibit Number 13 was            10:57

11   marked for identification.)

12   BY MS. RHODE:

13   **Q.**   I'm going to hand you what I've marked

14   as Exhibit 13.  Have you seen this document

15   before?                                                10:57

16   **A.**   I believe so.

17   **Q.**   Okay.  Can you tell me whose name is at

18   the top -- when it says received October 3 --

19   10/3/11, and then there's somebody's first initial

20   and name in the upper right-hand corner?               10:58

21   **A.**   I can't tell you whose name it is.

22   **Q.**   Is this the kind of schedule what was

23   given to physicians in October of 2011 at HMC?

24   **A.**   It's atypical to have a schedule with

25   handwriting on it for physicians, but if we were       10:58

Stone & George Court Reporting
615.221.1089
Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 74 of 150   PageID #:
467

EXHIBIT A

1    having a working document and working through with          10:58

2    a physician of what a schedule might be, this

3    might be a working document of some sort.

4        **Q.**   Do you have any idea who prepared this

5    document that's Exhibit 13?                                 10:58

6        **A.**   I don't.

7        **Q.**   If Ms. Rader were to testify that she

8    prepared it, would you have any basis to

9    contradict that?

10       **A.**   No.                                            10:58

11            (Whereupon, Exhibit Number 14 was

12   marked for identification.)

13   BY MS. RHODE:

14       **Q.**   I'm going to hand you what I've marked

15   as Exhibit 14, which purports to be an email from           11:00

16   Martine Jackson of my law firm to you and

17   Ms. Rader regarding Dr. Slusher's attempts -- she

18   indicates in there Dr. Slusher's attempts to

19   contact Ms. Rader but not being able to do that

20   successfully, but also indicating that she was             11:00

21   attaching a more formal letter to you regarding

22   Dr. Slusher's intents when he returned; is that

23   correct?

24       **A.**   That's what it says.

25       **Q.**   And did you receive that email?               11:00

EXHIBIT A

1    **A.**   I did.                                              11:00

2    **Q.**   Okay.

3            (Whereupon, Exhibit Number 15 was

4    marked for identification.)

5    BY MS. RHODE:                                                11:00

6    **Q.**   I'm going to hand you Exhibit 15 and ask

7    you if that's the letter that was attached to it,

8    to that email that was Exhibit 14.

9    **A.**   I have received this letter.  I assume

10   it was attached to that.                                     11:01

11   **Q.**   Okay.  Would you agree with me the email

12   and the letter both bear the date of August 30,

13   2011?

14   **A.**   Sure.

15   **Q.**   When you received Exhibit 15, what, if           11:01

16   anything, did you do in terms of -- strike that.

17           What, if anything, did you do?

18   **A.**   My recollection is that at this point I

19   was passing all information, attorney to attorney,

20   along to what's his name.                                    11:01

21   **Q.**   Mr. Garrett?

22   **A.**   Yes.  Thank you.  Rhea Garrett.

23   **Q.**   Okay.  So you just passed the letter on.

24   You read it and passed it on?

25   **A.**   I may have passed it on with a                    11:02

**EXHIBIT A**

1    conversation.  I'm not aware.                          11:02

2        Q.   Okay.  Do you recall if you read it?

3        A.   Yes, I did.

4        Q.   As a result of having received the

5    letter of August 30, 2011, other than speaking        11:02

6    with Mr. Garrett or any of the legal staff, what,

7    if anything, did you do in response to the letter

8    of August 30?

9        A.   I don't believe I did anything.

10       Q.   Did you know, Mr. Buckner, when           11:03

11   Dr. Slusher was deployed, if it was possible that

12   he would have remained in military service longer

13   than 90 days?

14       A.   He did tell me that was a possibility.

15       Q.   Okay.  Can you tell me what your          11:03

16   understanding is, then, if Dr. Slusher had

17   remained in military service into November of

18   2011...

19            MR. LONERGAN:  Object to the

20   form.  You can answer if you understand it.        11:03

21            THE WITNESS:  Okay.

22            MS. RHODE:  Well, wait.  I

23   haven't finished.  I'm sorry.

24            MR. LONERGAN:  Okay.  I'm

25   sorry.  You paused.  And I thought --              11:03

```
 1                    MS. RHODE:  Yeah, I did.  I          11:03

 2    was trying to --

 3                    MR. LONERGAN:  I do that same

 4    thing.  Sorry.

 5                    MS. RHODE:  Let me start            11:03

 6    again.

 7    BY MS. RHODE:

 8        Q.   Do you have an understanding,

 9    Mr. Buckner, that -- what, if any, work

10    Dr. Slusher would have returned to had he not      11:03

11    completed his deployment until November of 2011?

12        A.   My understanding is he would not have

13    returned to the hospital since at that point his

14    90-day notice would have been exhausted.

15               (Whereupon, Exhibit Number 16 was       11:04

16    marked for identification.)

17    BY MS. RHODE:

18        Q.   I'll hand you what's been marked as

19    Exhibit 16.  That is your letter to Dr. Slusher

20    dated October 26, 2011, indicating that's his last  11:04

21    day of employment with HMC, correct?

22        A.   It appears to be.

23        Q.   And does that appear to be your

24    signature?

25        A.   There's not a signature on it.           11:05
```

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 78 of 150   PageID #:
471

EXHIBIT A

1      **Q.**   Oh, I'm sorry.  Sorry.  I stand                    11:05

2   corrected.

3           Mr. Buckner, during the period of time

4   that you were the CEO at HMC, did you regularly

5   attend the medical executive committee?                        11:05

6      **A.**   Yes, I did.

7      **Q.**   Were you a member of that committee?

8      **A.**   I was an ad hoc member, meaning I could

9   be there but had no voting rights.

10      **Q.**   And when the executive committee met,            11:06

11   did they regularly prepare minutes?

12      **A.**   They did.

13      **Q.**   Did they prepare an agenda?

14      **A.**   Typically.

15           (Whereupon, Exhibit Number 17 was                    11:06

16   marked for identification.)

17   BY MS. RHODE:

18      **Q.**   I'm going to hand you what I've marked

19   as Exhibit 17 and ask you if that is the agenda

20   for the meeting of the medical executive committee            11:06

21   on October 20th, 2011.

22      **A.**   It appears to be.

23      **Q.**   Do you recall being at that meeting?

24      **A.**   I have a recollection, yes.

25      **Q.**   Okay.  You will note, in Section 4.11,           11:06

EXHIBIT A

1   there was an administrative update, and it has          11:06

2   your name in brackets behind it, correct?

3      A.   Right.

4      Q.   Did you give an administration update

5   concerning Dr. Slusher's contract?                       11:07

6      A.   It appears that I did.

7      Q.   Do you recall doing that?

8      A.   Not specifically, no.

9      Q.   What was the discrepancy that you

10  reported concerning Dr. Slusher's contract ending        11:07

11  date?

12     A.   The discrepancy was a legal discrepancy.

13  By that time we had talked to your co-attorney

14  there, and there were letters being passed -- or

15  conversations being passed between Rhea Garrett          11:07

16  and themselves that, frankly, I wasn't necessarily

17  involved in to any great degree.  And Dr. Slusher

18  was objecting to the fact that he had signed and

19  consented to his 90-day termination.  And the

20  hospital and the corporation were quite aware that       11:07

21  he had signed that 90-day termination, and that he

22  would be leaving October 26th.

23     Q.   Under the contract, did you

24  understand -- he wasn't required to sign and

25  accept a 90-day notice, was he?                          11:08

EXHIBIT A

1    **A.**   He -- under the contract, either party      11:08

2   could deliver a 90-day notice.

3        **Q.**   And again -- I'm just asking about your

4   understanding -- if HMC had just sent the notice

5   saying this is the 90-day notice under the          11:08

6   contract, it would have been effective, would it

7   not?

8        **A.**   You know, I suppose so.  Although I

9   think it would be more -- I think that would be

10   atypical.  I think typically we tried to come to     11:08

11   agreement and make sure they received it and that

12   kind of thing.

13       **Q.**   Acknowledge a receipt of it?

14       **A.**   Something like that, yeah.

15       **Q.**   Now, can you tell me, just in a          11:08

16   ballpark, how much gross income an orthopaedic

17   surgeon at HMC could generate in -- could generate

18   in a month in the fall of October of 2011?

19       **A.**   An employed physician would receive

20   whatever income their employment stated.  If        11:09

21   you're an independent physician, it would be based

22   on how many patients you were seeing.

23       **Q.**   Okay.  And Dr. Slusher was an employed

24   physician?

25       **A.**   Right.                                  11:09

EXHIBIT A

1    **Q.**   Okay.  So explain to me the process.  If          11:09

2   he's an employed physician, he knows what his

3   salary is going to be.

4    **A.**   Right.

5    **Q.**   But when he performs a surgical               11:09

6   procedure, that billing goes -- whatever is billed

7   and collected goes to the hospital.

8    **A.**   The hospital and/or the --

9    **Q.**   Clinic corporation?

10    **A.**   -- clinic corporation.                    11:09

11    **Q.**   Goes to the corporation.  Goes to his

12   employer, not to him directly.

13    **A.**   Right.  Correct.

14    **Q.**   Okay.  And would you agree with me that

15   Dr. Slusher was a productive surgeon when he was      11:09

16   employed for HMC?

17    **A.**   Sure.

18    **Q.**   And when he was actually employed from

19   HMC, can you give me just kind of a range of how

20   much gross income he could generate from his         11:10

21   surgical activities for HMC?

22    **A.**   Gross income, a surgeon could generate

23   anywhere from, without being overly facetious,

24   $50,000 to a million dollars.

25    **Q.**   Depends on how many people need what       11:10

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 82 of 150   PageID #:
475

EXHIBIT A

1    kind of orthopaedic surgery, correct?                    11:10

2       **A.**   How well he's trusted, how many people

3    are referring patients, what his outcomes are

4    like.

5       **Q.**   Was Dr. Slusher trusted?                      11:10

6       **A.**   I really can't speak to that.  That

7    would be the opinions of his referral sources.

8       **Q.**   Okay.  Did he have -- did he have a lot

9    of patients?  Did he perform a number of

10   procedures while he was employed for HMC?               11:10

11      **A.**   As compared to other orthopaedic

12   physicians that had been there beforehand, the

13   answer would be no.  He performed more of a

14   minimum number.

15      **Q.**   Did he have successful outcomes while he     11:11

16   was employed at HMC?

17      **A.**   I believe he did.

18      **Q.**   Is there anything else that you can

19   recall about your presentation to the medical

20   executive committee on October 20th, 2011, other       11:11

21   than what you've already told me today?

22      **A.**   I wouldn't imagine.

23      **Q.**   Is there anything that you could refer

24   to that would help refresh your recollection if

25   there was something more that you presented to the     11:11

EXHIBIT A

1    executive committee on that day?                    11:11

2        **A.**   Not that I can think of.

3        **Q.**   Did you ever have any kind of training

4    on the rights of an employee for military leave

5    while employed by HMC?                               11:12

6        **A.**   I believe in the employee handbook there

7    are some directions on how the company handles

8    that.

9        **Q.**   Okay.  But do you recall whether you

10   specifically ever had any training from corporate    11:12

11   or any of the corporate attorneys or anybody else

12   in terms of what your obligations as the CEO at

13   the hospital were if an employee requested

14   military leave?

15       **A.**   Yes.  Typically, on an issue like that,   11:12

16   my training would be to call corporate counsel as

17   it relates to the specifics.

18       **Q.**   Okay.  So --

19       **A.**   In this case, Rhea Garrett.

20       **Q.**   Okay.  So if you had -- if there was any   11:12

21   question, then you simply were to call Mr. Garrett

22   or a member of his staff.

23       **A.**   Anything that I felt was over my head or

24   I didn't understand completely.

25       **Q.**   Okay.  Let me go back a little bit         11:12

EXHIBIT A

1   before that.  Did you have any general training          11:12

2   specifically about the hospital obligations for

3   military leaves when an employee was being

4   deployed, so that -- and hold for a second -- if

5   you said it was over your head, then that assumes       11:13

6   that you had some basic understanding.  So my

7   question more specifically is did you get any

8   training about the basic requirements of military

9   leave regarding employees of HMC?

10       A.   Yes.  I believe, as all of our employees       11:13

11  do, including myself, in new-employee training at

12  the hospital, which I think comes in through the

13  handbook, there is a section regarding military

14  rights or military leave or something like that.

15       Q.   Okay.  So when you were a new employee          11:13

16  to HMC, did you have an orientation with HMC?

17       A.   I did.

18       Q.   And as part of that orientation, you

19  went over the handbook?

20       A.   Correct.                                        11:13

21       Q.   And so there was some -- just some

22  training about what the handbook is and what the

23  leaves are and where to go look if you have a

24  basic question?

25       A.   Yeah.                                           11:14

EXHIBIT A

1      Q.   And then if that question is not          11:14

2   addressed by the handbook, then you would go to

3   corporate counsel?

4      A.   Yes.

5      Q.   All right.  Anything else other than      11:14

6   that?

7      A.   I think -- no.  That would sum it up

8   nicely.

9      Q.   Okay.  And in any of the communications

10  you had with Dr. Slusher, did you ever             11:14

11  specifically discuss his USERRA rights?

12     A.   In written communications with his

13  attorney, it was discussed.

14     Q.   By you?

15     A.   I don't think so.  I think I received      11:14

16  those letters and forwarded them on.

17     Q.   Okay.

18     A.   I don't think -- it wouldn't be out of

19  the question that I would have, but I don't

20  believe I did.                                     11:14

21     Q.   And when I use the term "USERRA," do you

22  know what I'm referring to?

23     A.   I do.

24     Q.   Okay.

25          (Whereupon, Exhibit Number 18 was          11:15

EXHIBIT A

1   marked for identification.)          11:15

2   BY MS. RHODE:

3      Q.   Mr. Buckner, I'm handing you what I've

4   marked as Exhibit 18, which purports to be a

5   letter from Dr. Slusher to you, notifying you of   11:15

6   his intent to return to work on October 3rd, 2011.

7   Do you recall receiving this letter?

8      A.   I recall receiving something of this

9   nature, yes.

10      Q.   When Dr. Slusher returned from his   11:16

11   deployment in October of 2011, did you have any

12   discussions with him about the possibility of a

13   permanent employment with HMC?

14      A.   Upon his return?

15      Q.   Yes, sir.          11:16

16      A.   No.  At that point, Dr. Mosley was our

17   sole orthopaedic physician.

18      Q.   And prior to his deployment when you did

19   have discussions with Dr. Slusher about being a

20   permanent employee, did he ever suggest to you   11:16

21   that he needed to have his wife come to the area

22   first to see it?

23      A.   Yes.  At one point he acted like he

24   might have an interest in that, and we discussed

25   his wife and family might come see it.   11:16

EXHIBIT A

1      Q.   And to your knowledge, did they ever        11:16
2   come see it?
3      A.   I remember he may have spoken about
4   that, but I don't have specific recall.
5      Q.   And when he was actually in Shelbyville,     11:17
6   do you know if his family was still back in North
7   Carolina?
8      A.   I know that he told me they were.
9      Q.   Okay.  Mr. Buckner, how were you first
10  made aware that there had been a -- well, strike     11:17
11  that.
12           Are you aware that at some point in time
13  a complaint was made with the federal government
14  by Dr. Slusher concerning alleged violations of
15  his USERRA rights?                                   11:17
16     A.   I am.
17     Q.   How were you first made aware?
18     A.   I don't remember that.  Maybe there was
19  a letter sent to me regarding that?
20     Q.   Okay.  What role, if any, did you have       11:17
21  in preparing any response to that complaint?
22     A.   My role was to speak to Rhea Garrett and
23  counsel, and they would handle that on my behalf.
24     Q.   Were you also made aware that the
25  federal government found that HMC had, in fact,      11:18

EXHIBIT A

```
 1    violated USERRA with respect to Dr. Slusher?          11:18
 2         A.   I received a letter indicating that.
 3         Q.   Okay.  And what, if anything, did you do
 4    with respect to the letter indicating violation
 5    other than speak with legal counsel?                  11:18
 6         A.   Nothing.
 7         Q.   Okay.  Was anybody else present when you
 8    spoke with legal -- or did you actually speak to
 9    legal counsel?
10         A.   Yes.                                         11:18
11         Q.   Okay.  And was anybody else present
12    other --
13         A.   Well, may I go back?
14         Q.   Yes, sir.
15         A.   I may have emailed legal counsel.  I        11:18
16    don't know if I spoke directly.
17         Q.   That's all right.  Okay.  So you had
18    communication --
19         A.   Communicated with.
20         Q.   That's fine.  If you actually met with      11:18
21    legal counsel, was anybody else present other than
22    a member of the legal staff or a member of the
23    administration?
24         A.   I'm not aware.
25         Q.   I think you indicated earlier -- and I      11:19
```

EXHIBIT A

1    just want to make sure -- that when Ms. Rader was      11:19

2    negotiating or speaking with Dr. Slusher on behalf

3    of HMC, she did so with your authority; is that

4    correct?

5        **A.**   Yes.      11:19

6        **Q.**   And when did Ms. Rader leave HMC?

7    Before or after you?

8        **A.**   Before.

9        **Q.**   What were the circumstances of her

10   departure?      11:19

11       **A.**   Before she came to work for me, she had

12   worked doing physician credentialing, and she got

13   an opportunity to work from home doing the same

14   for another company.  And it was a more attractive

15   opportunity.      11:19

16       **Q.**   And do you know where she currently

17   resides?

18       **A.**   Somewhere in the Nashville area.

19       **Q.**   Have you had any discussions with her

20   about this case?      11:20

21       **A.**   No, I haven't.

22       **Q.**   Who is Shelly Dortch?

23       **A.**   She was one of the staff members

24   employed to work for Dr. Slusher in his clinic.

25       **Q.**   Did Ms. Dortch leave before or after      11:20

EXHIBIT A

1    you?                                                    11:20

2        **A.**    I don't recollect.

3        **Q.**    Do you know why she left HMC?

4        **A.**    I can -- I'll take a gut check on that.

5        **Q.**    Well, let me put it this way.  Do you        11:20

6    have an understanding --

7                      MR. LONERGAN:  Don't guess.

8    BY MS. RHODE:

9        **Q.**    Don't guess.

10       **A.**    Okay.                                        11:20

11       **Q.**    Do you have an understanding -- whether

12   it's accurate or not, do you have an

13   understanding?

14       **A.**    Yes.

15       **Q.**    And what is that?                            11:20

16       **A.**    That she went to work for Dr. Mosley

17   when he was -- became an independent practitioner.

18       **Q.**    When you say an "independent

19   practitioner," does that mean he no longer has --

20   he did not continue to have a contract with HMC?     11:20

21       **A.**    He wasn't employed by HMC.

22       **Q.**    Okay.

23       **A.**    He was in fact assisted financially as

24   he came in.

25       **Q.**    Okay.                                        11:21

EXHIBIT A

1      A.    But was not an employee.                          11:21

2      Q.    Do you know if Dr. Mosley still has a

3   relationship, an employment or a contractural

4   relationship, with HMC?

5      A.    No, I don't know.                                 11:21

6      Q.    Did he, at the time that you retired --

7   or resigned -- I'm sorry -- to your knowledge?

8      A.    Yes.

9      Q.    Okay.  Do you know if Dr. Mosley is

10  still in the same geographic area?                         11:21

11     A.    Yes.  Well, I shouldn't say that.  As of

12  three or four months ago, yes.

13     Q.    Okay.  Do you know if Dr. Mosley has any

14  ongoing litigation with Heritage or -- HMC or CHS?

15     A.    Yes.                                              11:21

16     Q.    And does he?

17     A.    Yes.

18     Q.    Bad question.  I'm sorry.  Do you know

19  what that litigation concerns?

20     A.    Utilization of his space by Dr. Slusher.         11:22

21     Q.    And have you been involved, in terms of

22  testifying or being deposed, in that case?

23     A.    Yes.

24     Q.    Has a deposition already occurred?

25     A.    I've talked to the lawyer several times.         11:22

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 92 of 150   PageID #:
485
EXHIBIT A

1    I don't recollect I've been deposed.                      11:22

2        Q.   Okay.  You talked to the lawyer for you

3    or for him?

4        A.   For me -- or for the hospital.

5        Q.   Okay.  Were you specifically alleged to         11:22

6    have engaged in any wrongdoing in that particular

7    case?

8        A.   No.

9        Q.   You're not a party to the litigation?

10       A.   No.                                              11:22

11       Q.   Okay.  When you said -- strike that.

12            Did you ever indicate to Dr. Slusher

13   that he had been accused of sexual misconduct?

14       A.   No.

15       Q.   Just the one incident we previously             11:23

16   talked about, about using the "B" word?

17       A.   Right.  But I believe that was under

18   hostile work environment.

19       Q.   Were there any patient complaints

20   involving Dr. Slusher during the time that he            11:23

21   worked for HMC?

22       A.   Not that I really recollect.

23       Q.   When a lawyer hears the words, "Not that

24   I really recollect" -- are there some that you

25   sort of recollect?                                       11:23

EXHIBIT A

1    **A.**   No.  No, there wasn't.                              11:23

2    **Q.**   Okay.  After Dr. Slusher left his

3    employment with HMC in October of 2011, did HMC

4    receive any requests for references?

5    **A.**   I'm not aware.                                      11:23

6    **Q.**   Did you specifically receive any

7    requests for references?

8    **A.**   Not that I remember.

9         (Whereupon, Exhibit Number 19 was

10   marked for identification.)                                 11:24

11   BY MS. RHODE:

12   **Q.**   Mr. Buckner, I'm going to hand you what

13   I've marked as Exhibit 19.

14   **A.**   Okay.

15   **Q.**   Now, is that a recruitment agreement               11:24

16   between HMC and Dr. Mosley?

17   **A.**   It is a page of a recruitment agreement.

18   **Q.**   Okay.  A page.  And it indicates a date

19   on this one page of the recruitment agreement

20   that -- a date of May 16th, 2011; is that right?           11:25

21   **A.**   Top left, yes.

22   **Q.**   Okay.  Is this the document that, if you

23   know, that Ms. Rader would have used?

24   **A.**   It's a document I would have used with

25   probably Sarah Smith --                                     11:25

**EXHIBIT A**

1    Q.   Okay.                                          11:25

2    A.   -- as we begin a conversation about a

3    physician -- as we begin a serious conversation

4    about a physician to start giving a heads-up to

5    our thought process.                               11:25

6    Q.   Okay.  Do you recognize the handwriting

7    on Exhibit 19?

8    A.   I don't.

9    Q.   Fair to assume, then, it's not yours?

10   A.   It's not mine.  The signature is not         11:25

11   mine.

12   Q.   I'm not sure if that's a signature or

13   just an indication that you would be the CEO.

14   A.   Yeah.  Exactly.

15   Q.   When is a document like Exhibit 19 --        11:25

16   when is that completed in the general recruitment

17   process?

18   A.   In the scheme of things, a document of

19   this nature would be completed as soon as we begin

20   to get serious and we're trying to start the       11:26

21   negotiation process on a contract.

22   Q.   So there might have been discussions,

23   just kind of an "are you interested" sort of

24   thing?  That might have occurred beforehand?

25   A.   Yes.  There would be lots of discussions     11:26

EXHIBIT A

1  that would be generated before a document like          11:26

2  this is produced.

3      Q.   In preparation -- during the preparation

4  of this lawsuit, there have been some documents

5  called interrogatories.                                  11:27

6      A.   I'm going to write a note to myself.

7      Q.   Okay.  Go ahead.

8      A.   My apologies.

9      Q.   That's okay.  Did the note have anything

10  to do with this case or was it just something           11:27

11  you're needing to do?

12     A.   It had to do with this being an 18-month

13  recruitment agreement with Dr. Mosley.

14     Q.   Okay.  So tell me what the note said.

15     A.   It will be the last time I write a note.        11:27

16     Q.   I bet it will.

17     A.   I was thinking in my head that

18  Dr. Slusher was employed for one year.  This is an

19  18-month guarantee with Dr. Mosley.  And just the

20  significance that we talked earlier, one is an           11:28

21  employment agreement and one is a contract

22  agreement.

23     Q.   Correct.  So what's the significance

24  that it -- the fact that it's an 18-month

25  guarantee?                                               11:28

1     **A.**   Only that it contrasts with the one-year    11:28

2  employment agreement with Dr. Slusher.

3     **Q.**   And Dr. Slusher was actually an employee

4  and Dr. Mosley was not?

5     **A.**   Correct.    11:28

6     **Q.**   Okay.  Feel free to write any other

7  notes.

8     **A.**   Yeah, you bet.  Am I allowed to whisper?

9              MR. LONERGAN:  No.

10  BY MS. RHODE:    11:28

11     **Q.**   Sure.  Did you go to whispering school?

12     Do you recall being presented with

13  certain questions that I had asked on behalf of --

14  I'm sorry.  Strike that.

15     Were you presented or did one of your    11:28

16  attorneys discuss with you the actual Complaint

17  that was filed in this case, the factual

18  allegations?

19     **A.**   I have seen it.

20     **Q.**   Okay.  And were you asked -- did you    11:29

21  give input as to whether those allegations,

22  factual allegations, were true or incorrect?

23     **A.**   Yes.

24     **Q.**   Okay.  So I'm going to ask you about

25  some of those and your answers --    11:29

**EXHIBIT A**

1    **A.**   Okay.                                    11:29

2    **Q.**   -- so you can help me understand.

3                    MR. LONERGAN:  Those are his

4    discovery responses?

5                    MS. RHODE:  This is actually      11:29

6    the answer to the Complaint right now --

7                    MR. LONERGAN:  Okay.

8                    MS. RHODE:  -- is what I'm

9    looking at, if you want to get it out.  I did not

10   make it an exhibit.                               11:29

11              Off the record for a second.

12          (Whereupon, a discussion off the

13   record occurred.)

14   BY MS. RHODE:

15   **Q.**   I asked a question in the Complaint --   11:33

16   or I made an allegation in the Complaint that

17   reads as follows -- it's in paragraph 27 -- "On

18   July 28th, 2011, while serving in Iraq" -- are you

19   there?  I'm sorry.

20   **A.**   Got it.                                  11:33

21   **Q.**   -- "Slusher received an email from Rader

22   containing a termination agreement effective that

23   same date."

24          The answer to that by the defendants,

25   you and the hospital -- you and the corporation -- 11:33

EXHIBIT A

1    says, "Defendants admit that the plaintiff and          11:33

2    Shelbyville Clinic Corporation entered into a

3    termination agreement in which they mutually

4    agreed to terminate the employment agreement

5    effective August 26, 2011."                             11:33

6          Can you tell me what mutual agreement

7    was made and by whom?  And I assume that to be

8    July --

9                MR. LONERGAN:  Can you read

10   the rest of that?                                       11:34

11               MS. RHODE:  Oh, I'm sorry.

12   BY MS. RHODE:

13   Q.   "Defendant further admits that the

14   termination agreement was created by mutual

15   negotiations between plaintiff and defendant, and       11:34

16   the referenced email was part of the

17   communications relating to that agreement.

18   Defendant denies all the remaining."

19               MS. RHODE:  Mr. Lonergan, I

20   assume you mean July 26, 2011?                          11:34

21               MR. LONERGAN:  Yes.

22               MS. RHODE:  Okay.  I made the

23   correction on my copy.

24               MR. LONERGAN:  Well, yeah.

25   The date that the agreement was signed.  Not the        11:34

EXHIBIT A

1  effective date of the termination.                    11:34

2                    MS. RHODE:  No, no, no.  I

3  understood that.  But you meant to say July, so I

4  was just correcting --

5                    MR. LONERGAN:  That is           11:34

6  correct.  Thank you.

7                    MS. RHODE:  Sure.

8  BY MS. RHODE:

9      Q.   So my question, Mr. Buckner, is

10 particularly to the second sentence, when the       11:34

11 answer says the termination agreement, do you know

12 what I'm referring to, the one page --

13     A.   If it's the termination agreement that

14 was the October 26th deadline, yes.

15     Q.   Yes.                                       11:34

16     A.   Right.

17     Q.   But it was signed on July 26th --

18     A.   Correct.

19     Q.   -- or effective July 26th.  It says "was

20 created by mutual negotiations between the          11:34

21 plaintiff and the defendant."  Can you tell me,

22 sir, your understanding of what mutual

23 negotiations occurred between the plaintiff and

24 the defendant that resulted in that termination

25 agreement dated July 26, 2011, effective           11:35

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 100 of 150   PageID #:
493
EXHIBIT A

1    October 26, 2011?                                    11:35

2        A.    Both parties agreed that they had a

3    contract, a one-year contract, with a 90-day

4    either-party out clause.

5                        MR. LONERGAN:  Slow down a        11:35

6    little bit.

7                        THE WITNESS:  Okay.

8    BY MS. RHODE:

9        Q.    Yeah.  For her.

10       A.    Both parties agreed that we had a          11:35

11   contract.  It was a one-year contract.  In that

12   contract was a 90-day, either-party, no-fault out

13   clause, and that the no-fault out clause was being

14   elected, and that is the same meaning as 90-day

15   termination.                                         11:35

16       Q.    Okay.  So when you say -- when the

17   answer says it was created by mutual negotiations,

18   it's your understanding that's in reference to the

19   actual contract that is Exhibit 3?

20       A.    True.                                       11:35

21       Q.    And now I'm looking at paragraph 30 on

22   page 4 of the Complaint.  And it reads, "The

23   termination agreement did not contain any language

24   waiving Slusher's USERRA rights or any other

25   employment rights."                                   11:36

EXHIBIT A

1      And on page 5 of the answer, from          11:36

2  paragraph 30, it says, "Defendants deny the

3  allegations contained in paragraph 30 of the

4  Complaint."

5      Do you believe that the termination          11:36

6  agreement --

7             MR. LONERGAN:  I've just

8  pulled it and put it in front of him.

9             MS. RHODE:  Okay.  It was just

10 Exhibit --                                        11:36

11            MR. LONERGAN:  No --

12            MS. RHODE:  I'm just looking

13 at the number.  Your hand is in front of it.

14 Sorry -- Exhibit 8.  Thank you very much.

15 BY MS. RHODE:                                     11:36

16    Q.   Do you believe that Exhibit 8 contains

17 any language waiving Dr. Slusher's USERRA rights?

18    A.   No.  No, it does not.

19    Q.   And so in the other -- in terms of any

20 other employment rights, do you have an           11:37

21 understanding of what other employment rights were

22 waived, if any, by Exhibit 8?

23    A.   He was an employee of the hospital and

24 an employee per contract with the corporation.

25    Q.   Okay.  So it's your understanding that    11:37

1  he's waiving the right to complete the contract      11:37

2  through February 28th of 2012?

3      A.   What number is it again?  Let me read it

4  again.

5      Q.   30.                                          11:37

6      A.   Yeah.  It's just saying that he, as an

7  employee of the hospital, he has rights.  The

8  contract itself says there is a 90-day term in

9  there, but other parts of the contract that would

10 remain alive, post that date, would remain alive.    11:37

11     Q.   I just want to be clear that I

12 understand.

13     A.   Okay.

14     Q.   Maybe I should have asked it as two

15 separate questions.  Is it your understanding that  11:37

16 as a result of Exhibit 8 that Dr. Slusher is

17 waiving his right to be employed by HMC after

18 October 27th through February 28th of 2012?

19     A.   Yes.

20     Q.   Okay.  Anything else that you contend     11:38

21 he's -- that you understand him to be waiving as a

22 result of signing Exhibit 8?

23     A.   No.

24     Q.   Now, paragraph 31 of the Complaint --

25     A.   Okay.                                        11:38

Stone & George Court Reporting
615.221.1089
Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 103 of 150   PageID #:
496

EXHIBIT A

1    Q.   -- reads, "Slusher did not receive          11:38

2   consideration for termination of his contract in

3   accordance with the terms of his contract."

4        And defendants denied that.  So when you

5   denied that particular allegation, what's the      11:38

6   basis for your denial?

7                MR. LONERGAN:  I'm going to

8   put an objection on the record just because that

9   denial also encompasses attorney-client privilege

10  and work product doctrine.  It's not just a denial  11:38

11  of a factual allegation.  It's a denial that --

12  his position at the corporation and the hospital

13  and Dan Buckner.

14  BY MS. RHODE:

15   Q.   Well, let me ask --                           11:39

16                MR. LONERGAN:  You can answer

17  it to the best of your ability.

18                MS. RHODE:  Yeah.

19  BY MS. RHODE:

20   Q.   Let me ask you, without referring to          11:39

21  anything that your lawyers may have told you,

22  what's your understanding of whether Dr. Slusher

23  received consideration for entering into

24  Exhibit 8, any separate consideration other than

25  his original contract, if any?                      11:39

1     **A.**   My understanding is that we had a          11:39

2     contract, and we were following the obligations

3     under that contract.

4     **Q.**   Okay.

5     **A.**   Period.                                     11:39

6     **Q.**   Okay.  So Dr. Slusher received all the

7     consideration that HMC provided to him as a result

8     of his original contract, correct?

9     **A.**   That's my -- yes.

10    **Q.**   And nothing new specifically for            11:39

11    entering into Exhibit 8.  Just what he had already

12    been promised under the original contract,

13    correct?

14    **A.**   Yes, ma'am.

15    **Q.**   Do you have personal knowledge of           11:40

16    whether Dr. Slusher was ever told specifically by

17    Ms. Rader or anyone else, prior to entering into

18    Exhibit 8, that he was not going to complete

19    employment through February 28, 2012, because

20    there just wasn't enough work for another           11:40

21    orthopaedic surgeon now that you had Dr. Mosley?

22    **A.**   I'm sure that I talked to him myself

23    about there not being enough work for two

24    orthopaedic surgeons in my town.

25    **Q.**   Okay.  Before or after Exhibit 8 was        11:41

EXHIBIT A

1    signed?                                              11:41

2        **A.**   Oh, I imagine both.

3        **Q.**   Can you specifically recall any

4    discussions of -- either from the time Ms. Rader

5    sent Exhibit 8 to Dr. Slusher for consideration      11:41

6    until the time he signed it -- as to a discussion

7    you may or may not have had with him regarding

8    only enough work for one orthopaedic surgeon?

9        **A.**   I can't recall a specific discussion.

10   That was a general theme of discussions, though.     11:41

11       **Q.**   Isn't it true that after Dr. Mosley was

12   hired that HMC continued to advertise for an

13   orthopaedic surgeon at -- strike that.

14            Isn't it true that after the time that

15   Dr. Mosley was hired or contracted with that HMC     11:41

16   continued to advertise for an orthopaedic surgeon?

17       **A.**   No.

18       **Q.**   It is not true?

19       **A.**   Well, not true to my knowledge.

20       **Q.**   Okay.                                   11:42

21       **A.**   I guess I'll make a potential exception.

22       **Q.**   Okay.

23       **A.**   We may have been looking for a --

24   typically, again, with the Tullahoma physicians I

25   referred to earlier -- someone to help cover         11:42

EXHIBIT A

1    weekends and a few heres and theres.                    11:42

2        **Q.**   Locums?

3        **A.**   Right.  But we were certainly not

4    advertising or not looking for, at least from my

5    office, additional coverage from an orthopod.          11:42

6        **Q.**   Well, who has authority to advertise for

7    a physician on behalf of HMC -- or who had it at

8    the time that you were the CEO?

9        **A.**   The corporate office has the recruitment

10   people that work there.  I've mentioned Sarah          11:42

11   Smith's name a number of times.  She's not in

12   charge of that department, but she works there.

13   So that department would be the ones that had the

14   authority to place advertisements.

15       **Q.**   And when the corporate advertised, if     11:42

16   you know, where would they place such an

17   advertisement if they were seeking an orthopaedic

18   surgeon?

19       **A.**   Oh, I -- I don't know.

20       **Q.**   Okay.  After Dr. Slusher returned, did    11:43

21   you tell him there just weren't job openings for

22   him, after he returned from his deployment?

23       **A.**   No.  In fact, I made him aware that we

24   could work within the company, with the larger

25   company.  And I'm sure there were orthopod           11:43

EXHIBIT A

1    positions out there.  And we would assist him, if          11:43

2    we could, to find a position that was mutually a

3    good fit.

4        Q.   And do you recall a specific discussion

5    or discussions of that nature?                              11:43

6        A.   I recall having discussions of that

7    nature.  I also recall an email where -- I think

8    it was Rhea Garrett -- offered him the same offer.

9        Q.   Do you know when that email was from

10   Mr. Garrett?                                                11:44

11       A.   I don't.

12       Q.   And when you had a discussion with

13   Dr. Slusher, was it one discussion or more?

14       A.   It would have been several.  It would          

15   have been a theme.                                          11:44

16       Q.   How did Dr. Slusher respond?

17       A.   I'm just cleaning my mind up to make

18   sure I'm talking about after now.  After he

19   returned?

20       Q.   Yes.                                               11:44

21       A.   I don't recollect his level of interest

22   in that.  Before that time, I had made the same

23   offer.  That's why I say that.  He -- when he told

24   me earlier on that -- "we're doing a year's bridge

25   agreement with you, and I know you want to go back         11:44

1    to Pinehurst, but, you know, CHS has an option for       11:44

2    you, too.  You ought to look around and see if you

3    have an interest."

4        **Q.**   Do you know approximately how many

5    hospitals CHS owns or has an ownership interest        11:45

6    in?

7        **A.**   Oh, I'd say when I was there, a hundred,

8    approximately.

9        **Q.**   Would it be fair to say that it has them

10   in various geographic locations?                      11:45

11       **A.**   Right.  All over the country.  None in

12   Pinehurst.

13                   MS. RHODE:  Off the record for

14   a second.

15                   (Whereupon, a discussion off the       11:46

16   record occurred.)

17                   (Whereupon, Exhibit Number 20 was

18   marked for identification.)

19   BY MS. RHODE:

20       **Q.**   Mr. Buckner, in this litigation, I         11:46

21   propounded a number of questions to you, and a

22   response to those was prepared.  And I'm going to

23   hand you what I've marked as Exhibit 20 and ask

24   you if that looks familiar.

25       **A.**   It does.                                   11:47

Stone & George Court Reporting
615.221.1089
Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 109 of 150   PageID #:
502

EXHIBIT A

```
 1      Q.   Specifically, on page 10, is that your        11:47

 2   signature?

 3      A.   It is.

 4      Q.   And under oath you said that the answers

 5   that were included in Exhibit 20 were true and       11:47

 6   correct to the best of your knowledge, correct?

 7      A.   Yes.

 8      Q.   All right.  So I'm going to ask you

 9   about some of these.

10      A.   Okay.                                         11:47

11      Q.   In particular, let's turn to Number 4.

12      A.   Page 4?

13      Q.   Page 4 and Number 4, yeah.  They're both

14   there.  On the third -- starting on the third

15   line, it says, "Defendant Buckner recalled several   11:48

16   conversations with the plaintiff regarding his

17   desire not to stay long term in Shelbyville,

18   Tennessee, as an orthopaedic surgeon at Heritage

19   Medical Center."

20           Are there any other discussions you had      11:48

21   with Dr. Slusher to that effect that you and I

22   haven't already talked about today that you can

23   recall?

24      A.   No.

25      Q.   Do you recall any of those types of          11:48
```

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 110 of 150   PageID #:
503

EXHIBIT A

1    discussions concerning not wanting to stay in          11:48

2    Shelbyville that occurred after June -- after

3    Dr. Slusher's June deployment in June of 2011?

4                    MR. LONERGAN:  So after he was

5    deployed?                                              11:48

6                    MS. RHODE:  After he was

7    deployed.

8                    MR. LONERGAN:  All right.

9    Thank you.

10                   THE WITNESS:  Did I have any           11:49

11   discussions with him about his desire to be in

12   Shelbyville after his deployment?  I don't believe

13   so.

14   BY MS. RHODE:

15     Q.    In the final sentence of your response        11:49

16   to Interrogatory Number 4, you indicate that there

17   was -- that you had a conversation with the

18   plaintiff regarding early termination of

19   plaintiff's employment agreement which was

20   substantially coordinated via communications          11:49

21   between plaintiff and Ms. Rader resulting --

22                   MR. LONERGAN:  Subsequently.

23                   MS. RHODE:  I'm sorry,

24   subsequently.  I'm sorry.

25                   MR. LONERGAN:  That's all              11:50

EXHIBIT A

1    right.                                              11:50

2    BY MS. RHODE:

3        Q.   -- subsequently coordinated via

4    communications between the plaintiff and Ms. Rader

5    resulting in the early termination agreement         11:50

6    executed by plaintiff and Heritage Medical Center.

7             We know the termination to be Exhibit 8.

8    What was the other -- you said you had another

9    conversation with Dr. Slusher regarding early

10   termination before it actually was reduced to        11:50

11   writing.

12       A.   That's what it appears to mean, yes.

13       Q.   What other conversation did you have

14   with Dr. Slusher and when?

15       A.   I don't recall specifically.  I may have    11:50

16   recalled that at the time.  That was a year or so

17   ago.

18       Q.   Okay.  Is there anything that would

19   refresh your recollection as we sit here today as

20   to what other conversation you had with            11:50

21   Dr. Slusher before the termination agreement which

22   is Exhibit 8 was executed?

23       A.   I can only make an assumption.

24       Q.   And what would you assume?

25       A.   The assumption that we discussed --        11:51

EXHIBIT A

1   yeah, we decided to do a 90-day, no-fault term.            11:51

2       Q.   You decided that -- and I understand

3   this is an assumption, but your assumption is that

4   you might have had that discussion with

5   Dr. Slusher?                                                11:51

6       A.   Correct.

7       Q.   Before he was deployed.

8       A.   Does it say before he was deployed?  I'm

9   sorry.

10      Q.   No.  It says before the termination            11:51

11  agreement was executed.  And it was executed after

12  he was deployed.

13      A.   Okay.

14      Q.   And I think you told me you didn't have

15  any actual discussions with him.  While he was          11:51

16  deployed --

17      A.   But this says -- this says it was

18  coordinated via Ms. Rader.

19      Q.   Right.

20      A.   So I guess by the words here I'm               11:51

21  reading, that yes, through Ms. Rader, I had this

22  discussion with him.

23      Q.   Okay.  You didn't specifically have a

24  discussion with him.  You had it with her, and she

25  communicated it to him.  Is that what you               11:51

EXHIBIT A

1    understand?                                      11:51

2        **A.**   That's what I understand, yes.

3        **Q.**   Okay.  And that's what you meant in this

4    answer?

5        **A.**   I think so, yeah.                   11:52

6        **Q.**   Okay.

7        **A.**   I think I was a little confused there

8    for a minute.

9        **Q.**   No, no.  That's fine.  That's why we do

10   this, just to make sure.                          11:52

11            If you will look at Number 6 --

12       **A.**   Number 6 or page 6?

13       **Q.**   Number 6, page 5.

14       **A.**   Okay.  Got it.

15       **Q.**   In the second sentence -- I'm sorry.  In   11:52

16   the second sentence it says, "Defendant Buckner

17   was not a party to the agreement."  What agreement

18   were you not a party to that you're referencing

19   here?

20       **A.**   Okay.  Let me -- let me just read it       11:52

21   myself real quick.

22       **Q.**   Take your time.

23       **A.**   (Reviews document.)  What this means to

24   me is that I was a member -- I was signing that

25   agreement as the CEO of the hospital but not       11:53

EXHIBIT A

1  personally as Dan Buckner.                                    11:53

2      **Q.**  Okay.  But you will agree with me that

3  you signed the contract which is Exhibit 3,

4  correct?

5      **A.**  Correct.                                           11:53

6      **Q.**  And you signed the termination agreement

7  which is Exhibit 8?

8      **A.**  I did.

9      **Q.**  And what you meant by saying you weren't

10  a party to the agreement is that you weren't          11:53

11  individually -- it wasn't Dan Buckner --

12     **A.**  Right.

13     **Q.**  -- farmer, signing with Dr. Slusher --

14     **A.**  Yeah.  The agreement had no effect on me

15  personally.                                           11:54

16     **Q.**  Okay.  Got it.

17     **A.**  I like that:  Dan Buckner, farmer.

18     **Q.**  That's what you said you do, right?

19     **A.**  Amen.  And I like it.

20     **Q.**  Okay.  Just checking.                      11:54

21          Now I'll ask you to look at

22  Interrogatory Number 11 on page 7, please, sir.

23     **A.**  Okay.

24     **Q.**  Okay.  Without getting specifically into

25  any discussions with you and Mr. Garrett, you         11:55

1    simply relied on whatever information or opinions          11:55

2    you were given in executing the documents we

3    talked about today that have your signature in

4    terms of the contract or in terms of the

5    termination.  Is that fair?                                11:55

6        **A.**   I was reading.  Would you say that

7    again?

8        **Q.**   Oh, I'm sorry.  Go ahead.

9        **A.**   Let me finish reading.  Then I'll listen

10   better.                                                    11:55

11       **Q.**   Just tell me when you're ready.

12       **A.**   (Reviews document.)  Okay.  Ask again.

13       **Q.**   When you executed the termination

14   agreement that is Exhibit 8, you simply relied on

15   whatever advice and information you received from          11:55

16   Mr. Garrett as legal counsel for the corporation

17   in doing so.

18       **A.**   True.

19       **Q.**   Let me direct your attention to

20   Number 13 on paragraph -- paragraph 13 on                  11:56

21   Number 8.

22       **A.**   Okay.

23       **Q.**   And I asked about your role in the

24   decision of where to assign Dr. Slusher when he

25   returned after his USERRA leave in October of              11:56

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 116 of 150   PageID #:
509

EXHIBIT A

1    2011.  And initially, you discussed with          11:56

2    Dr. Slusher about providing orthopaedic services

3    in the emergency room?

4        **A.**    That was a discussion, yes.

5        **Q.**    Because he was only going to be there    11:56

6    for three weeks or four weeks or that sort of

7    thing; is that right?

8        **A.**    Right.

9        **Q.**    Okay.  Was Dr. Slusher actually assigned

10   to the -- to provide orthopaedic services in the    11:56

11   ER or the ED, whatever they call it these days?

12       **A.**    Not from this perspective, no.

13       **Q.**    What do you mean "not from this

14   perspective"?

15       **A.**    He wasn't -- he still took -- as an    11:57

16   orthopaedic surgeon, he took call and things like

17   that in the ER.

18       **Q.**    Okay.  But that wasn't going to be his

19   sole responsibility --

20       **A.**    Correct.                              11:57

21       **Q.**    -- or a major component of his

22   responsibility.

23       **A.**    No.  It's just a regular -- as any

24   orthopaedic surgeon would have it.

25       **Q.**    And you did in fact discuss with him    11:57

EXHIBIT A

1  about working with Dr. Christopher Roane, an ER          11:57

2  doctor, to assist him in revising orthopaedic

3  protocols and policies to improve the ER

4  operation?

5      **A.**   I recall having that discussion.  He did     11:57

6  not -- that never happened, but we had the

7  conversation.

8      **Q.**   Okay.  And when you said in the last

9  line, "because Dr. Mosley had come on staff, there

10  was not a separate office location available for     11:57

11  the plaintiff," what did you mean by that?

12      **A.**   Well, that's kind of a -- you know, not

13  a very good answer there.  There was plenty office

14  space available.  But the office that he was in

15  previously had now been taken up by Dr. Mosley.     11:58

16      **Q.**   Okay.  So his office space was no longer

17  available.

18      **A.**   Right.

19      **Q.**   Not that there was no office space.

20      **A.**   Correct.                                11:58

21      **Q.**   Mr. Buckner, I've served notice to

22  Mr. Lonergan about certain questions I wanted

23  addressed, not knowing for sure who would be the

24  appropriate person.  And you have been identified

25  as the appropriate person to address certain        12:00

1    issues.  Are you aware of that?                    12:00

2        **A.**   I am.

3        **Q.**   Okay.  With respect to the first

4    question which reads, "All personnel matters

5    relating to the hiring duties, leave, and          12:00

6    termination of the plaintiff by and/or with HMC,"

7    are there other policies that you can direct me to

8    that would govern either Dr. Slusher's employment

9    with HMC and/or his -- let's start there -- with

10   his employment that were relative to the contract  12:00

11   or his rights under the contract?

12       **A.**   When you say "other," you mean other

13   than discussed here?

14       **Q.**   Yes.  I'm sorry.  Other than what we've

15   already discussed today, are there any other       12:00

16   policies that you think are relevant?

17       **A.**   No.

18       **Q.**   What about any specific policies

19   concerning termination of the contract?  Is there

20   anything that you can direct me to that was in      12:01

21   play with respect to Dr. Slusher's employment at

22   HMC other than what we've talked about today?

23       **A.**   No.

24       **Q.**   With respect to Question Number 4 which

25   reads, "HMC's handling of and response to the      12:01

EXHIBIT A

1   veteran's employment and training services," in          12:01

2   parens, in quotes, capital letters, "VETS

3   complaint filed by the plaintiff," were you

4   involved in the investigation of those

5   allegations?                                              12:01

6       **A.**   No.

7       **Q.**   Is there anything -- were you

8   specifically involved in preparing the response to

9   those allegations on behalf of the --

10      **A.**   Yeah.                                         12:02

11      **Q.**   -- corporation for HMC?

12      **A.**   I --

13                  MR. LONERGAN:  I'll reassert,

14  which we did by letter, the objections that we

15  have related to Number 4 --                               12:02

16                  MS. RHODE:  Okay.

17                  MR. LONERGAN:  -- to the

18  extent it seeks any information discussed with

19  counsel or work product, attorney-client

20  privilege, you don't have to answer that.                 12:02

21                  THE WITNESS:  Okay.

22                  MS. RHODE:  Yeah.

23  BY MS. RHODE:

24      **Q.**   I'm not --

25                  MR. LONERGAN:  And I know that             12:02

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 120 of 150   PageID #:
513
EXHIBIT A

1    you weren't, but we have a written objection.          12:02

2                        MS. RHODE:  No, no.  That's

3    fine.

4                        MR. LONERGAN:  I just want to

5    make sure we noted it.                                 12:02

6                        MS. RHODE:  Yeah.  And that's

7    fine.

8    BY MS. RHODE:

9        Q.   So I just want to explain.  I'm not

10   asking you about any discussions.  I'm not asking       12:02

11   you what they specifically asked you to go look

12   at.  I'm asking you once -- you read the

13   allegation, the Complaint, did you not?

14       A.   I did.

15       Q.   Is there anything that you said I'm            12:02

16   going to go do this or look at that or want to go

17   find out about something that you just went and

18   did?

19       A.   No.

20       Q.   Did you have any discussions other than       12:02

21   counsel, other than with counsel, about that

22   Complaint?

23       A.   It's possible that I did.

24       Q.   And who might you have had such

25   discussions with?                                      12:03

EXHIBIT A

1    **A.**   I may have discussed that with my                12:03

2    up-line.

3    **Q.**   I'm sorry?

4    **A.**   My operations up-line.

5    **Q.**   Your operations up-line?                          12:03

6    **A.**   At the first of the meeting we talked

7    about Neal Heatherley and Marty Smith.

8    **Q.**   Oh, okay.

9    **A.**   So I may have discussed it with that

10   up-line.                                                   12:03

11   **Q.**   Do you recall specifically whether you

12   did that or not?

13   **A.**   No.  It just wouldn't have been atypical

14   for me to have done that.  And they would have

15   referred me to counsel.                                    12:03

16   **Q.**   Okay.  And we'll stop there.  Can you

17   tell me -- let me -- and you know that you were

18   identified to address the question of HMC's

19   handling of and response to the veteran's

20   employment and training services complaint filed          12:03

21   by the plaintiff?

22   **A.**   Yes.

23   **Q.**   The next -- is there anything else about

24   that investigation or the preparation of that

25   response that you can tell me?                             12:04

Stone & George Court Reporting
615.221.1089
Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 122 of 150   PageID #:
515

EXHIBIT A

1      A.    No.                                          12:04

2      Q.    Do you understand that with respect to

3  Number 6, you've been identified as the individual

4  who can testify as to the search for and hiring of

5  orthopaedic physicians for HMC between June 2011    12:04

6  and December 2011, including but not limited to

7  orthopaedic physicians sought or hired as

8  replacements for plaintiffs?

9      A.    I am aware.

10     Q.    Okay.  So other than what we've talked      12:04

11 about with respect to Dr. Mosley, is there

12 anything that you can tell me about HMC's search

13 for or hiring of orthopaedic physicians for HMC

14 between June of 2011 and December of 2011?

15     A.    Only what we've already discussed          12:05

16 related to temporary locums kind of work from the

17 Tullahoma docs, et cetera.

18     Q.    Okay.  But nothing you and I haven't

19 already talked about today.

20     A.    No.                                          12:05

21     Q.    With respect to Number 9, do you

22 understand that you have been designated to

23 provide information about all negotiations by or

24 on behalf of HMC with plaintiff?

25     A.    Yes.                                         12:05

EXHIBIT A

1        MR. LONERGAN:  Subject to a        12:05

2    previously noted objection --

3        MS. RHODE:  Yes.

4        MR. LONERGAN:  -- both on

5    terms of -- the vagueness of the term and the     12:05

6    protected, privileged conversations.

7        MS. RHODE:  Okay.

8    BY MS. RHODE:

9        Q.   Are there any other negotiations with

10   respect to Dr. Slusher when he was originally     12:05

11   hired by HMC that you were engaged in or can

12   testify to that we haven't already discussed

13   today?

14       A.   No.

15       Q.   And you didn't personally have any      12:06

16   negotiations with Dr. Slusher about the

17   termination agreement which is Exhibit 8 before it

18   was executed, correct?

19       A.   I don't recollect -- I recollect that I

20   did not.                                          12:06

21       Q.   Okay.  But you did authorize Ms. Rader

22   to have negotiations with -- or to discuss it with

23   Dr. Slusher --

24       A.   Right.

25       Q.   -- on behalf of HMC?                     12:06

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 124 of 150   PageID #:
517                                                                    EXHIBIT A

1    **A.**   Right.  Up until the time that he got to    12:06

2   the hospital.

3    **Q.**   Right.  I mean before Exhibit 8 was

4   executed.

5    **A.**   Yes.                                          12:06

6    **Q.**   Okay.  And once he, Dr. Slusher,

7   returned to the hospital in early October of 2011,

8   are there any negotiations you had with him

9   regarding the remainder of his employment with HMC

10   that you and I haven't already talked about today?    12:06

11    **A.**   No.

12    **Q.**   And you understand that you were

13   designated to testify with respect to Number 10,

14   to all discussions and decisions regarding notice

15   of the plaintiff's intent to return to his          12:07

16   preservice position on October 3rd, 2011, and how

17   that return would be handled, including duties to

18   be or actually assigned to the plaintiff.  Do you

19   under --

20    **A.**   Yes.                                          12:07

21    **Q.**   And are there any such discussions or

22   decisions that you and I have not already talked

23   about today regarding those discussions or

24   decisions?

25    **A.**   No.                                           12:07

EXHIBIT A

1     **Q.** And do you understand further with    12:07

2 respect to Number 11 that you've been designated

3 to testify as to the recruitment, hiring, and

4 terms of engagement for Dr. Emmett Mosley?

5     **A.** Yes.    12:08

6     **Q.** Are there any other conversations that

7 you can testify to regarding the recruitment,

8 hiring, or terms of engagement for Dr. Mosley that

9 we haven't talked about today?

10     **A.** No.    12:08

11     **Q.** Well, let me ask you just a little bit

12 about Dr. Mosley.

13     **A.** Okay.

14     **Q.** Did you actually make the offer to

15 Dr. Mosley to enter into a contract providing    12:08

16 services to HMC?

17     **A.** That offer would have been -- yes, it

18 would have come from my office.

19     **Q.** And did you personally have a discussion

20 with him?    12:08

21     **A.** I assume.

22     **Q.** Okay. Do you recall having a discussion

23 with him about whether he had been in the

24 military?

25     **A.** Yes. I knew he had been.    12:08

Stone & George Court Reporting
615.221.1089
Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 126 of 150   PageID #: 519

EXHIBIT A

1   **Q.**   Okay.  Did you also ask him about                    12:08

2   whether he was subject to being deployed --

3   whether he was in the reserves and/or subject to

4   being deployed because of such service during the

5   period he would be contracted to HMC?                        12:09

6   **A.**   We discussed that.

7   **Q.**   Okay.  Did you express to him -- strike

8   that.

9        What did he tell you about --

10  **A.**   That he was subject to deployment.           12:09

11  **Q.**   And did you make any comments about that

12  when he said he was subject to deployment?  Do you

13  recall any comments?

14  **A.**   I don't recollect any comments.

15  **Q.**   Okay.  Are there --                          12:09

16  **A.**   That's never been an issue with me or --

17  am I speaking for the company now?

18  **Q.**   (No verbal response.)

19  **A.**   It's never been an issue with me or for

20  the company related to supporting the troops.        12:09

21  It's always been a good thing rather than a bad

22  thing.

23  **Q.**   I'm just asking you if you recall making

24  any comments to him specifically about potential

25  for his being deployed?                              12:09

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 127 of 150   PageID #:
520

EXHIBIT A

| | | |
|---|---|---|
| 1 | **A.** No. | 12:09 |
| 2 | **Q.** Do you have -- | |
| 3 | **A.** It would have been -- | |
| 4 | **Q.** I'm sorry. | |
| 5 | **A.** It would not have been atypical for me | 12:10 |

6 to have commented on if you're deployed, we've got

7 to figure out a way to cover you while you're

8 gone, you know, and talk about how we do locums or

9 something. So I probably would have had a

10 conversation like that.          12:10

11     **Q.** But you have no specific conversation?

12     **A.** No.

13     **Q.** Fair enough.

14             MS. RHODE: Can we take just a

15 couple of minutes? I think I'm done with      12:10

16 Mr. Buckner.

17             MR. LONERGAN: Okay.

18        (Recess observed.)

19             MS. RHODE: I'm done.

20        (Whereupon, Exhibit Number 21 was      12:16

21 marked for identification.)

22           CROSS-EXAMINATION

23 QUESTIONS BY MR. LONERGAN:

24     **Q.** Mr. Buckner, what's been marked as

25 Exhibit 21 is a document that's entitled Medical      12:17

EXHIBIT A

1    Staff Development Department.  Can you tell me          12:17

2    what that document is?

3         A.    It looks like a pre-agreement sheet that

4    would be signed off by the up-line indicating the

5    terms of a future contract.                            12:17

6         Q.    And who is that contract with?

7         A.    It's with Dr. Slusher.

8         Q.    Okay.  And what's the date on that?

9         A.    That is 11/3/10.

10        Q.    Okay.  And the subsequent employment         12:17

11   agreement was dated February 2nd, 2012; is that

12   right?

13        A.    I believe so.

14        Q.    Or 2011, excuse me.  Do you recognize

15   whose handwriting that is?                              12:17

16        A.    Offhand, I do not.

17        Q.    Okay.  The Sarah Smith that's at the

18   top, is that the person you referred to previously

19   today?

20        A.    Yes.                                         12:17

21        Q.    Okay.  And under the comments section,

22   if you'd just read that into the record, please.

23        A.    "Currently doing locums through

24   Weatherby at Shelbyville at $3,500 a day.

25   One-year term to bridge the gap.  Sourcing             12:17

EXHIBIT A

1    additional candidates."                        12:17

2       Q.   And when you made the reference earlier

3    in your testimony this morning about a bridge

4    position, is that consistent with this one-year

5    term to bridge the gap?                          12:18

6       A.   Yes.

7       Q.   Okay.  What does sourcing additional

8    candidates mean to you?

9       A.   Still looking for people to fill the

10   position full time.                              12:18

11      Q.   Okay.  And does that reference the

12   conversation you had with Dr. Slusher?

13      A.   Yes.

14      Q.   And then off to the right, there's some

15   notes made there.  Can you read that?            12:18

16      A.   Up on the top of the page, off to the

17   right, it says, "Max per week $3,000."

18      Q.   Okay.

19      A.   At the bottom of the page by the

20   Comments section it says, "Must include 90-day   12:18

21   out."

22      Q.   And what do you understand that to mean?

23      A.   Must include a 90-day, no-fault out

24   clause.

25      Q.   Okay.                                    12:18

EXHIBIT A

1      **A.**   The final contract must include that.        12:18

2      **Q.**   Okay.

3      **A.**   I don't recognize the handwriting but

4   this is the kind of thing that typically would be

5   generated from Sarah's desk.                          12:19

6      **Q.**   Okay.  And does that come back to you?

7      **A.**   It would come back to me, yes, sir,

8   eventually in the chain here.

9             (Whereupon, Exhibit Number 22 was

10   marked for identification.)                           12:19

11   BY MR. LONERGAN:

12      **Q.**   What's been marked as Exhibit 22 is a

13   list of physicians.  Can you identify that

14   document for me?

15      **A.**   Yeah.  It appears to me this is a        12:19

16   document that lists the locum tenens physicians

17   that were in place to fill the gap until

18   Dr. Slusher -- including Dr. Slusher -- to fill

19   the gap until he became full time.

20      **Q.**   Okay.  May 31st, 2011, a Glenn J. Kerr,   12:19

21   through 6/29/2011 -- was that during the time that

22   Dr. Slusher was on deployment?

23      **A.**   It appears to have been, yes.

24      **Q.**   And where was Dr. Kerr from?

25      **A.**   He was probably from the Weatherby or a   12:20

EXHIBIT A

1    locums contact.                                      12:20

2        **Q.**   Do you remember Dr. Zelle?

3        **A.**   Not specifically, no.

4        **Q.**   Okay.

5              (Whereupon, Exhibit Number 23 was          12:20

6    marked for identification.)

7    BY MR. LONERGAN:

8        **Q.**   What's been marked as Exhibit 23 is a

9    three-page document, and it's a reference to

10   Emmett Wayne Mosley.  I would ask if you can          12:20

11   identify that document and tell me what it is.

12       **A.**   This would come through the contract

13   recruiting section of the corporate office where

14   their computer keeps up with different potential

15   applicants.                                           12:21

16       **Q.**   Okay.  Earlier in your testimony this

17   morning you mentioned a specific reference to a

18   conversation with Dr. Mosley on April 4th, 2011;

19   is that right?

20       **A.**   April 7th?                                12:21

21       **Q.**   April 7th?

22       **A.**   Yeah.

23       **Q.**   And you made reference to a record.  Can

24   you find a reference to that conversation in this

25   document?                                             12:21

EXHIBIT A

1    **A.**    On the second page.                          12:21

2    **Q.**    Okay.

3    **A.**    4/7/2011, 3:45:17 p.m.  "This candidate

4    called the CEO in Shelbyville directly."

5    **Q.**    Okay.  Is that the conversation you          12:21

6    testified about earlier today?

7    **A.**    It is.  Yeah.

8    **Q.**    Up on -- above that, there's an entry

9    from December 20th, 2012.  I'm just going to read

10   the first sentence.  "Dr. Mosley called me about      12:22

11   his situation.  He is currently at our hospital in

12   Shelbyville, Tennessee, and he doesn't think he's

13   viable, not enough to do."

14          Do you recall any discussions with

15   Dr. Mosley about whether or not he thought there      12:22

16   was enough to do for an orthopaedic surgeon?

17   **A.**    He never specifically had that

18   conversation with me.

19   **Q.**    Okay.  Who is Joanne Anderson?

20   **A.**    That would be someone in Sarah Smith's       12:22

21   department.

22   **Q.**    Okay.  You mentioned earlier in your

23   testimony that you felt your community could only

24   support one full-time orthopaedic surgeon at HMC;

25   is that correct?                                      12:22

```
 1    A.   That is correct.                        12:22
 2    Q.   Did you maintain that belief during the
 3  entire time that you were the CEO of Heritage
 4  Medical Center?
 5    A.   Yes.                                     12:22
 6    Q.   Exhibit 19 that was offered to you
 7  earlier, the recruitment agreement for
 8  Dr. Mosley --
 9    A.   Okay.
10    Q.   -- that's dated May 16th, 2011 --        12:23
11    A.   Okay.
12    Q.   -- is it correct, in my understanding
13  from your testimony, that that agreement was
14  executed prior to Dr. Slusher going on -- being
15  deployed, his actual leaving for deployment?     12:23
16    A.   Executed?
17    Q.   The date.
18    A.   This certainly was, yeah.
19    Q.   Okay.  Did you advise Dr. Slusher that
20  you had a signed recruitment agreement with      12:24
21  Dr. Mosley before he left for deployment?
22    A.   I can only assume that I did.
23    Q.   Okay.  Do you recall a specific
24  recollection, other than discussion with
25  Dr. Mosley, that the 90-day termination agreement 12:24
```

1    would be coming to him prior to his deployment?        12:24

2                    MS. RHODE:  Dr. Mosley?

3                    MR. LONERGAN:  Excuse me.

4    Dr. Slusher.  Thank you.

5    BY MR. LONERGAN:                                        12:24

6        Q.    Let me rephrase that.  Do you recall

7    advising Dr. Slusher that he would be receiving

8    the 90-day notice or termination agreement before

9    he left for deployment?

10       A.    Yes.  I told Dr. Slusher upon             12:24

11   negotiating that contract.  That's why we're

12   putting it in there.

13       Q.    Okay.  But specifically, as it relates

14   to Dr. Mosley's recruitment agreement?

15       A.    I can assume that I did.                   12:24

16             (Whereupon, Exhibit Number 24 was

17   marked for identification.)

18   BY MR. LONERGAN:

19       Q.    Do you recognize what's been marked as

20   Exhibit 24?                                           12:25

21       A.    Yes.

22       Q.    Okay.  And can you tell me what that

23   document is?

24       A.    This would be a document that was used

25   for conversation in the negotiation process about    12:25

EXHIBIT A

1   what we were going to change or modify from the                    12:25

2   standard agreement.

3       **Q.**   And who was this for?

4       **A.**   This would be for myself, for Sarah

5   Smith, mainly, as we drew up a new contract.                       12:25

6       **Q.**   Okay.  And who did it relate to?  Whose

7   contract?

8       **A.**   Slusher, it looks like.

9       **Q.**   And what's the doctor's name right there

10  (indicating)?                                                      12:26

11      **A.**   Oh, I'm sorry.  Dr. Mosley, yes.

12      **Q.**   Wayne Mosley?

13      **A.**   Correct.

14      **Q.**   And these are concerns that, it's your

15  understanding, he had expressed the reason why the                 12:26

16  contract was being negotiated?

17      **A.**   Correct.

18      **Q.**   And what was -- Exhibit 19 is a

19  three-year contract?

20      **A.**   Yes, with an 18-month guarantee.                      12:26

21      **Q.**   What did the 18-month guarantee cash

22  collection -- what did that mean?

23      **A.**   That means that he could withdraw money

24  from the base of his cash collections guarantee

25  for up to 18 months.                                               12:26

EXHIBIT A

     1       Q.   And what would be his compensation after          12:26

     2   that 18 months?  Or how would he be --

     3       A.   It would be up to a total of $950,000.

     4       Q.   So the 18-month guarantee was a monetary

     5   guarantee to him pulled from the patient               12:26

     6   collections.

     7       A.   Correct.

     8       Q.   And after that, he was compensated

     9   without a guaranteed specific amount each month?

    10       A.   After that was burned, so to speak, he        12:27

    11   would be on his own, and whatever he generated in

    12   patient volume, he would get.  That number

    13   included money that he would have to pay for

    14   overhead.  It wasn't just salary.

    15       Q.   Okay.  Did you ever have any                  12:27

    16   communications with Dr. Slusher while he was on

    17   deployment -- and related to Exhibit 8.  Okay?

    18       A.   Okay.

    19       Q.   Did you ever have any communications

    20   from him or via Ms. Rader that he was not able to      12:28

    21   contact counsel to have the agreement reviewed?

    22       A.   That he was not able to?

    23       Q.   Right.

    24       A.   No.

    25       Q.   Okay.  And you sat in on Dr. Slusher's        12:28

EXHIBIT A

1   deposition a few weeks ago, correct?                    12:28

2       **A.**   Correct.

3       **Q.**   And you recall him testifying that he

4   had communicated via email that he would have

5   counsel review the email, that he would have          12:29

6   counsel review the agreement?

7       **A.**   Right.

8       **Q.**   Did you ever have any communications

9   with or did Ms. Rader relate to you that

10  Dr. Slusher told her that he was unable to reach       12:29

11  counsel to have the agreement reviewed?

12      **A.**   No.

13      **Q.**   Did you have any communications from

14  Dr. Slusher or via Ms. Rader that he had

15  communicated to her that he didn't understand or      12:29

16  wanted to negotiate changes to the termination

17  agreement?

18      **A.**   No.  Well, I need to correct that.

19      **Q.**   Okay.

20      **A.**   I had that -- after he signed the         12:29

21  termination agreement --

22      **Q.**   Okay.  That's not --

23      **A.**   Okay.

24      **Q.**   -- my question.

25      **A.**   Okay.  Got you.                            12:29

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 138 of 150   PageID #:
531
EXHIBIT A

1    Q.    Prior to his execution and your receipt         12:29

2    of that document.

3    A.    No, not prior to.

4    Q.    After that, you got a letter from the

5    attorney, right?                                      12:30

6    A.    Correct.  Yeah.

7    Q.    When Dr. Slusher returned to work at the

8    hospital, following his deployment and prior to

9    the early termination agreement, was he paid the

10   same compensation benefits that he had received      12:30

11   previously?

12   A.    Yes.

13   Q.    And is it your recollection that he was

14   performing largely the same type of work that he

15   had performed prior to deployment?                    12:31

16   A.    Yes.

17   Q.    And the number of patients he saw or the

18   number of surgeries he'd performed would not have

19   impacted his compensation, correct?

20   A.    No.                                             12:31

21   Q.    Exhibit 5, Military Leave policy --

22   A.    Yes, sir.

23   Q.    -- it says -- there's a section on

24   Compensation During Uniformed Services Leave.  Do

25   you know if physicians who went on military leave     12:32

1    were compensated under the hospital policies?        12:32

2        **A.**   They were not.

3        **Q.**   Okay.  But the regular hospital

4    employees would receive some form of pay; is that

5    correct?                                              12:32

6        **A.**   Yes.

7        **Q.**   Exhibit 17, which is the minutes from

8    the October 20th, 2011 meeting, the reference down

9    there, "Mr. Buckner stated there is not enough

10   orthopaedic business for both Dr. Slusher and        12:35

11   Dr. Mosley, and this is strictly an affordability

12   issue for the hospital," is that anything

13   different than you had told Dr. Slusher back prior

14   to his deployment in terms of the search for one

15   full-time orthopaedic surgeon?                       12:35

16       **A.**   No.  Same gist.

17       **Q.**   In terms of processing a request for

18   military leave while you were CEO at Heritage

19   Medical Center, if you were advised someone was

20   seeking military leave, how did you handle that?     12:35

21       **A.**   I typically would work with my human

22   resource director to determine the route to

23   follow.

24       **Q.**   Okay.  And who was that at the time?

25       **A.**   Rob Thorne.                             12:35

Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 140 of 150   PageID #:
533

EXHIBIT A

1  Q.  Exhibit 13 is the schedule, handwritten    12:36

2  schedule, for October.  You made reference that

3  that might have been a draft, that you didn't

4  think a final schedule would be handwritten; is

5  that correct?                                    12:36

6  A.  Correct.

7  Q.  If the reference there for Dr. Slusher

8  says "office and call," what does that mean?

9  A.  That he would be on call for the ER as

10 well as working in the office --                 12:37

11 Q.  Okay.

12 A.  -- on that particular day.

13 Q.  Okay.  So if any surgeries came in that

14 day, that would have been his responsibility?

15 A.  Any surgeries that did not specifically    12:37

16 request another orthopaedic surgeon.

17 Q.  Okay.  Or office visits, correct?

18 A.  Correct.

19         MR. LONERGAN:  That's it.

20         MS. RHODE:  I've got just a             12:38

21 couple quick questions following up on what

22 Mr. Lonergan asked.

23         THE WITNESS:  Okay.

24 //

25 //

EXHIBIT A

1          REDIRECT EXAMINATION                    12:38

2    QUESTIONS BY MS. RHODE:

3         Q.   With respect to Exhibit Number 19, when

4    you said -- talked about your discussions, you

5    said you assumed you would have advised          12:38

6    Dr. Slusher.  You don't have any specific

7    recollection about any actual discussions about

8    giving him a 90-day notice once you had signed

9    with Dr. Mosley, do you?

10        A.   Not specifically about having signed    12:39

11   with Dr. Mosley.

12        Q.   And once you had signed with Dr. Mosley,

13   you had a commencement date in place?

14        A.   Once we had signed the contract

15   agreement, yes.                                   12:39

16        Q.   Okay.  So you knew that there would be a

17   full-time physician as of August of 2011 with

18   Dr. Mosley coming on board, correct?

19        A.   Correct.

20        Q.   And there was nothing that would prevent 12:39

21   you, then, from giving Dr. Slusher his 90-day

22   notice so that you wouldn't have had any

23   obligation to reemployment after he had returned

24   if you had given him the 90-day notice at the time

25   you signed Dr. Mosley, correct?                   12:39

EXHIBIT A

1     **A.**   Correct.  This page does not indicate a          12:39
2  signed Dr. Mosley.  It doesn't have a signature
3  line completed for that.
4     **Q.**   Okay.  It does have a commencement date,
5  does it not?                                              12:40
6     **A.**   It does.  But at this point, a contract
7  on a face page like this, this is a working
8  document, not a final document, so that -- the
9  assumption would be that that's narrowing down the
10 start date but may not be absolute at that point.         12:40
11    **Q.**   Okay.  But there subsequently would be a
12 final document --
13    **A.**   Yes.
14    **Q.**   -- that had a commencement date.
15    **A.**   Correct.                                        12:40
16    **Q.**   And you could have given Dr. Slusher his
17 90-day notice under Slusher's contract as soon as
18 you knew that effective date if you had chosen to
19 do so.
20    **A.**   Probably.                                       12:40
21    **Q.**   So there would not have been an overlap,
22 a potential overlap, of two orthopaedic surgeons,
23 correct?
24    **A.**   Uh-huh.  Probably.
25    **Q.**   Well, there's nothing that would have           12:40

EXHIBIT A

1    prevented you from doing that if you had chosen to      12:40

2    do so, correct?

3        **A.**    Correct.

4        **Q.**    And with respect to conversations with

5    Dr. Slusher and speaking with his legal counsel          12:41

6    about the termination agreement, he never

7    specifically told you that he had actually gotten

8    to speak with his attorney, did he?

9        **A.**    No.

10       **Q.**    And Ms. Rader never told you that         12:41

11   Dr. Slusher said, "Yes, I have gotten to talk with

12   my legal counsel before I signed this agreement,"

13   did he?

14       **A.**    Well, can I answer that with a sentence?

15       **Q.**    Sure.                                     12:41

16       **A.**    Okay.  I read emails back and forth

17   between Rader and Slusher where he said, "I'm

18   sending this to my attorney."

19       **Q.**    Did you -- go ahead.  I'm sorry.

20       **A.**    And then he emailed it back without       12:41

21   saying that he had not discussed it, so the

22   assumption -- my assumption was that he certainly

23   had or he would have said so.

24       **Q.**    Irrespective of the assumption, was

25   there ever a specific comment that you saw in an        12:42

Stone & George Court Reporting
615.221.1089
Case 4:12-cv-00060-HSM-SKL   Document 27-1   Filed 05/30/14   Page 144 of 150   PageID #:
537

EXHIBIT A

1    email to Ms. Rader, or that she communicated to          12:42

2    you otherwise, that he specifically said, "I have

3    in fact gotten an opportunity and consulted with

4    my attorney before I signed this agreement"?

5        **A.**    I don't believe so.                          12:42

6        **Q.**    Now, you told Mr. Lonergan that

7    physicians who go on military leave, are deployed

8    on military leave, are not compensated; is that

9    correct?

10       **A.**    Correct.                                     12:42

11       **Q.**    Can you point to anything in the policy,

12   the military leave policy, which is Exhibit 5,

13   that says it does not apply to physicians who are

14   employed by HMC?

15       **A.**    No, I can't.                                 12:42

16       **Q.**    With respect to the note from the

17   medical executive committee on October 20th, 2011,

18   which is Exhibit 17 --

19       **A.**    Okay.

20       **Q.**    -- can you tell me if any of the other       12:43

21   individuals present on that day made any comment

22   to your contractual update concerning Dr. Slusher?

23       **A.**    No, I can't.

24       **Q.**    Do you recall, was there any discussion?

25       **A.**    I don't recollect.                           12:43

EXHIBIT A

1    Q.   Does anyone make an actual record of the          12:43

2  meeting?

3    A.   There are minutes kept on the meeting.

4    Q.   Okay.  And what you have as Exhibit 17,

5  are those the minutes or is this the agenda, if          12:43

6  you know?

7    A.   This is the minutes.

8    Q.   And now I'll ask you to look at

9  Exhibit 23, on the second page.  The note about --

10 made by Ms. Anderson concerning "Dr. Mosley called       12:44

11 me about his situation" -- I'm sorry.  Did you

12 find it?

13   A.   I'm ready.  Yeah.

14   Q.   Okay.  On page 2, there is an entry of

15 December 20th, 2012.                                      12:44

16   A.   Right.

17   Q.   That is a note by Ms. Anderson saying

18 that Dr. Mosley had called her and said there

19 is -- he doesn't think there's enough work for

20 him.                                                      12:44

21   A.   That's what it says.

22   Q.   That was more than a year after

23 Dr. Slusher left the employment of HMC, correct?

24   A.   Yes.

25   Q.   And the entry for April 7, 2011, made by       12:44

EXHIBIT A

1   Sarah Smith was simply that Dr. Mosley had called          12:45

2   you, directly entering a phone number for him.

3   That's all the comment reflects.

4       **A.**   Right.

5       **Q.**   Okay.  Was there anything else to that         12:45

6   conversation that you recall other than he gave

7   you a phone number?

8       **A.**   Oh, I think this is her saying she's

9   entering a phone number for him at their database.

10      **Q.**   Okay.                                           12:45

11      **A.**   But that she's just noting that he had

12  called me to ask about the position or to have

13  discussions about it.

14      **Q.**   Okay.  But it doesn't make -- the entry

15  on page 2 of Exhibit 23 doesn't say anything about     12:45

16  what specifically was discussed with you, correct?

17      **A.**   Right.

18      **Q.**   And do you have any notes about that

19  discussion on April 7th, 2011?

20      **A.**   No, I don't.                                    12:45

21      **Q.**   With respect to Exhibit 22, the

22  locums --

23      **A.**   Okay.  Got it.

24      **Q.**   -- Dr. Kerr was the locum from May 31st,

25  2011, through June 29th, 2011, correct?                 12:46

**EXHIBIT A**

1    A.    Yes.                                              12:46

2    Q.    Part of the time he was locums was when

3    Slusher was there and after he was initially

4    deployed.

5    A.    Correct.                                          12:46

6    Q.    And subsequent to Dr. Kerr, Dr. Zelle

7    provided locum services from July 22nd to

8    August 12, correct?

9    A.    Yes.

10    Q.    And there is no locum listed between          12:46

11    August 12 -- after August 12th and before

12    Dr. Slusher returned on October 3rd, 2011?

13    A.    Not that I see.

14    Q.    Okay.

15              MS. RHODE:  Nothing further.               12:46

16    Thank you.  I'm done.

17              MR. LONERGAN:  We're good.

18

19              FURTHER DEPONENT SAITH NOT.

20

21

22

23

24

25

EXHIBIT A

1    E R R A T A                                    12:46

2

3       I, DANIEL ANDREW BUCKNER, having read the
     foregoing deposition, Pages 1 through 148, taken
4    March 24, 2014, do hereby certify said testimony
     is a true and accurate transcript, with the
5    following changes, if any:                      12:46

6    PAGE    LINE      SHOULD HAVE BEEN

7    _____   _____     _____

8    _____   _____     _____

9    _____   _____     _____

10   _____   _____     _____   12:46

11   _____   _____     _____

12   _____   _____     _____

13   _____   _____     _____

14   _____   _____     _____

15   _____   _____     _____   12:46

16   _____   _____     _____

17

18                     _____

19                         DANIEL ANDREW BUCKNER

20                                                   12:46

21
     _____
22          Notary Public

23   My commission expires:  _____

24

25

EXHIBIT A

1          REPORTER'S CERTIFICATE                    12:46

2

3    STATE OF TENNESSEE    )

4    COUNTY OF WILLIAMSON  )

5                                                    12:46

6          I, Cassandra M. Beiling, CCR,

7    LCR #371, Notary Public and Court Reporter, do

8    hereby certify that I recorded to the best of my

9    skill and ability by machine shorthand all the

10   proceedings in the foregoing transcript, and that    12:46

11   said transcript is a true, accurate, and complete

12   transcript to the best of my ability.

13          I further certify that I am not an

14   attorney or counsel of any of the parties, nor a

15   relative or employee of any attorney or counsel      12:46

16   connected with the action, nor financially

17   interested in the action.

18          SIGNED this 7th day of April, 2014.

19

20                                                   12:46

21        _____

22        Cassandra M. Beiling, CCR, LCR# 371

23

24   My commission expires:  3/12/2016.

25

EXHIBIT A