1            IN THE UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF TENNESSEE

3

4    CIVIL ACTION NO. 4:12-CV-00060

5

6    RICHARD SLUSHER, D.O.,                    COPY

7               Plaintiff,

8    vs.

9    SHELBYVILLE HOSPITAL CORPORATION d/b/a

10   HERITAGE MEDICAL CENTER; and DAN BUCKNER,

11   individually,

12               Defendants.

13

14                    DEPOSITION OF

15               RICHARD SLUSHER, D.O.
          Bradley Arant Boult Cummings, LLP
16               One Federal Place
            1819 Fifth Avenue North
17          Birmingham, Alabama 35203
                 March 2, 2014
18

19   REPORTED BY:

20       Gail B. Pritchett

21       Certified Realtime Reporter,

22       Registered Professional

23       Reporter and Notary Public

EXHIBIT B

```
1                A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4            Ms. Shari Rhode

5            Attorney at Law

6            Rhode & Jackson, PC

7            1405 West Main Street

8            P. O. Box 99

9            Carbondale, Illinois 62903-099

10

11   FOR THE DEFENDANT:

12           Mr. Matthew C. Lonergan

13           Attorney at Law

14           Bradley Arant Boult Cummings

15           Roundabout Plaza

16           1600 Division Street, Suite 700

17           Nashville, Tennessee 37203

18           615.244.2582

19           mlonergan@babc.com

20

21   OTHERS PRESENT:

22           Mr. Dan Buckner

23
```

**EXHIBIT B**

```
 1              INDEX OF EXAMINATION

 2                                          Page:

 3   EXAMINATION BY MR. LONERGAN              7

 4   EXAMINATION BY MS. RHODE                153

 5   REEXAMINATION BY MR. LONERGAN           156

 6

 7

 8              INDEX OF EXHIBITS

 9                                          Page:

10   Defendants' Exhibit 1                    19

11   Defendants' Exhibit 2                    29

12   Defendants' Exhibit 3                    36

13   Defendants' Exhibit 4                    39

14   Defendants' Exhibit 5                    44

15   Defendants' Exhibit 6                    52

16   Defendants' Exhibit 7                    53

17   Defendants' Exhibit 8                    55

18   Defendants' Exhibit 9                    58

19   Defendants' Exhibit 10                   63

20   Defendants' Exhibit 11                   68

21   Defendants' Exhibit 12                   73

22   Defendants' Exhibit 13                  100

23   Defendants' Exhibit 14                  101
```

| | | |
|---|---|---|
| 1 | Defendants' Exhibit 15 | 103 |
| 2 | Defendants' Exhibit 16 | 104 |
| 3 | Defendants' Exhibit 17 | 108 |
| 4 | Defendants' Exhibit 18 | 116 |
| 5 | Defendants' Exhibit 19 | 120 |
| 6 | Defendants' Exhibit 20 | 125 |
| 7 | Defendants' Exhibit 21 | 129 |
| 8 | Defendants' Exhibit 22 | 132 |
| 9 | Defendants' Exhibit 23 | 141 |
| 10 | Defendants' Exhibit 24 | 145 |
| 11 | Defendants' Exhibit 25 | 148 |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |

**EXHIBIT B**

1  　　　　　S T I P U L A T I O N

2  　　　　　IT IS STIPULATED AND AGREED, by

3  and between the parties, through their

4  respective counsel, that the deposition of

5  RICHARD SLUSHER, D.O. may be taken before Gail

6  B. Pritchett, Commissioner, Certified Realtime

7  Reporter, Registered Professional Reporter and

8  Notary Public;

9  　　　　　That it shall not be necessary for

10 any objections to be made by counsel to any

11 questions, except as to form or leading

12 questions, and that counsel for the parties may

13 make objections and assign grounds at the time

14 of trial, or at the time said deposition is

15 offered in evidence, or prior thereto.

16

17

18

19

20

21

22

23

1          I, Gail B. Pritchett, a Certified

2   Realtime Reporter and Registered Professional

3   Reporter of Birmingham, Alabama, and a Notary

4   Public for the State of Alabama at Large,

5   acting as Commissioner, certify that on this

6   date, as provided by the Federal Rules of Civil

7   Procedure of the United States District Court,

8   and the foregoing stipulation of counsel, there

9   came before me at the offices of Bradley Arant

10  Boult Cummings, LLP, One Federal Place, 1819

11  Fifth Avenue North, Birmingham, Alabama, on the

12  2nd day of March, 2014, commencing at 9:31

13  a.m., RICHARD SLUSHER, D.O., witness in the

14  above cause, for oral examination, whereupon

15  the following proceedings were had:

16

17          RICHARD SLUSHER, D.O.,

18  being first duly sworn, was examined and

19  testified as follows:

20

21          THE COURT REPORTER:  Usual

22  stipulations?

23          MR. LONERGAN:  Well, Shari is not

**EXHIBIT B**

1  from this district.  We usually just reserve

2  all objections except to form.

3              MS. RHODE:  Agreed.

4              MR. LONERGAN:  And I think I heard

5  you say, but just to get it on the record, do

6  you want Dr. Slusher to read and sign?

7              MS. RHODE:  Yes.

8              MR. LONERGAN:  It means you read

9  your copy of the deposition and have an

10  opportunity to correct some things if you want

11  to.

12              THE WITNESS:  Okay.

13              MS. RHODE:  You can't change your

14  answers, but if she didn't understand it --

15              THE WITNESS:  Oh, yeah.

16              MS. RHODE:  In case you start

17  going too fast.

18

19  EXAMINATION BY MR. LONERGAN:

20        Q.    Your full name for the record,

21  please.

22        A.    Richard Michael Slusher.

23        Q.    Dr. Slusher, I introduced myself

**EXHIBIT B**

1    to you a little while ago this morning, Matthew

2    Lonergan.  I represent both Mr. Buckner and the

3    hospital corporation in your lawsuit that you

4    have filed.  Have you given a deposition

5    before?

6           A.    Yes, sir.

7           Q.    So I don't have to tell you a

8    whole lot about what we are here for, but I

9    will give you some just reminders.

10          A.    Yes, sir.

11          Q.    If you will, listen to my

12   questions.  And if you don't understand it,

13   please let me know and I will rephrase so you

14   can answer it.

15          A.    Yes, sir.

16          Q.    If you don't do that, I will

17   assume you have understood it and answered it

18   to the best of your ability.

19          A.    Yes, sir.

20          Q.    I'm sure you'll be fine, but the

21   court reporter needs verbal responses.  So we

22   try not to have head nods or uh-huhs --

23          A.    Yes, sir.

**EXHIBIT B**

1          Q.     -- and uh-uhs.  And I will -- make

2    sure that you let me finish my question.

3    Sometimes I kind of pause and you think I might

4    be done but I'm not.  And I will make sure I

5    let you finish your answers so we don't talk

6    over each other.

7          A.    Yes, sir.

8          Q.    If at any time you need a break,

9    need to get water or use the restroom, just let

10   us know.  It's not a marathon contest, just

11   trying to get your answers to my questions,

12   okay?

13         A.    Yes, sir.

14         Q.    I don't know how long we will be

15   today.  I'm sure we will be several hours.  But

16   like I say, if you need to take a break, take a

17   break.

18         A.    Yes, sir.

19         Q.    You have given a deposition

20   before; can you tell me in what context?

21         A.     It was for me versus Watson

22   Orthopedics in Springfield, Illinois.

23         Q.     And that's a prior lawsuit that

1    you filed?

2            A.      Yes, sir.

3            Q.      What is the status of that

4    lawsuit?

5            A.      Mainly just -- it's done, right?

6            Q.      She really can't tell you.

7                    MS. RHODE:  As you understand it.

8            A.      I understand it's over with.  We

9    are signing paperwork for it just to go away, I

10   guess.

11           Q.      Okay.  So you're dismissing it?

12           A.      Dismissing, yes.  Better word for

13   it, yes, sir.

14           Q.      What was your claim under that

15   lawsuit?

16           A.      That he did not -- that he was not

17   just in what he was doing with the contract

18   that we had with him.  It was just -- you know,

19   I really don't exactly know.  I know she can't

20   tell me exactly what I was suing for, but his

21   contract was not fair is basically what it was.

22           Q.      Were you suing for additional

23   compensation or compensation you thought was

**EXHIBIT B**

1  owed you under the contract?

2      A.    I believe it was just compensation

3  due under the contract, I believe.

4      Q.    And I assume they defended that

5  they didn't owe you any additional monies?

6      A.    Yes.

7      Q.    And it has been resolved without

8  the payment of any additional money?

9      A.    Yes, sir.

10     Q.    And was Ms. Rhode your legal

11  counsel in that lawsuit?

12     A.    Yes, sir.

13     Q.    Now, your current military

14  deployment or leave, why don't you walk me

15  through that.

16     A.    This one right here, sir?

17     Q.    Yes, sir.

18     A.    This is one with my Special Forces

19  group that I need to be qualified as a flight

20  surgeon.  So now I'm in Fort Rucker's School of

21  Aviation Medicine learning to be a flight

22  surgeon.

23     Q.    And is a flight surgeon what it

**EXHIBIT B**

1    sounds like, that you --

2         A.    What do you mean, sir?

3         Q.    Tell me what a flight surgeon is.

4         A.    A flight surgeon is aviation

5    medicine.  We take care of the pilots.  We take

6    care of all the aviators in the Navy, Air

7    Force, Army, Marine Corps.  We also take care

8    of the -- in my case, I take care of Special

9    Forces guys who are high altitude, HAHO/HALO

10   jumpers and taking care of the mountain team,

11   scuba teams, all of the scuba divers.  That's

12   about -- and that's basically the aviation --

13   U. S. Army School of Aviation Medicine.

14        Q.    And what is your current rank?

15        A.    Major.

16        Q.    And how long have you been a

17   Major?

18        A.    About five years.

19        Q.    When did you start the current

20   military leave?

21        A.    February -- today is March the

22   1st.  So February, I think, 9th I reported.

23        Q.    And how long are you supposed to

**EXHIBIT B**

1   be on leave?

2        A.     I will be there until March the

3   20th -- 21st, sorry, 21st.

4        Q.     So this was designed mainly for

5   the special training or the additional

6   training?

7        A.     Yes, sir.

8        Q.     What is your current employment

9   status?

10       A.     I'm employed with Triangle

11  Orthopaedic Associates in Durham, North

12  Carolina.

13       Q.     And how long have you been with

14  Triangle?

15       A.     So this is March.  It will be

16  twenty-three months.  It's twenty-three months

17  on March the 9th.

18       Q.     So back in April of 2012?

19       A.     April 9th, 2012.

20       Q.     And while you are on military

21  leave, you are getting paid by the military,

22  correct?

23       A.     Roger that, yes, sir.

**EXHIBIT B**

1       Q.     What is your compensation in the

2  military?

3       A.     What is my compensation?

4       Q.     Yes.

5       A.     I don't really know how much it

6  is.  It's like seven thousand dollars a month,

7  I think it is.

8       Q.     Are you getting any additional

9  payment from Triangle?

10      A.     I took one week of continuing

11 medical education, and the other five weeks I

12 am not getting paid.

13      Q.     Are you an employee of Triangle or

14 do you have an ownership interest in the

15 association?

16      A.     I am an employee, sir.

17      Q.     Does Triangle have more than one

18 office?

19      A.     Yes, sir.

20      Q.     How many do they have?

21      A.     All right.  One, two, three -- I

22 think there are eleven.

23      Q.     All in North Carolina?

**EXHIBIT B**

1        A.    Yes, sir.

2        Q.    And where are you based out of for

3  your work?

4        A.    The southeast region.  I am in

5  Erwin, North Carolina.

6        Q.    Is that Irwin with an I?

7        A.    E, E-r-w-i-n.

8        Q.    What is your residence address?

9        A.    305 South Bethesda Road,

10  B-e-t-h-e-s-d-a, Road, Southern Pines, North

11  Carolina 28387.

12        Q.    And your current marital status?

13        A.    Married.

14        Q.    Children?

15        A.    Two, boy and a girl.

16        Q.    Ages?

17        A.    Eight and twelve.

18        Q.    How long have you been married?

19        A.    Ten years July the 3rd.

20        Q.    Okay.  How long have you lived at

21  the Bethesda address, Bethesda Road?

22        A.    Four years.

23        Q.    And where was your residence

**EXHIBIT B**

1  before that?

2      A.   815 East Massachusetts.  And

3  that's in Southern Pines.

4      Q.   Do you still own that home?

5      A.   No, sir, we rent it.

6      Q.   The Bethesda Road home, do you own

7  or rent?

8      A.   Yes, sir, we own.

9      Q.   When did you first join the

10  military?  Just give me a brief history.  I

11  don't need all of your --

12      A.   Well, I went to basic in June of

13  1987.  Is that all you want, sir?

14      Q.   Well, a little bit more than that.

15  You shortened it too much.

16      A.   I joined the ROTC throughout that

17  summer, went to a military academy at Wentworth

18  Military Academy, started in August of 1987,

19  graduated in May, May 20th, 1989.  I was

20  commissioned as second lieutenant.  And then I

21  went back to my home state, which was Michigan,

22  joined a field artillery National Guard unit,

23  spent two years with them while I was getting

**EXHIBIT B**

1    my degree at Wayne State University, my

2    undergraduate.

3              I went to field artillery officer

4    basic course in 1992 at Fort Sill, Oklahoma,

5    graduated.  I came back to my home state and

6    continued on with my field artillery for the

7    next ten years.  Then when I graduated medical

8    school in 1999, I was commissioned -- actually,

9    I was already a captain, but they kind of

10   flipped me over and made me a captain in the

11   medical corps, which I joined a forward support

12   battalion as well as battalion surgeon for an

13   infantry unit --

14             (Reporter interruption.)

15        A.    A forward support battalion, which

16   I was a battalion surgeon for an infantry unit.

17        Q.    Okay.

18        A.    And then I started my residency in

19   2000, and I went to Chicago where I did not --

20   I was back and forth to Michigan with my

21   National Guard unit.  And then in 19 -- excuse

22   me, in 2004, I believe it was, I joined a

23   forward surgical team with the reserve.  I was

**EXHIBIT B**

1    in 919th Forward Surgical Team, which I spent a

2    year with.

3            Went to JRTC, which is a joint

4    readiness training in Fort Polk, and then I

5    went -- or I was assessed to go on active duty

6    to Fort Bragg in 2005 with the 82nd Airborne

7    Division, which I was part of the 782nd Forward

8    Surgical Team, 82nd Airborne.  And do you want

9    any more than that?  Do you want now?  Do you

10   want my deployments and all of that other kind

11   of stuff too?

12        Q.    Well, I'm going to ask you about

13   your deployments, but let me get to that.  When

14   did you cease active duty?

15        A.    October of 2009.

16        Q.    And where were you at that time?

17        A.    Residence, sir?

18        Q.    Yes, sir.

19        A.    I was at 815 East Massachusetts

20   Avenue, Southern Pines outside of Fort Bragg,

21   North Carolina.

22        Q.    Was Fort Bragg your last -- as an

23   active military member, was Fort Bragg your

**EXHIBIT B**

1    last assignment?

2          A.     Yes, sir.

3          Q.     So you were there from 2005 as an

4    active --

5          A.     Yes, sir.

6          Q.     -- member until --

7          A.     August 1st, 2005.

8                 MS. RHODE:  Let him finish.

9          A.     Oh, I'm sorry.  Thought he was --

10   he took a deep breath.

11         Q.     (BY MR. LONERGAN:)  Remember I

12   warned you about --

13                MS. RHODE:  You need to take one

14   too.

15         Q.     (BY MR. LONERGAN:)  The gray hair

16   makes you have to slow down a little bit.  I go

17   a little slow.

18         A.     Grass don't grow on a busy street.

19                (Off-the-record discussion.)

20         Q.     (BY MR. LONERGAN:)  So 2005 to

21   2009?

22         A.     Roger.

23                (Whereupon, Defendants' Exhibit 1

**EXHIBIT B**

1            was marked for identification and

2            copy of same attached hereto.)

3        Q.    Would you identify that document,

4    please, Dr. Slusher?

5        A.    It's my resume.  It's my resume.

6    Could you hear that?  Sorry.

7        Q.    Can you tell me when this was

8    current, as of what date?

9        A.    Let's see.  Well, my kids were

10    only eight and four, so four years ago for my

11    son.  Four years ago.

12        Q.    All right.  And it indicates at

13    the time I guess at the upper right-hand corner

14    Weatherby Locums, Inc.  Was that your employer

15    at the time?

16        A.    Yes, sir, that was a locums

17    company.

18        Q.    And you are an orthopedic surgeon,

19    correct?

20        A.    Yes, sir.

21        Q.    What current states do you hold

22    your medical license in?

23        A.    I have a Virginia medical license

**EXHIBIT B**

1    as well as a North Carolina medical license.

2         Q.    And prior states in which you have

3    been licensed?

4         A.    Michigan, Ohio, Illinois,

5    Tennessee.  And that is all.  No, I'm sorry.

6    Kentucky.  Kentucky.  I'm sorry.

7         Q.    That's all right.

8         A.    That was for my fellowship.

9         Q.    Now, you mentioned a little bit

10   ago and I said I would get to it, but why don't

11   we do that now.  Since you ended your active

12   duty assignment, can you tell me when and where

13   your deployments have been in terms of serving

14   reserves?

15        A.    The only one that I did was the

16   one in 2011, June 9th, 2011 until the end of

17   September 2011, when I went to Iraq, Basra,

18   Iraq.  Do you need to know the unit's name or

19   anything?

20        Q.    No, I don't.  Now, other -- is

21   that the only time you have been deployed

22   overseas?

23        A.    No, sir.  I was deployed to

**Tyler Eaton Morgan Nichols &**                    **877-373-3660**
**EXHIBIT B**

1    Afghanistan with the 541st Forward Surgical

2    Team, 82nd Airborne.

3          Q.    When was that?

4          A.    That was in October of 2006 until

5    October of 2007.

6          Q.    Others?

7          A.    I spent a month with Operation

8    Katrina from September of 2005 until October of

9    2005.  I have gone to -- and I apologize.  I'm

10   sorry.  I went to Africa last year with the

11   909th Forward Surgical Team to Botswana for a

12   month, and that was in 2013 -- August of

13   2000 and -- it wasn't last year.  It was 2012.

14   I'm sorry.  July 2012 to the end of August

15   2012.  They all roll together.  I'm sorry.

16         Q.    That's all right.  So two after

17   active duty, two while you were still in active

18   duty.  Any other call-ups or deployments

19   post-active duty?

20         A.    When I came back from Iraq, I was

21   at Fort Leonard Wood from November the 14th.  I

22   did backfill deployment until March of 2000

23   and -- November 14th, 2011 until March of 2012.

1          Q.      You said backfill deployment.  Can

2     you tell me what that is?

3          A.      Well, they needed an orthopedic

4     surgeon to help out the orthopedic surgeons.

5     The orthopedic departments at most of the major

6     bases, they are deploying their orthopedic

7     surgeons overseas, so they need sometimes

8     reservists to come in and help out, fill in

9     that spot.  So that's basically what I did to

10    help out.

11         Q.      And that was in Missouri?

12         A.      Roger, sir, Fort Leonard Wood,

13    Missouri.

14         Q.      Any others after 2009?

15         A.      I think that's it, sir.  Yeah, I

16    think that's it.

17         Q.      Okay.  And then your current one,

18    which we have already talked about.

19         A.      Yes, that's --

20         Q.      Is there a cap on the number of

21    times that you can be called up --

22         A.      No, sir.

23         Q.      -- as a reserve?

**EXHIBIT B**

1      A.    Not that I know, sir.  Actually

2  the reservists get tapped -- or get deployed

3  more than the active duty guys.  And that's

4  because we only go three months at a time.  So

5  they can snag -- excuse me, that's a terrible

6  word to use.  But they can take you off of your

7  civilian job three months.  It is easier for

8  them to do that than to take an orthopedic

9  surgeon active duty, which has to go six

10  months.  At least that's their thinking, their

11  feeling.

12      Q.    Okay.  When you ceased active

13  duty, 2009, what was your employment after

14  that?

15      A.    2009, I was recruited while I was

16  on active duty to go work for Watson

17  Orthopedics.

18      Q.    And that was in Illinois?

19      A.    Yes, sir.

20      Q.    What city?

21      A.    Springfield.

22      Q.    And how long were you with Watson?

23      A.    Three months.

1          Q.     And where did you go after -- and

2    were you an employee of Watson Orthopedics?

3          A.     Yes.   Yes, sir.

4          Q.     And then where did you go after

5    Watson?

6          A.     I did locums with Weatherby

7    Locums, which is on here.

8          Q.     Is that in 2009 as well?

9          A.     It was in 2010.   I was working

10   with Weatherby in 2009.

11         Q.     Okay.

12         A.     In October I started working with

13   them.   And then in 2010 I did some more, just a

14   of couple week things.   And then when I left --

15   after I left Watson Orthopedics, I also went to

16   Tennessee, to Nashville to work for Dr. Kahlon

17   for three months.   I worked for him from March

18   until June.

19         Q.     Is that Dr. Kahlon with a K?

20         A.     Dr. Kahlon, I think it's with a K,

21   yes, sir.   He works for Tennessee Orthopedics

22   and Sports Medicine.   Not the TOA.   There is a

23   difference.   Do you know the difference?

**EXHIBIT B**

1          Q.    I do.  I represent TOA.

2          A.    Okay.  They are a much better

3    group.

4          Q.    Big group.

5          A.    Yes, they are.

6          Q.    So three months with the Tennessee

7    Orthopedic and Sports Clinic?

8          A.    Yes, sir.

9          Q.    And was that through Weatherby?

10         A.    No, sir.

11         Q.    Okay.  And then after that group,

12   is that when you went back to Weatherby with

13   Heritage?

14         A.    That's when Heritage got ahold of

15   Weatherby; Weatherby got ahold of me.  And they

16   needed to have somebody to come and help them

17   out, so that's when I got turned on to the

18   Heritage Medical Center.

19         Q.    So Weatherby would be -- you just

20   have a contractual relationship with Weatherby

21   and if you are looking for work or assignment,

22   or they might contact you and say would you

23   like to go to wherever?

1          A.     Yes, sir.

2          Q.     Okay.  Did you get lined up with

3    Watson through Weatherby?

4          A.     No, sir.

5          Q.     And Dr. Kahlon's group, that was

6    via Weatherby?

7          A.     No, sir.

8          Q.     Besides Heritage Medical Center,

9    which is the Shelbyville, Tennessee location we

10   are talking about, what other assignments have

11   you had through Weatherby?

12         A.     I worked at Herrin Hospital in

13   Illinois.  It's Herrin, Illinois.  It's right

14   outside of Marion.  And then I worked at

15   Hawkins County.  It is in Kentucky, Hawkins

16   County Medical.  And I also worked -- just

17   recently did a weekend call, Christmas call for

18   Laurinburg in Scotland Memorial Hospital in

19   Laurinburg, North Carolina.

20         Q.     In Herrin, Illinois, how long were

21   you there?

22         A.     I believe it was a couple of

23   months.  I did a couple of different -- I think

1  two weeks there -- no.  No, no, I'm sorry.  It

2  was longer -- it was October, November,

3  December and January I did a couple of

4  two-week -- two weeks at a time.

5       Q.    For two weeks at a time?

6       A.    Yes, sir.

7       Q.    Over that four-month period?

8       A.    Yes, sir.

9       Q.    What did you do those two weeks

10  where you weren't working at the hospital?

11       A.    What do you mean, sir?

12       Q.    Well, maybe I misunderstood.  You

13  were in Herrin, Illinois for four months.

14       A.    No, I was in Springfield,

15  Illinois.

16       Q.    Okay.

17       A.    I was working with Dr. Watson.

18  But Dr. Watson wasn't -- whatever.  It is what

19  it is.

20       Q.    Right.

21       A.    So I took two weeks to support

22  myself, working locums, because I wasn't

23  getting paid by Dr. Watson.

1          Q.    So you were doing that at the same

2     time you were doing Watson?

3          A.    Yes, sir.

4          Q.    Got you.  How long were you in

5     Kentucky at Hawkins County Medical?

6          A.    A week and a half.  I just did a

7     real quick locums there.  And I believe that

8     was in February of 2010.

9          Q.    And then the North Carolina,

10    Laurinburg?

11         A.    That was just recent, just last --

12         Q.    Holiday?

13         A.    Last December, yes, sir.

14         Q.    Any other assignments through

15    Weatherby besides the Heritage Medical Center?

16         A.    No, sir.  Heritage started out as

17    Weatherby.

18         Q.    Uh-huh.

19         A.    Okay.  You added that one.  That

20    was one of them.

21         Q.    I will mark these as a

22    collective 2.

23              (Whereupon, Defendants' Exhibit 2

**EXHIBIT B**

1              was marked for identification and

2              copy of same attached hereto.)

3         Q.     Dr. Slusher, what has been marked

4    as collective Exhibit 2 is a series of

5    documents relating to your temporary assignment

6    at Heritage Medical Center.  Do you recognize

7    these documents?

8         A.     (Reviewing document.)  Yes, sir.

9         Q.     And simply put, these would

10   reflect your assignments at Heritage Medical

11   Center through Weatherby under the locum tenens

12   status, correct?

13        A.     That's what it looks like.

14        Q.     First one is July, right?

15        A.     Yes, sir, I started July 21st.

16        Q.     It refers to thirty-day periods,

17   and then it can be renewed not to exceed a

18   hundred and twenty total days.  Are you

19   familiar with that?

20        A.     Where does it say that at, sir?

21        Q.     The first one that's dated July

22   20th, the first page.

23        A.     First one I have is dated August

1    the 4th.

2                    MS. RHODE:   (Indicating.)

3         A.    My bad.  Sorry.

4         Q.    (BY MR. LONERGAN:)   That's all

5    right.  So thirty-day increments not to exceed

6    a hundred and twenty days?

7         A.    Yes, sir.

8         Q.    It's your understanding that's a

9    Tennessee law in terms of your affiliation with

10   the hospital, that you are limited in how long

11   you can serve at this locums tenens status?

12        A.    I did not know the law.  I didn't

13   know the law, no, sir.

14        Q.    Have you run across that in any

15   other states in which you have been licensed --

16        A.    No, sir, I never knew this.

17        Q.    So that is the first one.  The

18   second page or second document is dated August

19   4th, correct?

20        A.    Yes, sir, it is.

21        Q.    Can you tell me if you recall

22   receiving that document?

23        A.    No, sir.

**EXHIBIT B**

1       Q.    It's from Mr. Buckner, Dan

2    Buckner, to all physicians and department

3    directors.  Do you know what this document

4    refers to?

5       A.    No, sir.

6       Q.    It identifies the orthopedic

7    office being staffed with locum tenens

8    positions.  Do you see that?

9       A.    Yes, sir.

10      Q.    It looks like a rotation there of

11   a number of physicians going two weeks and

12   covering with others, and your name is

13   included, is that correct?

14      A.    Yes, sir.

15      Q.    Did you know who Dr. Elizondo was?

16      A.    No, sir.

17      Q.    On any of these other physicians

18   listed, Dr. West, Dr. Ramprasad, I will say --

19   I don't know that's right -- and Dr. Hardin,

20   did you meet those gentlemen while you were

21   serving at Heritage Medical Center?

22      A.    I met Dr. West and Dr. Ramprasad.

23      Q.    Were they orthopedic physicians as

**EXHIBIT B**

1   well?

2        A.    Yes, sir.

3        Q.    Did you know who Dr. Purvis was?

4        A.    No, sir.

5        Q.    Do you know if Dr. Purvis ever

6   joined Heritage Medical Center as a full-time

7   orthopedic surgeon?

8        A.    No, sir, I don't.

9        Q.    Did you know if Dr. Elizondo was a

10  full-time permanent orthopedic surgeon?

11       A.    I knew that he was prior to me,

12  yes.  I never met him.

13       Q.    Now, the next three pages,

14  Dr. Slusher, are the same type of document in

15  terms of the locum tenens assignment.  One is

16  August, one is September, and one is October.

17       A.    Yes, sir, they are all dated, yes,

18  sir.

19       Q.    And they are all addressed to you

20  at the 815 East Massachusetts Avenue residence,

21  correct?

22       A.    Yes, sir.

23       Q.    And Southern Pines has been your

**EXHIBIT B**

1   residence since you -- since 2005, is that

2   right --

3          A.    Yes, sir.

4          Q.    -- when you were at Fort Bragg?

5   Okay.  As it relates to the September and

6   October time frame, do you recall any of the

7   other orthopedic physicians who might have

8   worked at the hospital as locum tenens?

9          A.    I don't understand that, sir.

10  What do you mean?

11         Q.    I asked you earlier, and you were

12  familiar with Dr. West and Dr. -- is it Dr.

13  Ramprasad?

14         A.    Yes, sir.

15         Q.    Did they continue to serve in a

16  locum tenens capacity in September and October

17  of 2010?

18         A.    I believe Dr. West, I saw him one

19  time.

20         Q.    Okay.

21         A.    Dr. Ramprasad was an attending

22  physician in Tullahoma, which was down the

23  street, and he would take call at the hospital.

**EXHIBIT B**

1   He didn't necessarily work in the same office

2   as me.  But I met him and knew him.

3          Q.    Any other orthopedic surgeons that

4   were at Heritage during the time frame that you

5   were serving as locum tenens?

6          A.    No, sir.

7          Q.    That you can recall?

8          A.    No, sir.

9          Q.    How did you get originally

10  connected with Weatherby?

11         A.    Originally with Weatherby?

12         Q.    Yes, sir.

13         A.    Back in 2009?

14         Q.    Yes, sir.

15         A.    Through the computer, just looking

16  for locum tenens work.

17         Q.    And why did you choose locum

18  tenens work?

19         A.    Because I didn't have a job coming

20  off of active duty yet.

21         Q.    Okay.  So you started in locum

22  tenens capacity at Heritage in July of 2010?

23  Does that sound right?

1       A.      Yes, sir.

2       Q.      And then after the locum tenens

3   assignment, you entered into an employment

4   contract with Heritage Medical Center, is that

5   correct?

6       A.      Yes, sir.

7       Q.      Do you recall an orthopedic

8   surgeon named Robert Swift?

9       A.      Yes.

10      Q.      Did he serve in some locum tenens

11  capacity at Heritage Medical Center while you

12  did as well?

13      A.      Yes, he did.  As a matter of fact,

14  yes, he did.  Wow, yes, he did.  I knew him

15  from the same in TOA, not the TOA that you are

16  representing, but the other, Tennessee

17  Orthopedic Sports Medicine.  He had worked for

18  Dr. Kahlon as well.  I totally forgot about

19  that guy.

20              (Whereupon, Defendants' Exhibit 3

21              was marked for identification and

22              copy of same attached hereto.)

23      Q.      What has been handed you as

**EXHIBIT B**

1   Exhibit 3 dated November 10, 2010, it's a

2   letter to you from Heritage Medical Center

3   regarding appointment to active medical staff,

4   correct?

5          A.    Yes, sir.

6          Q.    Granting your clinical privileges

7   starting November of 2010?

8          A.    Yes, sir.

9          Q.    Do you recall receiving that?

10         A.    I never received this, but it's

11  here.  I never got this copy, no, sir.

12         Q.    I guess it went to your home

13  address.

14         A.    It may have.

15         Q.    It's identified as going to the

16  East Massachusetts Avenue, Southern Pines

17  address, right?

18         A.    Yes, sir.

19         Q.    Tell me the circumstances -- what

20  changed to go from locum tenens to going to

21  work for Heritage?  How did that come up?

22         A.    How did it come up?  Since I had

23  started there doing locum tenens, they had been

1    offering me a job, wanting me to come work

2    there, come full-time.  And I told them that,

3    you know, I --

4                MS. RHODE:  Slow down a little.

5          Q.    (BY MR. LONERGAN:)  Slow down a

6    little.

7          A.    I'm sorry.  I told them that I

8    wasn't sure.  I didn't know if I wanted to move

9    to Tennessee or not.  I wanted it -- I just

10   wanted to keep my options open still.  When I

11   was approached to do the one-year contract, I

12   said yeah, I would do it one year.  It would

13   help me to convince my wife, and we would come

14   here and move here.  So I wanted to do the full

15   year contract with them.  It was my intention

16   to honor that full year contract, which is why

17   I signed the contract.

18         Q.    You never moved your wife and

19   family to Tennessee, correct?

20         A.    No, sir, we never moved there.  We

21   visited.  She came and looked at places.

22         Q.    And you initially lived in a

23   hotel?

**EXHIBIT B**

1       A.     Yes, sir, I did.

2       Q.     And then after that, did you rent

3   a home or apartment, a duplex?

4       A.     Yes, sir, I did, a home.

5       Q.     What type?  A house?

6       A.     A home.

7       Q.     In Shelbyville?

8       A.     Yes, sir.

9              (Whereupon, Defendants' Exhibit 4

10             was marked for identification and

11             copy of same attached hereto.)

12      Q.     What has been marked as Exhibit 4,

13  Dr. Slusher, is a copy of what looks like your

14  application for medical staff appointment at

15  Heritage.  Take a minute and look at that.

16      A.     (Reviewing document.)  Did you

17  want me to answer yes to this?

18      Q.     Yes.

19      A.     Yes, sir.

20      Q.     Do you recall completing that

21  document?

22      A.     This is not my handwriting, but --

23  some of it is my handwriting; some is not.

**EXHIBIT B**

1    But, yes, this is --

2         Q.    And it lists your residence as the

3    Massachusetts Avenue in Southern Pines, North

4    Carolina?

5         A.    Yes, sir.

6         Q.    Tell me what is not your writing.

7         A.    Well, that address is not written

8    in my -- this first page is not my handwriting.

9         Q.    Okay.

10        A.    Second page, none.  This stuff was

11   all pre-filled in except for the portion --

12   that is my handwriting that says "Wellington

13   Orthopedics."  And then type of fellowship was

14   sports medicine, that is all my handwriting.

15        Q.    Okay.

16        A.    And the rest -- page three -- or

17   page -- is that page three or page four,

18   whatever?

19        Q.    Looks like page three.

20        A.    The top one that says "board

21   certification," I wrote that one.

22             (Reporter interruption.)

23        A.    This top one of orthopedics, that

1    one, that is my handwriting.  But otherwise,

2    the rest of this is not my handwriting.  The

3    next page, that's my handwriting, AOA and

4    AOBOS.  And then the next page, none of that --

5    that's not my handwriting.

6         Q.    Do you recall answering any of the

7    questions listed on this application?  Did

8    someone call you by telephone and ask you these

9    questions or did they ask you in a face-to-face

10    meeting?

11         A.    No.  No, sir.  But the last page

12    is my handwriting, except for the Howard Rupard

13    portion.

14         Q.    The easiest way to do this, I

15    guess, the fourth page which is identified as

16    page fourteen at the top --

17              MS. RHODE:  Can you use the Bates

18    number?

19              MR. LONERGAN:  Don't want to

20    confuse him.

21              MS. RHODE:  Okay.

22         A.    Page fourteen at the top.  Roger,

23    got it.

**EXHIBIT B**

1       Q.    (BY MR. LONERGAN:)  Do you recall

2 having to answer those questions that are

3 listed one through eight?

4       A.    Yeah, this is -- what I believe

5 this is here, this is coming from my -- I'm

6 sorry, this is coming from my friend. I

7 believe what happened, I don't have a fax

8 machine at home.

9       Q.    Got you.

10       A.    And this was Dana asking me these

11 questions, who is my friend, and she just

12 filled it in because she has better

13 handwriting. And they had to fax from his

14 office. That's probably what happened.

15       MS. RHODE:  He is asking you about

16 page fourteen.

17       A.    Oh, I'm sorry. I understand your

18 question, sir. Yes, I answered these

19 questions.

20       Q.    (BY MR. LONERGAN:)  And it looks

21 like this would have been -- it was faxed,

22 anyway, it says, on July 19th, 2010.

23       A.    Yes, sir.

**EXHIBIT B**

1    Q.    So that would have been when you

2 were first starting the locum tenens at

3 Heritage?

4    A.    Yes, sir.

5    Q.    And in terms of those questions,

6 one through eight, they are all marked as --

7    A.    Same page?

8    Q.    -- as no?

9    A.    Yes, sir.

10    Q.    Are those answers, would they all

11 still be the same today?

12    A.    Yes, sir, they are all -- can I

13 ask a question?  Am I allowed to ask any

14 questions?

15    Q.    You can ask me a question if you

16 have a question about the document or something

17 I have asked you.

18    A.    Number six, the question on number

19 six here on that page, "Have you been involved

20 in any claims, judgments or settlements in the

21 past five years?  Have any been removed from

22 your record -- or expunged or removed from your

23 record?"  I just want to know if that lawsuit

**EXHIBIT B**

1    with Watson would be considered something like

2    that.

3         Q.    No.   No.   I interpret that as

4    whether or not you had any claims or judgments

5    made against you because of your performance at

6    the time.

7         A.    Oh, no, sir.   Okay.

8         Q.    That's the way I read that.

9         A.    Okay, sir.

10        Q.    Malpractice.   Now, who did you

11   from Heritage negotiate or discuss the terms of

12   your employment agreement with?

13        A.    Mr. Buckner.   Are you done with

14   this paper, sir?

15        Q.    Yes.

16              (Whereupon, Defendants' Exhibit 5

17              was marked for identification and

18              copy of same attached hereto.)

19        Q.    What has been marked as Exhibit 5

20   is identified as Physician Employment

21   Agreement.   It's an agreement also with a cover

22   page.   If you will just take a minute and look

23   through that and make sure you are familiar

**EXHIBIT B**

1    with the document.

2          A.    (Reviewing document.)  Yes, sir.

3    Yes, sir, I am familiar with this document.

4          Q.    The cover page, the first page,

5    identifies some of the basic terms, correct?

6          A.    Yes, sir.

7          Q.    It's a one-year agreement, right?

8          A.    Yes, sir.

9          Q.    Supposed to start on or before,

10   but it looks like it says February, has been

11   written in, 28th, 2011.

12         A.    Yes, sir.

13         Q.    The date of the agreement is

14   identified as February 2nd, 2011 --

15         A.    Yes, sir.

16         Q.    -- right?  Base salary four

17   hundred fifty thousand dollars?

18         A.    Yes, sir.

19         Q.    Then additional compensation,

20   compensation provided for you to the extent you

21   serve on the emergency department on call,

22   correct?

23         A.    Yes, sir.

**EXHIBIT B**

1       Q.    And there is a rate for Monday

2   through Fridays and a rate for on-call duty in

3   the emergency room on weekends as well.

4       A.    Yes, sir.

5       Q.    Which would represent potential

6   three thousand dollars of compensation to you

7   on your off week each month, right?

8       A.    Yes, sir.

9       Q.    Is that the way you understand it?

10       A.    Well, it was each day -- what I

11   understood, each day after -- yes, sir, yeah.

12       Q.    Did you know if there was a cap on

13   the maximum amount of on-call pay you would

14   get in any --

15       A.    No.

16       Q.    And then you signed this document?

17       A.    Yes, sir.

18       Q.    Now, if you will look at the first

19   page of the employment agreement, under 3.1,

20   this agreement does not automatically renew,

21   correct?

22       A.    It is my understanding it was a

23   one-year contract, yes, sir.

1      Q.    Okay.  And then if the parties

2  agree or if the parties attempt to negotiate

3  another agreement, you have thirty days to do

4  that.  And if you are not successful in

5  negotiating a second agreement, then the

6  agreement may be terminated.

7      A.    Yes, sir, that's what it says

8  here.

9      Q.    Starting in section five, that

10 lists the duties and covenants, your

11 obligations under the agreement, correct?

12     A.    Yes, sir.

13     Q.    Those are all pretty

14 straightforward, right?

15     A.    Seem to be, sir.

16     Q.    Okay.  And did you perform those

17 duties while working under this employment

18 agreement?

19     A.    Yes, sir.

20     Q.    Section six, employer, being

21 Heritage Medical Center, provides you adequate

22 office space, equipment, furniture, utilities,

23 supplies and support personnel?

**EXHIBIT B**

1      A.    Yes, sir.

2      Q.    And the support personnel were

3 employees of the clinic, correct?

4      A.    Yes, sir.

5      Q.    Section eight sets forth your

6 compensation and benefits, correct?

7      A.    Yes, sir.

8      Q.    Section nine is identified as

9 insurance, correct, your liability insurance?

10     A.    Yes, sir.

11     Q.    And then when the agreement --

12 either upon expiration or termination, Heritage

13 would purchase for you what is referred to as

14 tail coverage?

15     A.    Yes, sir.

16     Q.    And that's a fairly common

17 procedure for -- under physician agreements, is

18 that correct?

19     A.    Yes, sir.

20     Q.    And then it also refers to you had

21 an obligation to make sure that any -- that

22 your duties or your practice was covered for

23 anything prior to coming to Heritage Medical

**EXHIBIT B**

1    Center, correct?

2        A.    Yes, sir.

3        Q.    Section ten sets forth the

4    circumstances under which the agreement may be

5    terminated, right?

6        A.    Yes, sir.

7        Q.    Okay.  And 10.1 are circumstances

8    which would allow the clinic to terminate you

9    immediately without further compensation,

10   correct?

11       A.    Yes, sir.

12       Q.    10.2 is if either party materially

13   breaches the agreement and it is not cured

14   within thirty days, the other party may

15   terminate the agreement immediately, right?

16       A.    Yes, sir.

17       Q.    Article 10.4 says that either

18   party, either you or the clinic, can terminate

19   the agreement upon ninety days written notice,

20   correct?

21       A.    Yes, sir.

22       Q.    It also provides the option to the

23   clinic that in lieu of that ninety-day notice,

EXHIBIT B

1    it says that there can be a cash payment made

2    in lieu of the notice and terminate the

3    agreement, correct?

4          A.    What section are you at, 10.4?

5          Q.    Still at 10.4.

6          A.    Okay.  Yes, sir, that's what it

7    says.

8          Q.    And that 10.4 -- so either with or

9    without cause, upon ninety days written notice,

10   either you or the clinic can terminate the

11   agreement or if the clinic so desires, they can

12   provide you pay in lieu of the notice and

13   terminate the agreement, correct?

14         A.    Yes, sir.

15         Q.    So gone into this arrangement

16   under the employment agreement, the clinic, if

17   it had gotten sixty days into it, the clinic

18   could have given you written notice of ninety

19   days and said we have changed our mind, we are

20   terminating the agreement?

21         A.    Say that over again, sir, one more

22   time.

23         Q.    Sure.  Say you are two months into

**EXHIBIT B**

1   it.

2        A.    Roger.

3        Q.    And the clinic says this isn't

4   working.

5        A.    Yes, sir.

6        Q.    They could choose to terminate you

7   by just simply providing you ninety days

8   written notice.

9        A.    Yes, sir.

10       Q.    Okay.  Or --

11       A.    Vice versa.

12       Q.    -- vice versa.  You could have

13   said, you know what, this isn't working --

14       A.    Yes, sir.

15       Q.    -- here is my notice, ninety days,

16   see you later, right?

17       A.    Yes, sir.  Just talking louder so

18   you can hear me.  Sorry.

19       Q.    Section eleven, patient care,

20   makes reference to patients assigned to you.  I

21   assume they were assigned to you by the clinic?

22       A.    I assume so, yes, sir.

23       Q.    Now, who represented you in the

**EXHIBIT B**

1    negotiation of this contract?

2           A.     My current counsel.

3           Q.     Is that Ms. Rhode?

4           A.     Yes, sir.

5           Q.     Or somebody else from her office?

6           A.     Martine Jackson, same office.

7           Q.     And section twenty under

8    miscellaneous refers to the fact that the

9    agreement can be amended -- or can only be

10   amended, altered or modified by a written

11   agreement signed by both parties, correct?

12          A.     Yes, sir.

13                 (Whereupon, Defendants' Exhibit 6

14                 was marked for identification and

15                 copy of same attached hereto.)

16          Q.     Dr. Slusher, what has been marked

17   as Exhibit 6 is three pages of what I will

18   refer to as employment-related policies or

19   acknowledgments.  Each document which has your

20   signature on it, I just want to make sure that

21   you are familiar and acknowledge receipt of

22   these documents.

23          A.     (Reviewing document.)  Yes, sir,

**EXHIBIT B**

1    that's my signature.

2          Q.    And the first one is a sexual

3    harassment policy, correct?

4          A.    Yes, sir.

5          Q.    The second one refers to an

6    orientation notebook that has different --

7          A.    Yes, sir.

8          Q.    -- regulations within that

9    notebook, and the third page is the -- I guess

10   a standards acknowledgment.

11         A.    Yes, sir.

12               (Whereupon, Defendants' Exhibit 7

13               was marked for identification and

14               copy of same attached hereto.)

15         Q.    Exhibit 7 is two pages,

16   Dr. Slusher.  One acknowledges -- called the

17   handbook receipt and acknowledgment, and the

18   second one is acknowledgment on the CHS code of

19   conduct.

20         A.    Yes.

21         Q.    Is that your signature on each of

22   those pages?

23         A.    Yes, sir.

**EXHIBIT B**

1          Q.     And do you recall receiving a copy

2     of the -- what I will refer to as the employee

3     handbook?

4          A.     No, sir.  I don't remember getting

5     a copy of it, no, sir.

6          Q.     And then you recall receiving a

7     copy of what is referred to as the CHS code of

8     conduct?

9          A.     No, sir, I don't remember getting

10    a copy of it.

11         Q.     Did you ever review it?

12         A.     No, sir.

13         Q.     Do you understand that what you

14    have signed indicates an acknowledgment that

15    you received, read and understand --

16         A.     Yes.

17         Q.     -- the code of conduct?

18         A.     Yes, sir.

19         Q.     And same thing with the handbook?

20         A.     Yes, sir.

21         Q.     But as you sit here today, you

22    don't fully recall whether or not you received

23    those?

**EXHIBIT B**

1          A.      I don't recall whether I received

2     those, no, sir.

3                    (Whereupon, Defendants' Exhibit 8

4                    was marked for identification and

5                    copy of same attached hereto.)

6          Q.      I will represent to you,

7     Dr. Slusher, what has been marked as Exhibit 8

8     is a cover page of an employee handbook.  And

9     then the section that is printed out there is

10    Roman numeral six, employee leaves, which

11    includes the handbook policy on military leave.

12         A.      (Reviewing document.)

13         Q.      Represent pages thirty-five and up

14    from the actual handbook.  It is not the full

15    handbook.

16         A.      (Reviewing document.)

17         Q.      And then the second part of that

18    is a policy on military leave.

19         A.      (Reviewing document.)  Yes, sir, I

20    see that here.

21         Q.      Have you reviewed these policies

22    or seen these policies relating to military

23    leave and the reinstatement rights?

**EXHIBIT B**

1    A.    No, sir, I didn't.

2    Q.    At the time that you went to work

3    under this agreement with Heritage Medical

4    Center, did you understand your -- that

5    Heritage had a military leave policy?

6    A.    I did not know they had a military

7    leave policy.  I was -- I didn't know anything

8    about the -- the law that governed that.  I

9    didn't know anything about it.

10    Q.    What, if any, understanding did

11    you have regarding Heritage obligations as

12    related to you and your reserve duty?

13    MS. RHODE:  I'm just going to

14    object as to the no time frame.  Are you asking

15    him when he was hired, when he deployed?

16    MR. LONERGAN:  I was asking him at

17    the time that he worked for Heritage.

18    MS. RHODE:  Any of the time.

19    A.    Can you ask that question again?

20    Q.    (BY MR. LONERGAN:)  Yes, I will

21    rephrase it.  You don't recall reviewing the

22    military leave policy?

23    A.    No, I don't.

1          Q.    Okay.  When you went to work,

2    which I think is the way I phrased it, so when

3    you started work at Heritage Medical Center,

4    what, if anything, was your understanding of

5    Heritage's obligation towards you in any

6    military leave that you might be called for?

7          A.    What I understood through just

8    being in the military and being deployed in the

9    military is that employers will honor your

10   contract when you come back from service,

11   serving the country.  That was my

12   understanding.

13         Q.    Okay.  And whether you had a

14   contract or not, employers would honor your

15   return to work, is that your understanding?

16         A.    That's my understanding.

17         Q.    And you had been through that

18   process before, correct?

19         A.    I had not necessarily been through

20   this process before.

21         Q.    You hadn't been employed by

22   someone else and gone on military leave?

23         A.    No, sir, I haven't.  This is the

**EXHIBIT B**

1    first time.

2         Q.    Who did you discuss your military

3    leave with at Heritage?

4         A.    Mr. Buckner.

5         Q.    What did you tell him, generally?

6         A.    I told him that -- I'm sorry.

7         Q.    What did you tell him?

8         A.    I told him that I had been called

9    to go to deployment overseas in Iraq, and I

10   informed him ninety days prior to my deployment

11   date.

12        Q.    Do you recall what his response

13   was?

14        A.    No, I don't recall what his

15   response was.

16        Q.    Any difficulty being released to

17   serve on your military leave?

18        A.    Not that I recall.

19              (Whereupon, Defendants' Exhibit 9

20              was marked for identification and

21              copy of same attached hereto.

22              MS. RHODE:  Can you just give me

23   the Bates numbers?

**EXHIBIT B**

1          MR. LONERGAN:  038 -- 38 through

2     40.

3          MS. RHODE:  Okay.  Thanks.

4          Q.   (BY MR. LONERGAN:)  Do you

5     recognize these documents, Dr. Slusher?

6          A.   Yes, sir.

7          Q.   The first one is your notice of

8     being called up, right, for deployment?

9          A.   Yes, sir, these are orders.

10         Q.   And then the second document that

11    is dated May 4th gives you specific notice of

12    where and when you are supposed to report, is

13    that correct?

14         A.   Which one is -- oh, I'm sorry.

15    Yes, sir.

16         Q.   Did you present copies of these

17    documents to Mr. Buckner?

18         A.   Yes, sir.  Oh, you put them

19    together.

20         Q.   I did, just because they are

21    related.  Trying to save her stickers.

22              Do you recall when you were

23    released by Heritage to -- looks like you were

1    reporting initially to Fort Benning, Georgia.

2         A.    I don't recall the exact date, no,

3    but it was -- I believe it was a couple of days

4    prior or a week prior to me reporting to Fort

5    Benning.

6         Q.    Did you drive to Fort Benning,

7    Georgia?

8         A.    Yes, I did.

9         Q.    Did you go home to North Carolina

10   before you went on to this deployment?

11        A.    Yes, sir, I did.  Went and picked

12   up my family and we drove to Fort Benning

13   together.

14        Q.    And the anticipated length of

15   service was supposed to be ninety days, is that

16   right?

17        A.    Ninety days boots on the ground,

18   yes, sir.

19        Q.    Did Heritage pay you while you

20   were on -- while you were deployed?

21        A.    No, sir.

22        Q.    And that's -- from your experience

23   now, most employers don't pay --

1       A.      Roger that, sir, they don't pay.

2       Q.      You get your military --

3               MS. RHODE:  Let him finish.

4       A.      Oh, I thought he was done.  He

5   gave a --

6       Q.      (BY MR. LONERGAN:)  So you just

7   would have received your military pay while you

8   were deployed?

9       A.      Yes, sir.

10      Q.      Did you take any paid time that

11  was available to you through Heritage to

12  compensate you while you were on leave?

13      A.      I'm going to give you ten or

14  fifteen seconds.

15      Q.      I can't ask a question while I am

16  drinking.  I'll promise you that.

17      A.      No, sir, I did not take any

18  compensation from Heritage Medical Center.

19      Q.      I'm not trying to cause a problem

20  with the way you -- that's just the way I ask

21  questions.

22      A.      You are an attorney.  I get it.

23  You guys are always thinking.

EXHIBIT B

1          Q.    Do you recall when you actually

2    were in Iraq to start your service, what date?

3          A.    My orders -- are you done?

4          Q.    Uh-huh.

5          A.    My orders are from June the 10th.

6    We have a one week prior -- or one week that we

7    do before we report in country.  So we go to

8    Fort Benning for a week.  We do our in

9    processing, go to medical, dental, hearing, all

10   of that kind of stuff to make sure that we are

11   okay to be deployed, just one more final check

12   before they send you off.  And, then, I think

13   it was June 16th, I believe, I was in country.

14         Q.    And then where specifically were

15   you?

16         A.    I originally was in Kuwait.  Well,

17   we all go to Kuwait first, spend a day there or

18   two there, and then I was stationed at Basra,

19   Basra, Iraq.

20         Q.    Is that where you stayed for the

21   duration of your deployment?

22         A.    Yes, sir.

23         Q.    And what were your -- generally

1    what were your duties while you were in Iraq?

2            A.    Orthopedic surgeon, forward

3    surgical team, trauma, orthopedic surgeon.

4            Q.    How big of a presence in terms of

5    number of doctors that were there with you at

6    that time?

7            A.    You want to know how many doctors

8    were there?

9            Q.    That's my question.

10           A.    Myself, there was a cardiothoracic

11   surgeon, and there was one, believe it or not,

12   nephrologist, and that was it.

13           Q.    Okay.

14                 (Whereupon, Defendants' Exhibit 10

15                 was marked for identification and

16                 copy of same attached hereto.)

17           Q.    Can you identify that document for

18   me?

19           A.    Yes, sir, this is the release from

20   active duty or the release from Fort Benning.

21   This was my go sheet.  This means I get to go

22   home.  This was very important.

23           Q.    I understand.  When did you come

**EXHIBIT B**

1    back into the country from Iraq?

2         A.    August -- this is dated the 31st.

3    I think this was a couple of days prior to

4    that.  Because same thing, one, you have to do

5    the same thing you do before you go, then the

6    same thing, you have to outprocess before you

7    go home.  So I would -- maybe a couple of days

8    before this was dated here, August 31st.

9         Q.    Did you do the same thing as you

10   went in Iraq, do you go to Kuwait for a couple

11   of days --

12        A.    Yes, sir.

13        Q.    -- and then home?

14        A.    (Nodding head affirmatively.)

15              MR. BUCKNER:  Where are the

16   restrooms?

17              (Whereupon, a break was had from

18              10:39 a.m. until 10:47 a.m.)

19        Q.    (BY MR. LONERGAN:)  So if I

20   understood correctly, Dr. Slusher, you recall

21   coming back in the country a few days before

22   this August 31st document, is that right?

23        A.    Yes, sir, it is.

**EXHIBIT B**

1          Q.      And were you actually released,

2     then, on September 23rd or what was your

3     release date from your service?

4          A.      Effective date 23 September, yes,

5     sir.

6          Q.      And when did you report then back

7     to work at Heritage?

8          A.      Are you ready?

9          Q.      Uh-huh.

10          A.      I believe it was October the 3rd.

11          Q.      Did your family stay in Fort

12     Benning while you were overseas, then?

13          A.      No, sir.  They stayed back home.

14          Q.      Okay.  I thought you had made

15     reference to moving the family to Fort Benning.

16          A.      No, sir, I never said that.  I

17     said that we -- I drove home from Shelbyville

18     to pick my family up so they could be with me

19     at Fort Benning before I was deployed.  And

20     then they drove back home.

21          Q.      When you were released and prior

22     to returning to Heritage Medical, did you go

23     back home to North Carolina to visit your

**EXHIBIT B**

1   family?

2          A.     I'm giving you five seconds.  Yes,

3   sir.

4          Q.     When I asked you about the

5   handbook and the code of conduct and you said

6   you didn't recall receiving them, those

7   documents that you signed, do you recall who

8   met with you or presented you those documents

9   for you to sign?

10         A.     No, sir.  I don't recall who it

11   was.

12         Q.     Okay.  Do you know if it was

13   someone from the Heritage human resources

14   department?

15         A.     It must have been, sir.  I'm sure

16   it was, but I don't recall who it was.

17         Q.     Before you went on your

18   deployment, did you ask anyone at Heritage

19   questions about military leave or your rights

20   while you were gone?

21         A.     No, sir.

22         Q.     Besides Tish Rader, who else did

23   you keep in contact with from Heritage while

**EXHIBIT B**

1  you were deployed, or was there anyone else?

2      A.    I don't believe there was anyone

3  else.  I may have stayed in contact with my --

4  you know, just hello, I'm fine emails to maybe

5  Shelly, Shelly Dortch, but nobody in

6  administration or anything like that.

7      Q.    Who was Tish Rader?

8      A.    It is my understanding she was the

9  clinical practice manager type person.

10     Q.    Kind of liaison position between

11  the physicians and the hospital, clinic?

12     A.    I think that's what it was.  I

13  believe so.

14     Q.    What about Ms. Dortch, who was

15  she?

16     A.    She was our office -- really don't

17  know what her job was.  I don't know what her

18  title was.  But I know what she did.  She

19  worked the front desk, she checked patients in,

20  checked patients out, you know, scheduled

21  patients, things like that.  And she kind of

22  took care of the office.  So I assumed she was

23  the office manager type, and she answered to

1    Ms. Rader.

2              (Whereupon, Defendants' Exhibit 11

3              was marked for identification and

4              copy of same attached hereto.)

5         Q.    Dr. Slusher, do you recognize what

6    has been marked as Exhibit 11 and handed to you

7    as termination of employment agreement?

8         A.    Yes, sir.

9         Q.    Is that your signature on the

10   bottom of the page?

11        A.    Yes, sir.

12        Q.    Tell me what you remember about

13   circumstances of receiving this document.

14        A.    I was contacted by Ms. Rader by

15   email -- I don't remember the exact date --

16   while I was in Iraq who said that I needed to

17   sign this thing, this termination agreement.  I

18   wasn't able to get ahold of my counsel to do

19   this, and I thought that this was a document

20   that -- I was in military mode.  You give me my

21   orders, and here it is, sign your termination

22   agreement.  So going along with being in Iraq

23   and seeing this termination agreement, I signed

1    it because I thought that's what I had to do,

2    that's what I was supposed to do.

3         Q.    Is it your testimony that the

4    first time you received this -- the first time

5    you had seen this document was when you

6    received it from Ms. Rader?

7         A.    Yes, sir.

8         Q.    Had you had any discussions about

9    termination of employment agreement prior to

10   receiving this document?

11        A.    Not to any extent, no, sir.

12        Q.    I don't understand what you mean

13   by that, not to the extent.

14        A.    Well, I knew that my -- I was

15   supposed to come back and fulfill my agreement.

16   That's what I knew.  I didn't know about

17   anything about termination.

18        Q.    Is it your testimony that you

19   didn't have discussions about notice of

20   termination of your agreement or that your

21   employment agreement was going to be

22   terminated?

23        A.    That was done in -- yes, Ms. Rader

**EXHIBIT B**

1   sent an email to me saying that they had hired

2   somebody and he was going to start.  And that's

3   when I started emails back, well, what are you

4   going to do with me?  So I guess if that's what

5   you consider discussion about termination, then

6   yes.

7       Q.   Did you know -- hired someone, is

8   that the reference to Dr. Mosley?

9       A.   I didn't know his name at the

10  time.  I don't believe I knew his name at the

11  time, but yeah, that's who it was.

12      Q.   Do you have any recollection of

13  discussing that issue prior to your deployment?

14      A.   I guess I don't understand that

15  question.  One more time there, just --

16      Q.   Sure.  Do you have any

17  recollection of a discussion regarding who

18  turned out to be Dr. Mosley prior to you being

19  deployed?

20      A.   Yes.  She had mentioned that they

21  were recruiting a gentleman, but she said they

22  had not hired anyone yet.

23      Q.   And was it your understanding that

**EXHIBIT B**

1    they were recruiting this person to be the

2    permanent full-time orthopedic surgeon at the

3    clinic?

4         A.    Yes, sir.

5         Q.    But you don't remember -- your

6    recollection at the time, you weren't specific

7    of who it was, but you later learned that was

8    Dr. Mosley, is that right?

9         A.    Yes.  I didn't know -- they had

10   not hired him.  They had not said they hired

11   him.  They had just said they interviewed him.

12        Q.    And you knew that prior to your

13   June deployment?

14        A.    Yes.

15        Q.    And is it your testimony that --

16   strike that.

17             Was Ms. Rader the person you had

18   had the conversation with about this individual

19   prior to being deployed?

20        A.    Yes, sir.

21        Q.    Did you have any conversation

22   relating to that issue with Mr. Buckner prior

23   to being deployed?

1      A.    Not that I recall, sir.

2      Q.    Do you recall any conversation in

3  which you advised Mr. Buckner prior to your

4  deployment that after your service was over you

5  were going to head back to North Carolina?

6      A.    No, sir.  My intentions were to

7  come back and fulfill my contract, my entire

8  year in February.

9           MR. LONERGAN:  Can we go off the

10  record a second?

11          (Off-the-record discussion.)

12     Q.    (BY MR. LONERGAN:)  Briefly, on

13  the termination agreement notice, this

14  indicates that your employment agreement is

15  being terminated or the parties -- let me

16  restart that.

17          The second paragraph says, "The

18  parties agree to mutually terminate the

19  employment agreement as of October 26, 2011

20  (termination date) and to waive any of its

21  notice requirements for termination."  Do you

22  see that?

23     A.    Yes, sir.

1    Q.    And then it says, "If Dr. Slusher

2    returns to work at Heritage before October 26,

3    2011, Heritage agrees to pay him his current

4    rate of pay for that work up until termination

5    date."  Do you see that?

6    A.    Yes, sir, I do.

7    Q.    Do you recall when you signed this

8    document reading that and understanding that

9    that was the effect of the document relating to

10   your employment agreement being terminated?

11   A.    Yes, sir, I do.  Are you done with

12   that one, sir?

13   Q.    Yes.  Don't bury it too deep.

14   A.    Okay.  I will just keep it right

15   there, then.

16   Q.    Turn it sideways or something like

17   that.  All right.  I'm going to start with

18   these series of emails, Dr. Slusher, and they

19   are going to be marked collective 12.

20          MR. LONERGAN:  Is that right,

21   Gail?

22          (Whereupon, Defendants' Exhibit 12

23          was marked for identification and

**EXHIBIT B**

1          copy of same attached hereto.)

2          Q.     First one is Bates stamped 478.

3  If I read this correctly, Dr. Slusher, it is an

4  email exchange from July 2nd, 2011 between you

5  and Ms. Rader, is that correct?

6          A.     (Reviewing document.)  Yes, this

7  is a conversation -- email from me and Tisha.

8          Q.     Do you recall if this was the

9  first email communication between you and

10  Ms. Rader after being deployed?

11          A.     I don't recall.  No, I don't know

12  if that's the first one or not.

13          Q.     Evidently Ms. Rader had a brother

14  who was overseas.

15          A.     Yes, he was with 5th Group.

16          Q.     If I understand correctly, there

17  might have been some hope that maybe she

18  thought you could see him or say hello, but you

19  didn't wind up being in the same area, is that

20  right?

21          A.     Yes, sir.  She had mentioned to me

22  that he was one of the 5th Group guys that was

23  north of me, and that was where my other half

1    of my forward surgical team was stationed.  I

2    unfortunately was put in Basra as opposed to

3    being put where he was at.  She was hoping I

4    could say hi to him, yes.

5              Q.    The part of the email back on the

6    top of that page makes reference to "still no

7    contract signed from Mosley."

8              A.    Yes, sir, it says that.

9              Q.    Now, that's reference to the

10   doctor they were discussing him becoming

11   full-time permanent orthopedic surgeon at the

12   Heritage Medical Clinic, correct?

13             A.    I believe so, yes, sir.  That's

14   what it looks like.

15             Q.    And was it your understanding

16   then -- strike that.

17                   This is an email we marked as

18   12.2, Bates labeled 479 from July 22nd from you

19   to Ms. Rader, correct?

20             A.    Yes, sir.

21             Q.    Evidently you had had some

22   additional discussion or information that

23   Mosley had not signed his contract yet.

**EXHIBIT B**

1          A.     Yes, sir, appears so.

2          Q.     But you have an understanding that

3     he is going to soon, but let you know if any

4     changes.

5          A.     Yes, sir, that's what the document

6     says.

7          Q.     It is your understanding, then,

8     that when Dr. Mosley signed his employment

9     agreement to become the permanent orthopedic

10    surgeon at Heritage, that then your employment

11    agreement would be terminated?

12         A.     No, I was thinking that I was

13    supposed to stay there and fulfill my contract,

14    my entire contract.  It was always my intention

15    to come back and fulfill my entire contract,

16    whether it be, you know, in a part -- part-time

17    or whatever it is, I was supposed to be there.

18    That was my intention.

19         Q.     What has been marked as 12.3 is a

20    rather lengthy email from Ms. Rader to you from

21    July 23rd, 2011, correct?

22         A.     I agree.

23         Q.     The bulk of it is just personal

**EXHIBIT B**

1    discussion about her and her parents' trip or

2    whatnot?

3          A.    Yes, sir.

4          Q.    But the initial part of that is

5    she is confirming to you they still don't have

6    a signed contract from Dr. Mosley.

7          A.    Yes, sir.

8          Q.    And there is a reference to the

9    next locum starts Monday and Daniel's last day

10   is Wednesday.  Do you know who Daniel is?

11         A.    Yes, sir.

12         Q.    Who is that?

13         A.    He was the nurse practitioner that

14   was working there with us.

15         Q.    What has been marked as 12.4,

16   email back from you to Ms. Rader dated July

17   23rd, 2011, correct?

18         A.    Yes, sir.

19         Q.    About halfway through this

20   paragraph, Dr. Slusher, it says, "I just want

21   to know what you guys were going to do about

22   the ninety-day notice.  When would this guy

23   start?"

**EXHIBIT B**

1          A.    Yes, sir.

2          Q.    So as of July 23rd, 2011, is it

3    not true that you had some understanding that

4    your employment agreement was going to be

5    terminated as a result of this Dr. Mosley being

6    hired?

7          A.    Yes, sir.

8          Q.    And the specific inquiry is how is

9    the notice going to be handled, is that right?

10         A.    Yes, sir.

11         Q.    Number 12.5, Dr. Slusher.

12         A.    Yes, sir, 12.5.

13         Q.    First the bottom one being the

14   earlier one from Ms. Rader back to you and then

15   the top one is your response.

16         A.    Okay.

17         Q.    On the bottom one, it says, "As

18   far as the ninety-day notice, I met with key

19   management yesterday.  They gave the go-ahead

20   to send you a ninety-day notice."  Do you see

21   that?

22         A.    Yes, sir, I see that, uh-huh.

23         Q.    And then your response says, "As

**EXHIBIT B**

1    for the ninety-day notice, I am supposed to be

2    back to work there on October 9th.  Do the

3    math.  The ninety-day notice would have to be

4    given by July 12th or so.  Correct me if I am

5    wrong.  If the notice comes dated, say, August

6    1st, then ninety days from that is October

7    30th.  How does that work?  I really do not

8    know and would have to get with the attorney of

9    when this guy wanted to start."  Correct?

10        A.     Yes, sir, that's what it says.

11        Q.     So, again, based on this email,

12   you are anticipating the ninety-day notice

13   which would terminate your employment agreement

14   and you are asking what the end date would be,

15   right?

16        A.     Yes, sir.

17        Q.     12.6, Dr. Slusher, email back from

18   Ms. Rader to you that specifically references

19   the termination agreement that is attached to

20   this email and sent to you, correct?

21        A.     Yes, sir.

22        Q.     And that's in reference to what we

23   have earlier marked and introduced as

1  Exhibit 11, the termination of employment

2  agreement, is that correct?

3       A.    Yes, sir.

4       Q.    12.6 is your response back to

5  Ms. Rader dated the 28th of July, correct?

6       A.    28th of July, yes, sir.

7       Q.    And the reference to "I will try

8  to print it out," that's a reference to the

9  termination agreement, correct?

10      A.    Yes, sir.

11            MS. RHODE:  Is that 12.6 or 12.7?

12      A.    12.7.

13            MR. LONERGAN:  12.7.  Did I

14  misspeak?

15            MS. RHODE:  Yes.

16            MR. LONERGAN:  Thank you.

17      Q.    (BY MR. LONERGAN:)  Exhibit 12.8,

18  Dr. Slusher, dated July 29th, 2011, email from

19  you back to Ms. Rader, correct?

20      A.    Yes, sir.

21      Q.    And, again, referencing the

22  agreement, it says, "I will have my attorney

23  look at it and let you know ASAP.  Thanks

**EXHIBIT B**

1    again.  Nice working with you."  Is that

2    correct?

3          A.    Yes, sir, that's what it says.

4          Q.    Exhibit 12.9, Dr. Slusher, email

5    from you back to Ms. Rader, at this point you

6    are indicating to her that you return before

7    the 26th of October.

8          A.    Yes, sir.

9          Q.    And will work those days and also

10   be compensated for the vacation days as well,

11   correct?

12         A.    Yes, sir.

13         Q.    So is it your understanding you

14   were going to -- when you came back, you would

15   still have time that would work prior to the

16   effective date of the termination, correct?

17         A.    Yes, sir.

18         Q.    And that termination date was

19   ninety days after -- the termination of your

20   agreement was ninety days after the date of

21   that agreement, correct?

22         A.    Yes, sir.

23         Q.    And this also says, "My attorney

**EXHIBIT B**

1   is looking at the termination agreement.  I

2   will get it back to you as soon as she is done

3   with it," correct?

4           A.   Yes, sir.

5           Q.   Now, which attorney was that that

6   was reviewing the agreement?

7           A.   I wasn't able to get ahold of her.

8   She was out of town, so she -- I did this on my

9   own.

10          Q.   Okay.  But you are communicating

11  to Ms. Rader that your attorney has the

12  document and is reviewing it.

13          A.   Yes, sir.

14          Q.   12.10, email from you,

15  Dr. Slusher, dated August 8th and sent back to

16  Ms. Rader with the signed termination

17  agreement, correct?

18          A.   Yes, sir.

19          Q.   And you confirm that you are

20  planning on coming back to Heritage on October

21  3rd and to finish out the month of work,

22  correct?

23          A.   Yes, sir.

1          Q.      A reference to what you think to

2    be your accrued vacation days.

3          A.      Yes, sir.

4          Q.      And then reference to "Thanks for

5    everything.  Nice working with you.  Hope it

6    all works out there."

7          A.      Yes, sir.

8          Q.      You clearly understood that your

9    employment agreement was terminating on that

10   October 26th date?

11         A.      Yes, sir.

12         Q.      And there is nothing in this email

13   that raises any questions to Ms. Rader about

14   the contents of your termination agreement,

15   correct?

16         A.      Not in this email, no, sir.

17         Q.      In fact, you didn't raise any

18   question to Ms. Rader during this email

19   exchange about the contents or meaning of the

20   termination agreement?

21         A.      No, sir.

22         Q.      12.11, email from you back to

23   Ms. Rader dated August 9th, 2011, and her email

1    to you below is clarification or statement on

2    what the accrued vacation was, is that correct?

3            A.    Yes, sir, it is.

4            Q.    She is indicating to you what

5    Heritage shows as your being in your accrued

6    vacation as opposed to what your question was,

7    right?

8            A.    Yes, sir.

9            Q.    And your response to that is,

10   "Sure, whatever you say, thanks," right?

11           A.    Yes, sir.

12           Q.    Exhibit 12.12, short email from

13   you back to Ms. Rader asking about what work

14   you would be doing when you returned and where

15   you might have a place to stay.

16           A.    Yes, sir.

17           Q.    Now, you said earlier this morning

18   that you -- once you signed the employment

19   agreement, you moved from a hotel to renting a

20   house or an apartment, is that right?

21           A.    Yes, sir, Mr. Buckner helped me

22   with that.

23           Q.    When you left on deployment, did

1    you vacate, evidently, that house?

2          A.    Yes, sir, I did.

3          Q.    Dr. Slusher, document 12.13, email

4    exchange between you and Ms. Rader or emails,

5    August 15th.  Your response is the 16th of

6    August 2011.  She indicates she is going to

7    check with Dan -- that is Mr. Buckner -- on

8    your work and a reference to a woman named Pam

9    possibly renting her mother's house or this is

10   a reference to possibly staying at the

11   Cumberland House Bed and Breakfast.  Do you see

12   that?

13         A.    Yes, I do, sir.

14         Q.    Where did you wind up staying when

15   you returned?

16         A.    That's a good question.  I

17   stayed -- Dan, you can help me out here.  It

18   was down the street in downtown Shelbyville --

19   I don't know who -- I know he is not allowed to

20   talk --

21         Q.    Just wanted to make sure he

22   understood that.

23         A.    It was a house that I -- I don't

**EXHIBIT B**

1    know how I got ahold of the person or whatever,

2    but it was a house I stayed at, rented that

3    house.

4         Q.    So you sent the signed termination

5    agreement back, according to 12.10, on August

6    8th.  Okay.  And then on August 30th, 2011,

7    Ms. Martine Jackson sends a letter, an email to

8    Mr. Buckner and Ms. Rader and maybe you

9    forwarded that by email to Ms. Rader, is that

10   correct?

11        A.    Is that a question towards me,

12   sir?

13        Q.    Yes.

14        A.    Could you say that one more time?

15        Q.    Did you get this from Ms. Jackson

16   on August 30th?

17        A.    I don't recall getting this email.

18   I knew that she had sent him an email.  I knew

19   that.  I don't know that I got this email.

20        Q.    And in this email she advises

21   Mr. Buckner that you are going to -- are eager

22   to return to fulfill the remainder of your

23   employment agreement, correct?

1          A.     Yes, sir.

2          Q.     What changed, Dr. Slusher?

3          A.     I don't understand the question.

4          Q.     What changed in your position that

5    you then as of September -- excuse me, August

6    30th were intending to -- or wanting to fulfill

7    the remainder of your employment agreement

8    after you had already signed an agreement to

9    terminate?

10         A.     I was always under the impression

11   that I had to fulfill my contract.  When I got

12   back off of active duty, I was informed by one

13   of the JAGs at the military, because I had told

14   them what had happened, and they informed me of

15   my USERRA rights and instructed me to go to not

16   so much the military system, to go through the

17   civilian system.

18         Q.     August 30th you would have been

19   back stateside, right?

20         A.     Yes, sir, I was back by then, yes,

21   sir.

22         Q.     So then after you say you were

23   advised by someone in the military that states

1  about your rights, is that when you contacted

2  Ms. Jackson?

3        A.     Yes, sir.

4        Q.     Did Ms. Jackson have a copy of

5  your signed termination agreement?

6        A.     I don't know that, sir.  I believe

7  she does, yes, sir.  Now I believe she does.

8        Q.     Do you know whether or not she had

9  a copy of it at the time --

10       A.     No, sir, I don't recall.

11       Q.     -- you sent it to -- all right.

12  Dr. Slusher, three emails printed on that page

13  between you and Ms. Rader and Mr. Buckner, do

14  you recognize those emails?

15       A.     Well, they are assigned to me,

16  but, yeah, sure.

17       Q.     One of them has to do with the

18  attached, you are asking for the legal

19  department address for the clinic.  And then

20  one of the things references an attachment

21  about your returning to work.  And then

22  Mr. Buckner advises you that he can't open the

23  attachment.

1          A.    So we are going from top to

2    bottom.   The first one is from me.   I just want

3    to make sure.   Is that --

4          Q.    Yes.

5          A.    Okay.   Yeah, this is -- all you

6    are asking is do I recognize --

7          Q.    Confirmation.

8          A.    Okay, sir, yes.

9          Q.    And then you sent this letter, but

10   he indicates that he can't open it so you would

11   have to resend the letter, is that right?

12         A.    Yes, sir.

13         Q.    12.16 appears to be the content of

14   the letter you are referring to, but it looks

15   like it has been converted to email form, is

16   that right?

17         A.    Yes, sir.

18         Q.    12.17 looks like it is the letter

19   you were able to get in the format and email it

20   to Dr. Buckner -- I mean, Mr. Buckner, correct?

21         A.    Yes, sir.

22         Q.    And it's the same content that the

23   email talks about, completing your obligations

**EXHIBIT B**

1    under the employment agreement.

2         A.    Yes, sir.

3         Q.    And that you will be reporting to

4    work on October 3rd.

5         A.    Yes, sir.

6         Q.    Now, at no point in any of these

7    communications that we have looked at this

8    morning, prior to you sending this letter, did

9    you ever indicate to Mr. Buckner or Ms. Rader

10   that you didn't understand the contents of the

11   termination agreement, correct?

12        A.    No, sir.

13        Q.    And you did not indicate to them

14   that contrary to your representation, that you

15   had not, in fact, had legal counsel review the

16   agreement.

17        A.    Are you saying that I didn't have

18   any counsel when I got the termination

19   agreement?  Is that what you are asking me?

20        Q.    You represent in these emails that

21   you were going to have your attorney look at

22   the document.

23        A.    Roger that, sir.

**EXHIBIT B**

1          Q.     And that there was a second

2    communication that said it has been reviewed

3    and you sent it back signed to Heritage.

4          A.     Roger that, sir.

5          Q.     And at no point prior to

6    Ms. Jackson communicating with Heritage did you

7    ever indicate to Ms. Rader or Mr. Buckner that

8    you hadn't had legal counsel look at it or that

9    you couldn't get it to them.

10         A.     No, sir.  Thanks for clearing that

11   up.  That was nice.

12         Q.     I do not profess to ask clear

13   questions all the time.  But I do want to, if

14   you don't understand them, to correct it.

15                Do you recognize 12.18?

16         A.     Yes, sir.

17         Q.     And that's a reference to

18   Dr. Mosley being on staff and I guess taking

19   the office space that had previously been

20   provided to you when you were at Heritage,

21   correct?

22         A.     Yes, sir.

23         Q.     Where did they wind up placing you

1    for space when you returned on October 3rd?

2         A.    They put me in the office right --

3    the office, as in the room office, next to

4    Dr. Mosley.  He had the corner office.  I had

5    the one where Mr. Enroth was, Dan Enroth was at

6    when I was there previously.

7         Q.    And just to make sure, that email

8    is dated September 8, 2011, correct?

9         A.    Yes, sir, it is.

10        Q.    And at that time you were in Fort

11   Benning, Georgia?

12        A.    I think I was back.  I think I was

13   home at that time.

14        Q.    Do you recall how many days you

15   were at Fort Benning before being completely

16   released?

17        A.    I believe it was five.  It's

18   usually around five.  I don't remember exactly,

19   but it's around five.  Depends on how -- I'm

20   not going to say how lazy, but I will, how lazy

21   the government workers are to get you --

22        Q.    You mean how long it takes to

23   get --

**EXHIBIT B**

1      A.      How long it takes to get

2  outprocessed, yes, sir.

3      Q.      And then from there you went back

4  to North Carolina with your family?

5      A.      Yes, sir.

6      Q.      Do you remember when you drove --

7  I assume you drove -- when you came back to

8  Shelbyville to resume the October work?

9      A.      It would have been the day before,

10  so probably October 1st or 2nd.

11      Q.      So almost a month you spent at

12  home in North Carolina with your family?

13      A.      It was probably about three weeks,

14  yes, sir.

15      Q.      And you didn't make any inquiry of

16  Heritage about coming back earlier than October

17  3rd?

18      A.      As a matter of fact, I did, sir,

19  but it's not on email.  I don't have proof of

20  that.  So I did.  I believe too that you

21  can't -- I don't know if this is right or

22  wrong.  I don't know if it's right.  You can't

23  be on active duty still and still go back to

1    your employment.  That was the understanding

2    that I have.  You can't do that.  You can't,

3    quote, unquote, double-dip.

4           Q.    So the twelve -- the September

5    23rd date you are saying is the date the

6    government would say you were --

7           A.    Would release you.

8           Q.    -- done.  Even if they release you

9    to go home, you are still on the payroll

10   through September 23rd?

11          A.    Yes, sir.

12          Q.    That's your understanding?

13          A.    Yes, sir.

14          Q.    12.19 is your response back to

15   Ms. Rader about what office to put you in, and

16   you are just indicating at this point

17   everything should go through your attorney,

18   correct?

19          A.    Yes, sir.  I'm going to -- from

20   now on I'm going to wait for you to look at me.

21   Is that okay?

22          Q.    That's fine.

23          A.    Okay.

**EXHIBIT B**

1          Q.      Communication between you and

2     Ms. Rader -- Ms. Rader, excuse me, not to be

3     confused with Walter O'Reilly.

4                  MS. RHODE:  MASH.  Radar.

5          A.      Oh, I'm not as old as you, sir.

6          Q.      (BY MR. LONERGAN:)  That's right.

7     You are not.  I pronounced it Radar instead of

8     Rader.

9          A.      By the way, that stuff is not

10    true, that MASH stuff, definitely Hollywood.

11         Q.      October 4th, just making

12    arrangements when you are reporting in to

13    Heritage Medical Center, is that what this

14    email is about?

15         A.      Yes, sir.  She indicates to meet

16    me in her office, yes, sir.

17         Q.      What was your assignment when you

18    returned, at Heritage, what did you do?

19         A.      I went back to the same thing I

20    was doing.  I was seeing patients and taking

21    calls, the same thing I was before.

22         Q.      Same pay?

23         A.      Oh, yes, sir.

EXHIBIT B

1      Q.    Same benefits?

2      A.    Yes, sir.

3      Q.    Different physical office?

4      A.    No, sir.  Oh, the physical --

5 there are two offices.  There was a big one in

6 the same building.

7      Q.    Right.

8      A.    And there were two offices in the

9 building, in the orthopedic clinic.  And

10 Dr. Mosley was in the one that I was in

11 previous to my deployment.  I was in the one

12 right next to him, the office.  We shared the

13 same office space, I guess you want to say.

14      Q.    Different room, I guess, within

15 the same location?

16      A.    Yeah, yeah, yeah.

17      Q.    Part of your legal complaint

18 alleges or complains that when you returned,

19 you were doing things that you hadn't done

20 before, like review procedures, take ER call,

21 make sure the emergency room was stocked or

22 staffed.  Is that accurate?

23      A.    I would like to know what you mean

**EXHIBIT B**

1 by stocked because I'm not an ER technician. I

2 don't stock ERs. I staffed the ER as in call.

3 I don't stock them. I think that my degree

4 tells me I can do a little more than stock an

5 ER.

6       Q. I would think so.

7       A. No. I went back to taking the

8 same call. I went back -- it was originally

9 a -- from my understanding, I don't know

10 exactly -- you can refer to the documents and

11 all of the stuff with my attorney. I don't

12 know, but it was my understanding when I was

13 going back that I was going to work the same

14 thing, take the ER call, same pay, fulfill my

15 obligation and my agreement in the same office,

16 seeing patients just like I did before.

17       Q. And that's what you did?

18       A. And that was established the day

19 that I got there. And Ms. Rader, when I met

20 her at 8:30, she was like okay, we are going to

21 send you back to do the same thing. But

22 previous to that it was my understanding they

23 didn't know what they were going to do with me,

**EXHIBIT B**

1    they didn't know how they were going to do it.

2         Q.    But you came back and did what you

3    did before?

4         A.    Roger that, sir.

5         Q.    Because your complaint, what I was

6    referring to in your complaint, which is this

7    legal document filed by your attorneys in the

8    lawsuit, alleges under paragraph fifty-four in

9    the October 3rd, 2011 meeting --

10        MR. LONERGAN:   Do you want me to

11   wait while you pull it?

12        MS. RHODE:   Is it all right if I

13   show him?

14        MR. LONERGAN:   That's fine.   I'm

15   not making it an exhibit.

16        MS. RHODE:   That's fine.   Just so

17   he can see what it is.

18        Q.    (BY MR. LONERGAN:)   Paragraph

19   fifty-four says, "Buckner instead told Slusher

20   that his reemployment duties were going to be

21   only in the emergency room to take calls, stock

22   and check the equipment and review and draft

23   HMC policies and procedures through October

EXHIBIT B

1    26."

2         A.    That -- yes, he did say that, yes.

3         Q.    But you are telling me today that

4    that's not what you did?

5         A.    That's not what I did, no, sir.

6         Q.    Okay.  Paragraph fifty-five,

7    "Slusher's duties before reporting for active

8    duty as an orthopedic surgeon was with his own

9    clinic and staff."  That's a -- that's the

10   hospital's clinic?

11        A.    Roger.

12        Q.    And hospital staff?

13        A.    Yes, sir, it was hospital --

14        Q.    Not yours?

15        A.    Right.

16        Q.    "Treating patients in a practice

17   setting and performing surgeries."  And you

18   just confirmed that that's what you continued

19   to do in October, right?

20        A.    Yes, sir.

21        Q.    Okay.  Paragraph fifty-six, prior

22   to your deployment it says you had an office,

23   exam room, staff, equipment, et cetera.  And

1  then fifty-seven says, "Defendants failed to

2  provide office, exam room, staff, equipment or

3  patient appointments." That's not true, is it?

4      A.    That's not true now. When I got

5  there. No, it's not true now, no.

6      Q.    Well, it wasn't true at the time

7  that this complaint was filed either.

8      A.    No, I had -- when I got back to

9  work, they had -- I was put in that same office

10 and I was seeing patients and had the hospital

11 staff and everything, yes.

12     Q.    You had the equipment, patient

13 appointments, exam room, et cetera?

14     A.    Yes, sir.

15         MS. RHODE:  Are you done?

16         MR. LONERGAN:  You might leave it

17 open.  I will go back to it.

18         (Whereupon, Defendants' Exhibit 13

19          was marked for identification and

20          copy of same attached hereto.)

21     Q.    (BY MR. LONERGAN:)  Exhibit 13,

22 Dr. Slusher, looks like a schedule.

23     A.    Yes, sir.

1        Q.    And you are on that schedule,

2    correct?

3        A.    Yes, sir.

4        Q.    And this is for October of 2011?

5        A.    Yes, sir.

6        Q.    Same work schedule in terms of the

7    number of days that you had had prior to

8    deployment, right?

9        A.    Yes, sir, seems to be that way.

10       Q.    And Dr. Mosley is also on the

11   schedule as well.

12       A.    He is, sir.

13       Q.    And prior to deployment, you

14   took -- I think your employment agreement shows

15   that you took on-call patients as well, right?

16       A.    Yes, sir.

17       Q.    And you did that when you returned

18   as well?

19       A.    Yes, sir, I did.

20            (Whereupon, Defendants' Exhibit 14

21             was marked for identification and

22             copy of same attached hereto.)

23       Q.    Do you recognize what has been

**EXHIBIT B**

1  marked as Exhibit 14, the letter to you dated

2  October 26, 2011?

3      A.    Yes, sir.

4      Q.    Now, that has your home address on

5  it.  Do you know if this was also given to you

6  hand-delivered or how you received it?

7      A.    This address is wrong.

8      Q.    Okay.

9      A.    Number one.  I was at 305 South

10 Bethesda, but that is my home address -- well,

11 it was.

12     Q.    It was.  Did you change home

13 addresses -- or residences while you were

14 deployed?

15     A.    No, sir, I was in that house

16 before that.

17     Q.    Okay.  Do you remember when you

18 moved into --

19     A.    I believe it was October of 2010.

20     Q.    Okay.

21     A.    The boss knows that better.  We

22 all know who the boss is, right?

23     Q.    I believe I'm on the same page

1    with you there.

2           MR. BUCKNER:  You are miraculous

3    with dates.

4           MR. LONERGAN:  Off the record.

5           (Off-the-record discussion.)

6           (Whereupon, a break was had from

7           11:44 a.m. until 11:57 a.m.)

8           (Whereupon, Defendants' Exhibit 15

9           was marked for identification and

10          copy of same attached hereto.)

11     Q.    (BY MR. LONERGAN:)  Exhibit 15

12    looks like it is notification of a call-up,

13    November 7, 2011, is that correct?

14     A.    Roger that, sir.

15     Q.    That's the one that you did in

16    Missouri that you referred to earlier?

17     A.    Roger that.

18     Q.    Where is Fort Leonard Wood?

19     A.    Fort lost in the wood, sir.  It's

20    about two and a half hours south of St. Louis.

21    Home of the engineers.  Home of the military

22    police.

23     Q.    And what did you do on that

1   assignment?

2   A.   This assignment was the backfill

3   where they needed an orthopedic surgeon to come

4   in and help them to -- there was only two

5   orthopods there.  I'm sorry.  Orthopedic

6   surgeons are called orthopods.  I will refer to

7   them as orthopedic surgeons.

8   But there were only two, and they

9   needed, patient load, they needed to have

10  another one come in and help.  And this was the

11  place that they needed it at.  So I took this

12  job because I was no longer welcomed at

13  Heritage, so I had to have -- to support my

14  family, so I had to take this deployment.

15  Q.   So within -- go ahead.

16       (Whereupon, Defendants' Exhibit 16

17       was marked for identification and

18       copy of same attached hereto.)

19  Q.   Your last day at Heritage would

20  have been October 26, pursuant to the

21  termination agreement, correct?

22  A.   Oh, yes, sir.

23  Q.   And on November 7th, you got this

**EXHIBIT B**

1    notification?

2         A.    Yes, sir.

3         Q.    And then you served for how long

4    on that?

5         A.    It ended up being four months,

6    November 14th to March -- say I'm good with

7    numbers or dates, but I believe it was March

8    13th or 15th.

9         Q.    2012?

10        A.    Oh, yes, sir, 2012.

11        Q.    And then Exhibit 16 is the

12   activation date and your reporting notice,

13   correct?

14        A.    Yes, sir.

15        Q.    Help me understand the two

16   report-to destinations or dates.  The first one

17   says November 11th, U. S. Army Hospital.  Is

18   that Detroit or destination?

19        A.    Detachment.

20        Q.    Detachment.

21        A.    Yeah.

22        Q.    That's your unit that you are

23   going to?

1          A.      Roger.

2          Q.      And then the actual reporting date

3   of Fort Wood --

4          A.      Fort Leonard Wood.

5          Q.      -- Fort Leonard Wood is the 14th

6   of November.

7          A.      That's the start date, yes, sir.

8   On these orders, for people who don't really

9   see these very often, I will help you

10  understand.

11         Q.      That would be me.

12         A.      That would be you.  Okay.  The

13  11th, I report on that date.  They give you

14  time to get to your station, your duty station.

15  So they always give you a backdate.  So

16  November 14th was a Monday.  So that means

17  that's when I report to the hospital.  The 11th

18  is typically they give you the date to do

19  inprocessing and stuff like that.  So they give

20  you a couple of days forward, and they don't

21  normally give you days after, because they do

22  it, you know, in that time frame.  So does that

23  help you?

**EXHIBIT B**

1        Q.    Yes, thank you.  You were home in

2  North Carolina?

3        A.    When, sir?

4        Q.    When you got these orders?

5        A.    Roger that, sir.

6        Q.    And did you drive to Missouri or

7  did you fly?

8        A.    I sure enough did drive, sir.  I

9  drive everywhere.

10        Q.    And do you recall what your

11  compensation rate was on this call-up?

12        A.    Well, I will just use it in terms

13  of major pay.

14        Q.    Yes, sir.

15        A.    And I don't exactly know what that

16  is, but they did give you a -- just being a

17  doctor pay.  And I don't recall.  It's in the

18  notes and stuff like that, but I don't recall

19  exactly how much it was.  I think it worked out

20  to be like ten grand a month or something like

21  that because they pay -- they pay for TDY.

22             I'm being verbose right now, but I

23  will help you understand the military.  When

**EXHIBIT B**

1   you go on TDY, you go on deployments like this,

2   they pay for certain things like your BAH, BAS,

3   your living arrangements, things like that so

4   --

5          Q.    So when you say paying for your

6   living arrangements, are you including that in

7   that ten thousand dollar figure?

8          A.    Yes, sir.  So it's major pay plus

9   what you get -- you know, the government, they

10  have got computer number generated times .3

11  times the date of your children's birth and all

12  of that other kind of thing, you know.  There

13  is a computation for it.

14         MS. RHODE:  Just wait for him to

15  ask questions.

16         A.    Oh, all right.  My bad.

17         (Whereupon, Defendants' Exhibit 17

18         was marked for identification and

19         copy of same attached hereto.)

20         Q.    (BY MR. LONERGAN:)  Dr. Slusher,

21  what has been handed to you is a letter dated

22  August 30th, 2011 from your attorney,

23  Ms. Jackson, one of your attorneys,

**EXHIBIT B**

1    Ms. Jackson, to Mr. Buckner and Ms. Rader.  And

2    it shows you as a copy on this document.  Do

3    you recall receiving this letter?

4          A.    Yes, sir.  Yes, sir.

5          Q.    Do you know if you reviewed this

6    letter before it was sent?

7          A.    Yes, sir, they always sent me --

8          Q.    Okay.

9          A.    Although I can't read it right

10   now.

11         Q.    Well, that first page is largely

12   some legal assertions by your attorney.

13         A.    Okay.

14         Q.    I'm going to ask you a couple of

15   questions.

16         A.    Are you going to give me a second

17   to read it, just to --

18         Q.    Yes.

19         A.    Okay.  I just wanted to make sure.

20         Q.    I think if you will start on the

21   bottom of the page, the third paragraph and

22   read over the second page, that's what I am

23   going to ask you about.  I'm not going to ask

**EXHIBIT B**

1    you about the first two paragraphs.

2            MS. RHODE:  Can you read that

3    paragraph okay?

4        A.    (Reviewing document.)

5            MS. RHODE:  Do you care if I show

6    him a copy he can actually read?

7            MR. LONERGAN:  That's fine.

8        A.    (Reviewing document.)  Are you

9    ready, sir?

10       Q.    (BY MR. LONERGAN:)  Yes.

11       A.    Oh, I'm sorry.  I apologize.  Go

12   ahead.

13       Q.    There is a reference in the

14   letter.  We talked about this earlier in the

15   agreement.  It says, "Your employment agreement

16   may be terminated by either party with or

17   without cause upon ninety days written notice,"

18   correct?

19       A.    Correct, sir.

20       Q.    And we confirmed in these email

21   communications with Ms. Rader that you were --

22   on the termination agreement that you were

23   asking what your ninety-day notice period was

1    going to be.

2         A.    Yes, sir.

3         Q.    And as it worked out, it was from

4    the date of this agreement through the

5    October 26 period, correct?

6         A.    Yes, sir.

7         Q.    And then you signed that agreement

8    that confirmed that, the termination, and it

9    was ninety days out, right?

10        A.    Yes, sir.

11        Q.    The next paragraph says, 10.4, two

12   options for termination.  "Give Dr. Slusher

13   ninety days notice of termination and continue

14   paying him per the agreement during the notice

15   period."  That's not exactly what the

16   employment agreement says, does it?  Which is

17   Exhibit 5.

18        A.    We killed a lot of trees here.

19   Are you going to reference a portion of this or

20   are you just saying that this --

21        Q.    Fair question.  The 10.4.

22        A.    Roger that, sir.

23        Q.    Now, if you had taken a personal

1  leave, okay --

2       A.    Got it, sir.

3       Q.    -- there was no obligation of the

4  hospital to pay you, correct?

5            MS. RHODE:  Under this section?

6            MR. LONERGAN:  Under this

7  employment agreement.

8            MS. RHODE:  If he had chosen to

9  take a --

10           MR. LONERGAN:  Uh-huh.

11           MS. RHODE:  I will simply object.

12  It calls for a legal conclusion, but you can

13  answer to the extent you understand it.

14       A.    I understand if I took vacation

15  time, I would get paid.

16       Q.    (BY MR. LONERGAN:)  Right, that's

17  paid time off.

18       A.    Right.  But not if I just say hey,

19  Mr. Buckner, I'm leaving, see you later.

20       Q.    I need ninety days --

21       A.    Right.

22       Q.    -- I'm going to go climb the

23  closest mountain.

**EXHIBIT B**

1          A.    In Tennessee, yes, sir.

2          Q.    You have the Smokies.  Pretty good

3    mountains.

4          A.    Yes, sir.

5          Q.    But they had no obligation to pay

6    you?

7          A.    No, sir.

8          Q.    And under that hypothetical --

9          A.    Yes, sir.

10         Q.    -- you could say I'm going for

11   ninety days, they could have sent you a letter

12   and said we changed our mind, we are

13   terminating you and here is ninety days notice?

14         A.    Yes, sir.

15         Q.    And you wouldn't be paid?

16               MS. RHODE:  I'm going to object.

17   That calls for legal conclusion.  You can

18   answer.

19               MR. LONERGAN:  Well, we were

20   holding the objections to the form only.

21         Q.    (BY MR. LONERGAN:)  But you can

22   answer, if you understand my question.

23         A.    Yes, sir, my understanding is

**EXHIBIT B**

1    that, yeah, if I wanted to go, what you say,

2    climb the highest mountain -- it wouldn't take

3    me ninety days, by the way.

4         Q.    I said you took ninety days; I

5    didn't say it would take ninety days.

6         A.    I would take -- yes, they didn't

7    have to pay me, yes.

8         Q.    And they had no obligation to pay

9    you while you were on your military leave

10   either, correct?

11        A.    No, sir.

12        Q.    Did Ms. Rader or Mr. Buckner

13   communicate to you when you returned from

14   deployment, at any time did they tell you that

15   they were not going to return you to your

16   position at Heritage Medical Center?

17        A.    The only thing that I -- can I

18   answer now?

19        Q.    Uh-huh.

20        A.    The only thing that I understand,

21   they didn't know what they were going to do

22   with me.  The first thing I heard when I came

23   back was on the day that I came back, in

1    Ms. Rader's office, what they were going to do.

2    I tried to call her.  She never returned my

3    calls.

4         Q.    But neither Ms. Rader or

5    Mr. Buckner told you that they would not be

6    returning you to work out the period identified

7    in your termination agreement, correct?

8         A.    I don't understand that.

9         Q.    Okay.

10        A.    One more time.

11        Q.    You're saying they weren't

12   clear -- or they weren't sure what they were

13   going to do with you?

14        A.    Right.

15        Q.    But neither of them ever told you

16   that they would not have -- that they would not

17   return you to work?

18        A.    No, sir, they just didn't know

19   what they were going to do with me.

20        Q.    And then when you did return on

21   the date that you had agreed upon, you returned

22   to your normal position and duties?

23        A.    Well, I returned to what I was

1    doing, but let's make this clear.  The office

2    and stuff, that was Dr. Mosley's office.  They

3    were allowing me to use his office space.

4            Q.    You had office, you saw patients,

5    conducted exams, provided treatment?

6            A.    But it was in Dr. Mosley's office,

7    yes.

8            Q.    And you knew as far back, as

9    you've already confirmed, prior to being

10   deployed that you knew that they were

11   negotiating with Dr. Mosley to bring him on as

12   a full-time orthopedic surgeon?

13           A.    Yes, sir.  They had told me they

14   were going to be recruiting.

15           Q.    I'm not going to ask you about

16   this set of letters, but I just want to confirm

17   that you received a copy, so you don't have to

18   study it.

19                  (Whereupon, Defendants' Exhibit 18

20                  was marked for identification and

21                  copy of same attached hereto.)

22           Q.    It is a letter dated September

23   15th, 2011.  It's addressed to Mr. Rhea Garrett

**EXHIBIT B**

1    with the Community Health Systems, signed by

2    your attorney, Ms. Jackson, and it shows you as

3    a recipient of the letter.

4         A.    Yes, sir.

5         Q.    Do you recall receiving that

6    letter?

7         A.    Yes, sir.

8         Q.    Do you recall when you returned to

9    Heritage in October of 2011 whether or not

10   there were any other locum tenens orthopedic

11   surgeons being utilized?

12        A.    I -- I think you used one guy

13   before me.  I think there was a guy that was

14   there.  I don't remember his name.  I don't

15   recall his name.

16        Q.    But you recall, as you sit here

17   today, you think there was someone being used?

18        A.    I think there was someone there.

19        Q.    And you said earlier that there

20   was another -- the Tullahoma office?

21        A.    Well, it's Dr. Ramprasad.  That's

22   his office.  He's a private orthopedic surgeon.

23        Q.    I just wanted to make sure that

1  wasn't associated with Heritage.

2       A.    Negative, sir.  He wasn't.  He is

3  not, no.

4       Q.    In some of the communications or

5  documents produced, without trying to find it,

6  there is a reference to you had applied for

7  licensing in Virginia.

8       A.    Yes, sir.

9       Q.    Can you tell me what the

10  circumstances were that led you to apply for

11  licensing in Virginia?

12       A.    That's kind of a funny story,

13  actually.  I was applying for licensure there

14  because I was recruited to go there a while

15  back.  And I had already paid the money to get

16  the license.  So I just went on ahead and got

17  the license, went through the rest of the

18  procedure.

19            I had already paid for it.  So I

20  wasn't just going to -- it was three hundred

21  dollars.  I wasn't just going to let that go in

22  the wind.  And I have since kept my credentials

23  in the state of Virginia.  I don't practice out

**EXHIBIT B**

1    of there, but I keep it.  It is a very hard

2    license to get, so once you get it, you keep

3    it.

4         Q.    What had been the time frame that

5    you were being recruited for the Virginia

6    position?

7         A.    I don't recall what the dates on

8    that were.  That's one that I don't remember.

9         Q.    Was it a locum tenens type thing?

10        A.    No.  It was a --  I believe it was

11   while I was at Heritage.  And people were just,

12   you know, interviewing me and stuff like that

13   for going there.  And I told them I didn't want

14   to go there.

15        Q.    Okay.

16        A.    I think it was in 2010, I believe.

17        Q.    Do you remember where in Virginia?

18        A.    Yes, South Boston, Virginia.

19   That's the name of the city.  I don't know the

20   name of the hospital.

21        Q.    So it was a hospital, not a

22   practice?

23        A.    Right.

**EXHIBIT B**

1              MS. RHODE:   South Boston,

2      Virginia?

3              A.     Yes, it's right on the border

4      of -- it's actually a very popular city.   It's

5      where Sir or Lord Cornwallis during the

6      Revolutionary War crossed the Dan River and was

7      chasing George Washington's troops across.

8      It's pretty popular, actually.   It was just on

9      the History Channel.

10             (Whereupon, Defendants' Exhibit 19

11             was marked for identification and

12             copy of same attached hereto.)

13             Q.    (BY MR. LONERGAN:)   This document

14     or set of documents, as I understand it, is --

15     sets forth the terms of your complaint with the

16     Department of Labor on the USERRA claim, right?

17             A.     I believe so, sir.   Yes, sir.

18             Q.    If you will turn, I guess, the

19     fourth page in, which is just a basic

20     information sheet, it still shows your address

21     as the -- that's your most current address,

22     right, South Bethesda Road?

23             A.     Roger that, sir.   Where are you

**EXHIBIT B**

1   at?

2          Q.     I think I'm at the same page you

3   are.

4          A.     Okay.

5          Q.     It has the black --

6          A.     Roger.

7          Q.     Took out the Social Security.   And

8   then the next page, again, this is an

9   information sheet, and then it has the

10  verification that what you are submitting is

11  true and accurate, signed off on --

12         A.     Yes, sir.

13         Q.     -- October 18th, 2011, correct?

14         A.     Yes, sir.

15         Q.     And then the page after that is

16  two pages of typed information with your

17  initials on the bottom of each page, correct?

18         A.     Yes, sir.

19         Q.     There is a reference in here.   It

20  says, "HMC," second paragraph, "was aware of

21  Slusher's military status, as it was discussed

22  during contract negotiations."   What do you

23  mean by that?

**EXHIBIT B**

1        A.      That they knew that I was in the

2    reserve and could be deployed at any time.

3        Q.      And they still entered into the

4    employment agreement with you, correct?

5        A.      Yes, sir, they did.

6        Q.      We have already talked about the

7    email exchanges between you and Ms. Rader and

8    the termination agreement, correct?

9        A.      We certainly did, sir.

10       Q.      Okay.  You say in here, "Since he

11   was in Iraq and unaware of his USERRA rights,"

12   he being -- were you communicating directly

13   with the investigator on the contents of this

14   statement?

15       A.      She contacted me a couple of

16   times, yes, to get information, yes, sir.

17       Q.      And then she sent this back to you

18   and you signed off on it?  I believe her name

19   was Ms. Shackelford.

20       A.      Ms. Shackelford, roger, yes, sir.

21       Q.      Did you tell Ms. Shackelford that

22   you had told Heritage that you were having the

23   agreement, the termination agreement, reviewed

**EXHIBIT B**

1   by your legal counsel?

2        A.    I don't remember that.  I don't

3   recall that, sir.

4        Q.    Now -- strike that.  The second

5   page of the typewritten statement, Dr. Slusher,

6   contains the same allegations that you would be

7   in the emergency room, take calls, stock the

8   emergency room, check the equipment, which you

9   have already verified is not what you did.

10       A.    I did not do that, no, sir.

11       Q.    When was that Virginia license

12  ultimately approved?

13       A.    You got me, sir.  Don't know.  I

14  had to renew it once since then.

15       Q.    How long does a license last?

16       A.    They usually last about three

17  years.

18       Q.    And like lawyers, do you have the

19  continuing education training requirements?

20       A.    Roger that, sir.

21       Q.    Are those requirements universal

22  or are they state specific?

23       A.    Every state that I have been

1     licensed in, it's the same.  You do fifty -- or

2     a hundred and fifty CME credits over a

3     three-year period to maintain your license.

4          Q.     And it works across whatever

5     states you have your license --

6          A.     I believe so, sir.  Every one I

7     have been licensed in, I believe it has been

8     the same.

9          Q.     Okay.  When you were with Heritage

10    through Weatherby, did they pay for your

11    accommodations?

12         A.     Weatherby, sir?  Yes, sir, they

13    did.

14         Q.     And then once you went under the

15    employment agreement with Heritage, was that

16    your responsibility then for paying for your

17    accommodations?

18         A.     Roger that, sir.

19         Q.     When you went on deployment and

20    vacated the house that you had been renting,

21    did you terminate the lease, I guess?  Was it a

22    month to month?

23         A.     It was a month to month, sir.

1          Q.     And so you were able to terminate

2     it and not be on the hook for the rent while

3     you were deployed?

4          A.     Roger that, sir.  I informed her

5     the same time that I informed the hospital.

6                 (Whereupon, Defendants' Exhibit 20

7                 was marked for identification and

8                 copy of same attached hereto.)

9          Q.     Dr. Slusher, this is a December

10    2nd, 2011 letter from your law firm to the DOL

11    investigator on your USERRA complaint signed by

12    Ms. Cassie Korando.  I think I said that right.

13         A.     Cassie, but roger.

14         Q.     And it shows you as a recipient of

15    the letter.  And I ask you if you recall

16    receiving this.

17         A.     I don't recall receiving this, but

18    I'm sure that Cassie had sent it to me in an

19    email or sent it to me in the mail.

20         Q.     In the paragraph A it says, "While

21    performing locum tenens service, Dr. Slusher

22    was full-time and the only orthopedic physician

23    in the department."

**EXHIBIT B**

1          I think we have already verified

2 there were other locum tenens surgeons working

3 at the same time, correct?

4          A.    There was Dr. West.

5          Q.    So there were others, at least one

6 other?

7          A.    At least one other, that didn't

8 work very much.  Roger that.

9          Q.    And your permanent residence has

10 been in North Carolina since 2005, is that

11 correct?

12          A.    2005.  August 1st, 2005.

13          Q.    Did you ever speak to anybody at

14 Heritage about employment at other hospitals

15 within that system, the Community Health

16 Systems organization?

17          A.    Not that I can recall, sir.

18          Q.    Either before your deployment or

19 after you returned?

20          A.    Not that I recall, sir, no, sir.

21          Q.    In your discussions with

22 Mr. Buckner about your employment agreement, do

23 you have any recollection of him using the term

**EXHIBIT B**

1    "bridge agreement"?

2            MS. RHODE:  I'm sorry.  Could you

3    repeat that?  I didn't hear it.

4            MR. LONERGAN:  I asked him whether

5    he recalled Mr. Buckner using the term "bridge

6    agreement" as it referred to the employment

7    agreement you signed.

8        A.    I don't know what that is.

9        Q.    (BY MR. LONERGAN:)  So the answer

10   is you don't recall that?

11       A.    I don't recall it.

12       Q.    When did you first become

13   contacted by Triangle Orthopaedics for

14   employment?

15       A.    January of 2012.

16       Q.    Am I correct in my statement that

17   they contacted you, or did you contact them?

18       A.    Well, it really -- that's more

19   than -- it's a longer discussion than just

20   Triangle, because Triangle bought the practice

21   that I went and worked for.  I had touched base

22   with Dr. Stevens with Johnston Memorial

23   Hospital when I had a feel I was going to need

1   a job, so I contacted him.  And then he was

2   going through negotiations with Triangle to buy

3   his practice.  So Triangle actually contacted

4   me and interviewed me in January.

5          Q.    When did you talk to Dr. Stevens

6   about joining his practice?

7          A.    I believe that was in -- I had an

8   interview with him.  I believe it was in

9   mid-September of 2011.

10         Q.    And do you recall first contact

11  with Dr. Stevens about an employment

12  opportunity?

13         A.    I don't recall a date, no, sir.

14         Q.    Would have had to have been prior

15  to September of 2011, if that was your

16  interview?

17         A.    I guess that's a -- I guess so,

18  would have to have been before September of

19  '11.

20         Q.    And how did you know Dr. Stevens?

21         A.    I didn't.

22         Q.    How did you find out about him or

23  his opportunity?

**EXHIBIT B**

1          A.      Orthopedic surgeons, I don't know

2     if you know, we get things in the mail all the

3     time for job opportunities.  So his job

4     opportunity was posted through a headhunter,

5     and I went through that.  And I don't remember

6     the headhunter.  Is that okay to use

7     headhunter?

8          Q.      I don't have a problem with it.

9          A.      Okay.

10         Q.      And where was the location of

11    Dr. Stevens' practice, city-wise?

12         A.      Smithfield, North Carolina.

13         Q.      And then Triangle Orthopaedics is

14    where?  You already said you were in Durham.

15         A.      I'm not in Durham, no, sir.  Their

16    head shed is in Durham.

17                 (Whereupon, Defendants' Exhibit 21

18                 was marked for identification and

19                 copy of same attached hereto.)

20         Q.      What has been marked as

21    Exhibit 21, is a reprint of a news article or

22    posting.  And I ask you if you have seen that

23    before.

1        A.      (Reviewing document.)   Yes, sir.

2        Q.      So that's Dr. Smith -- Dr. Stevens

3   in Smithfield is referenced there, correct?

4        A.      Where do you see -- oh, there he

5   is.  Yes, sir, he is referenced here.

6        Q.      Did Stevens go with you to

7   Triangle or you went with him?

8        A.      As I explained before, sir, yes,

9   sir.  He was bought out by Triangle

10   Orthopaedics.  It was his practice.

11        Q.      Did you actually start working

12   with Dr. Stevens before Triangle?

13        A.      No, sir.

14        Q.      Or you went straight to Triangle?

15        A.      Went straight to Triangle, sir.

16        Q.      And do you do mostly sports

17   medicine at Triangle?

18        A.      I do everything, sir.  I don't do

19   back surgery, but I do -- I'm a general

20   orthopedist with a sports medicine fellowship.

21   As you can read here, I enjoy sports medicine.

22   That's my fellowship.  But I do joint

23   replacement and things like that, yes, sir.

**EXHIBIT B**

1          Q.     In reference to you and your

2    family, divide homes between Southern Pines and

3    Clayton?

4          A.     Yes, sir.  That was the initial

5    thing, because I live so far away from

6    Smithfield.  I rented a condo from my friend,

7    but that turned out I didn't need it and I stay

8    at home.

9          Q.     You mentioned earlier that

10   somebody at Fort Benning talked to you about

11   your USERRA rights, is that correct?

12         A.     Well, I approached the JAG officer

13   and told him what was going on.

14         Q.     Did you ever have a discussion

15   with Dr. Mosley about your USERRA rights?

16         A.     He mentioned them to me.  He asked

17   me if I knew about them.  And I said no, I

18   wasn't aware of them.

19         Q.     That was the crux of the

20   conversation?

21         A.     Pretty much, yes.

22         Q.     He was a veteran?

23         A.     I think a veteran of three

**EXHIBIT B**

1    deployments, yes, sir.

2              MR. BUCKNER:  I vote for a lunch

3    break.

4              (Off-the-record discussion.)

5              (Whereupon, Defendants' Exhibit 22

6              was marked for identification and

7              copy of same attached hereto.)

8         Q.    (BY MR. LONERGAN:)  This is a

9    letter dated December 5th, 2011 from your

10   counsel back to the UL investigator,

11   Ms. Shackelford.  And again, it shows you as

12   the recipient of the letter.  Do you recall

13   receiving it?

14        A.    Yes, sir.

15        Q.    The employment agreement that you

16   signed with Heritage Medical Clinic in

17   February, did you ever discuss a term longer

18   than one year with Heritage?

19        A.    No.  No, sir.

20        Q.    You have an employment agreement

21   with Triangle?

22        A.    Yes, sir, I do.

23        Q.    How long is that one for, the

1  term?

2        A.    Two-year contract, sir.  Are you

3  done with this one, sir?

4        Q.    Yes, sir.  Did you say you

5  purchased the Bethesda Road home in October of

6  2010?

7        A.    I believe that's when it was.

8  Like I say, I have to call the boss.  She would

9  confirm when we signed everything.

10        MR. LONERGAN:  Short break.  I'm

11  going to review a little bit and can give you a

12  guesstimate how much more I have got.

13             (Whereupon, a break was had from

14             12:53 p.m. until 1:15 p.m.)

15        Q.    (BY MR. LONERGAN:)  In your

16  complaint that your lawyers filed on your

17  behalf in this lawsuit, you make reference to a

18  telephone conversation with Ms. Dortch and

19  state in that complaint, paragraph forty-two,

20  that Ms. Dortch said there were rumors that

21  Slusher was not returning to HMC and that he

22  did not want to return.  Do you recall when you

23  had that conversation with Ms. Dortch?

**EXHIBIT B**

1         A.    I don't remember the date on it,

2   but, yes, I remember her telling me that.  I

3   don't remember the date on it, but I snuffed

4   that out because that was never -- I don't know

5   where those rumors came from.

6         Q.    And she didn't identify where they

7   came from?

8         A.    No, sir, she didn't.

9         Q.    Paragraph forty-four --

10         MS. RHODE:  Are you okay if I show

11   it to him?

12         MR. LONERGAN:  Yes, fine, as long

13   as you haven't written any secret code on

14   there.

15         A.    I can't even do Morse code, chief,

16   so --

17         Q.    (BY MR. LONERGAN:)  "Within this

18   time Slusher learned that HMC had accused him

19   of inappropriate sexual conduct with Dortch and

20   further allege that there were unidentified

21   patient complaints regarding his prior medical

22   services."  Explain that to me.

23         A.    That was just told to me by

1   Shelly, who said that they were saying that I

2   inappropriately sexually harassed her, which

3   was completely false.  She -- and that there

4   were patient complaints that I never got

5   anything from.  That was the end of that, never

6   heard anything after that.

7          Q.    Did she say who had accused you?

8          A.    No, sir.

9          Q.    Okay.  And that's the only thing

10  that was said about it?

11         A.    Roger that, sir.

12         Q.    And when you returned to HMC, did

13  you approach Mr. Buckner and ask him you had

14  heard this rumor or this is what Ms. Dortch

15  told you?  Did you raise any questions about

16  that?

17         A.    I don't remember.  I don't recall

18  doing that, sir.  I think it was kind of a

19  thing that just got blown away.  It wasn't

20  anything that I approached or went any further

21  with it, I guess is what --

22         Q.    You weren't concerned about it?

23         A.    No, sir.

**EXHIBIT B**

1    Q.    And you didn't talk to Mr. Buckner

2  about it or anybody else?

3    A.    I don't recall talking to Dan

4  about that, no.

5    Q.    Do you recall any conversation

6  with Mr. Buckner prior to your deployment that

7  someone had complained or expressed concern

8  about your language?

9    A.    Oh, yeah.  Yes, sir.  In the

10 operating room?  Yes, sir.  Yeah, I remember --

11 yes, sir.

12   Q.    Not that that would be unusual,

13 based on my experience.

14   A.    Roger that, sir.

15   Q.    But that someone had said that

16 they objected to your profanity or some sort of

17 your language?

18   A.    Roger that, sir.

19   Q.    And Mr. Buckner talked to you

20 about it?

21   A.    Yes, sir.

22   Q.    You just need to know I heard a

23 complaint, just please watch?

**EXHIBIT B**

1          A.     Roger that, sir.

2          Q.     Right?

3          A.     Roger.

4          Q.     And that didn't cause you any

5    heartburn?

6          A.     No, sir.

7          Q.     And you think it was fair for him

8    to approach you with that comment?

9          A.     Roger that.

10         Q.     Did you have -- were there any

11   other conversations like that that might have

12   been related to the patients or relations with

13   doctors or staff that you can recall --

14         A.     No, sir.

15         Q.     -- before you were deployed?

16   Sorry, I let that one slide too long.

17         A.     No, sir, I don't remember that,

18   no, sir.

19         Q.     The discussion with Mr. Buckner,

20   he didn't say that you were accused of

21   inappropriate sexual conduct or sexual

22   harassment, right?

23         A.     No, sir, he didn't.

**EXHIBIT B**

1          Q.     Did you talk to Ms. Rader about

2    that, the conversation that -- strike that.

3                 Did you talk to Ms. Rader about

4    the rumors of the sexual conduct relationship

5    with Ms. Dortch?

6          A.     No, sir.

7          Q.     Did you have any conversations

8    with Ms. Rader similar to what Mr. Buckner had

9    with you that somebody had objected to your

10   language?

11         A.     Not that I recall, sir.

12         Q.     The conversation with

13   Ms. Dortch -- you do have a date, September

14   20th, so you were back from deployment.  Okay.

15   No question.

16                Do you get notice of opportunities

17   for call-up duty because of your position as an

18   orthopedic surgeon and what appears to be a

19   lack of qualified folks?  Do you get

20   opportunities passed to you through the

21   government?

22         A.     Yes, they are out there.  I could

23   call, whatever and say I'm unemployed and do

1   you have a spot somewhere in the world that --

2   yes, sir.

3        Q.    Is that how the one in November of

4   2011 in Missouri came about?

5        A.    Yes, sir.

6        Q.    I assume they are posted online?

7        A.    They are not posted online, sir.

8        Q.    Your access --

9        A.    I don't have access to it.  My

10  Lieutenant Colonel Cradier was my -- she is

11  the -- I forgot what her job title is, but she

12  is the one who gives the deployments out,

13  whether you like it or not.

14       Q.    Okay.  But you could contact her

15  and say I'm looking for a deployment because

16  I'm not employed at Heritage anymore and I need

17  work?

18       A.    Yes, I could.

19       Q.    And is that what happened on the

20  November 2011 deployment?

21       A.    Yes, it is.

22       Q.    And what was her name?

23       A.    Her name is Lieutenant Colonel

**EXHIBIT B**

1    Jennifer Cradier.  She is at Fort Bragg, North

2    Carolina.

3         Q.    Can you spell the last name for

4    me?

5         A.    It's on all of the documents, but

6    I believe it's C-r-a-d-i-e-r.

7         Q.    And Mr. Buckner never accused you

8    of engaging in any inappropriate sexual

9    conduct, correct?

10        A.    No, sir, he never did.

11        Q.    Nor did Ms. Rader?

12        A.    No, sir.

13        Q.    Did Mr. Buckner ever tell you that

14   he had received patient complaints about your

15   behavior?

16        A.    No, sir.

17        Q.    Did Ms. Rader ever tell you she

18   received patient complaints about your

19   behavior?

20        A.    No, sir.

21        Q.    Did you feel like you had good

22   relationships with staff and personnel at

23   Heritage before you went on deployment?

1          A.       Yes, sir.

2                   (Whereupon, Defendants' Exhibit 23

3                   was marked for identification and

4                   copy of same attached hereto.)

5          Q.       (BY MR. LONERGAN:)   Dr. Slusher,

6    what has been handed to you marked as

7    Exhibit 23 is a damages calculation that your

8    attorneys I believe put together and have

9    presented.   I ask you if you have reviewed this

10   document before today.

11         A.       Yes, sir, I have seen this.

12         Q.       Now, as I read this document, you

13   are asking for compensation from your -- from

14   June 19th, 2011 through the February 1st, 2012,

15   what was the end date of your employment

16   agreement, is that correct?   It's under heading

17   number one, second paragraph.

18         A.       I think the date was February

19   28th, 2012, was it not?

20         Q.       It says February 1, but --

21         A.       Where does it say February 1st at,

22   sir?

23         Q.       The second paragraph -- it says,

1    "The remainder of the contract would have been

2    through February 28th.  The period from June

3    19th, 2011 through February 1st contains

4    sixteen pay periods."  I just didn't know what

5    the February 1st date represented.

6           A.    I still don't see the February 1st

7    date.

8                 MS. RHODE:  Probably a typo.

9           A.    Oh, there it is.  Okay.  Roger.

10    Could you ask the question again, then, sir?

11    I'm sorry.

12           Q.    (BY MR. LONERGAN:)  Well, you are

13    asking to be compensated from June 19th

14    through whether it's February 1st or February

15    28th, is that correct, what you are saying your

16    damages are?

17           A.    I would just like what's, you

18    know, through the law, what the law entitles me

19    to.

20           Q.    Well, if you use the June 19th

21    date, if I understand it, you are asking to be

22    paid while you were deployed.

23           A.    That's what it looks like there,

1   sir.  I just want what the law entitles me to.

2   I would like, not want.  I would like.

3        Q.   Page two, the damages calculations

4   worksheet has placed a value of a hundred

5   thousand dollars on what you claim is extreme

6   emotional distress and hardship; can you

7   expound upon that for me?

8        A.   I guess I don't understand.

9   What do you mean?  Do you want me to tell you

10  what extreme distress is?

11       Q.   Do you know how you came up with a

12  hundred thousand dollars?

13       A.   No, I don't know how come up -- I

14  don't know how the figures are put on things.

15  But if you have ever been in a combat

16  situation, you understand what stress is.

17       Q.   I understand that.

18       A.   I don't understand where the

19  number came from, but --

20       Q.   Okay.

21       A.   Yeah, I don't know where the

22  number -- I don't know how you calculate that

23  number, I guess is what I'm trying to say.

**EXHIBIT B**

1          Q.     And then you were -- you secured

2     your Triangle employment within -- by April of

3     2012, correct?

4          A.     I started April 9th, 2012.

5          Q.     Okay.  And you said you started

6     conversations with Dr. Stevens in September of

7     2011?

8          A.     I believe so, yes, sir.

9          Q.     Did you know that you had the

10    employment opportunity with Triangle before you

11    went to Fort Leonard Wood, Missouri?

12         A.     No, sir.

13         Q.     When did you, if you recall, did

14    the Triangle Orthopaedic opportunity become

15    concrete?

16         A.     Are you done?  As I said before, I

17    originally went through Dr. Stevens.

18    Dr. Stevens interviewed me.  I'm sure it is the

19    same for lawyers.  You go through all of the

20    partners, you go through everybody, and you say

21    this is the guy that I want.  So while that

22    whole thick process was going on, he in turn

23    was also selling his practice to Triangle.

1        So I had to come back because they

2    didn't know if they wanted to hire me.

3    Dr. Stevens said yeah, you know, this is the

4    guy that I want, but we have to get it approved

5    through Triangle.  So I had to come back in

6    January to get the job.  So I had no

7    opportunity -- I didn't know if I was being

8    hired by them or not, not until January when

9    they interviewed me again.

10        And then they sent me a contract.

11    I don't know what day the contract they sent

12    me, but they sent it to me after the January --

13    I don't even remember -- I think it was the

14    third week in January when they interviewed me,

15    I believe.  And I believe that Johnston

16    Memorial sent me a contract as well to review

17    and look at if I was okay with it.

18        Q.    Okay.

19            (Whereupon, Defendants' Exhibit 24

20            was marked for identification and

21            copy of same attached hereto.)

22        Q.    Do you recognize that document?

23        A.    This looks like my employment

1    agreement with Triangle, I believe.

2        Q.    Correct.  And it's effective April

3    9th, and if I understood your testimony

4    correctly, sometime about the 3rd -- late in

5    January of 2012, this offer materialized?

6        A.    No.  That's when I had -- I

7    interviewed with them.

8        Q.    Okay.

9        A.    And that's when they kind of put a

10   name to a face.

11       Q.    Got you.  When do you think from

12   your recollection and sitting here this

13   afternoon the offer materialized, the contract

14   may not have been written, but the offer

15   materialized?

16       A.    I would say in February, some time

17   frame like that, February, mid-February, late

18   February.

19       Q.    Does your wife work, Doctor?

20       A.    No, sir, she doesn't.  She works

21   with the kids at home.

22       Q.    That's hard work and no pay.  The

23   reason I ask that is on your income tax returns

1    that you supplied, spouse is identified as a

2    business administrator.

3           A.     Huh?  I don't know what that

4    means.  Which one was that?  We have a guy that

5    does our taxes for us.

6           Q.     2011, 2012.  And I don't need to

7    make them an exhibit.  I just want to --

8           A.     Maybe I should have that changed.

9    I don't know.  She is not a business -- she is

10   a very good housewife is what she is.  Where

11   would it say that at?

12          Q.     On the second page.

13          A.     Oh, sure does, doesn't it?

14          Q.     On both of them.

15          A.     Well, I'm going to have to call

16   Keith on that.  I don't know what that means.

17   Do you want these back, sir?

18          Q.     Yes.  I'm not going to make them

19   an exhibit.  Do you want them so it can remind

20   you to call?

21          A.     Yeah, I do.  Thank you.  I don't

22   know what that means.

23                 MR. LONERGAN:  I will go ahead and

**EXHIBIT B**

1    mark those collectively.

2                    (Whereupon, Defendants' Exhibit 25

3                    was marked for identification and

4                    copy of same attached hereto.)

5        A.    I don't know what that means.  She

6    will probably laugh.  He went ahead and made it

7    a collective, and he gives me this so I can

8    show --

9                    MS. RHODE:  Oh, okay.

10       Q.    (BY MR. LONERGAN:)  With the

11   Missouri deployment --

12       A.    Yes, sir.

13       Q.    -- you are able to provide a

14   continuous health and family medical insurance

15   once you left Heritage?

16       A.    Through the military, yes, sir.

17       Q.    And you maintained that until you

18   went to work for Triangle?

19       A.    I still have Tri-Care.  I still --

20   through the Reserve Select, I chose to do that.

21   Instead of taking Triangle's insurance, I'm

22   covered under Tri-Care.  It's actually a better

23   insurance for us.

**EXHIBIT B**

1        Q.     I would think so.

2        A.     Well, it's a little bit better.

3   It's just a different --

4        Q.     And you have been on that since

5   November of 2011 when you were deployed to

6   Missouri or prior to that?

7        A.     Well, we get it while we're in --

8   while I was in Iraq, and then you get it for a

9   hundred and eighty days when you leave.  After

10  you come back from active duty, you stay on it,

11  so they allow you to get insurance, blah, blah,

12  blah, right?

13       Q.     Right.

14       A.     So then I decided we would just

15  stay on the Reserve Select instead of going

16  back.

17       Q.     So you have been on it, then,

18  since your Iraq deployment?

19       A.     I believe so, yes, sir.

20       Q.     Other than complaining about your

21  sore back, are you in good health?

22       A.     Yes, sir.

23       Q.     And your family members as well?

**EXHIBIT B**

1          A.     As far as I know, sir.

2          Q.     Okay.

3          A.     I hope they are okay.  Do you know

4   something I don't know?

5          Q.     No.  You have had no major medical

6   claims or anything --

7          A.     With my wife?  Yes.  She had a --

8   in February of last year, she had a tumor in

9   her chest, and she had to have open-heart

10  surgery and have that removed, had that

11  resected.

12         Q.     But in terms of through 2000 --

13  from your deployment through 2012, your wife's

14  surgery wasn't until 2013?

15         A.     2013.  I think it was January.

16  She will kill me if I don't remember.  End of

17  January 2013.

18         Q.     But no major medical issues for

19  your family post-deployment for 2012?

20         A.     No, sir.  Knock on wood, sir.

21  That's not wood but --

22         Q.     What is your date of birth?

23         A.     July 22nd, 1969.

1          Q.    When you returned from your

2    deployment, did you have to -- I think my

3    question already covers this, but just to be

4    safe, did you have to seek medical treatment

5    for any conditions, illnesses, et cetera?

6          A.    Negative, sir.

7          Q.    Have you had counseling for any

8    issues from -- following your deployment?

9          A.    No, sir.

10          MR. LONERGAN:  Why don't you give

11   me about five minutes with Mr. Buckner and we

12   will be in a position to wrap this up.

13          MS. RHODE:  Sounds terrific.

14   Thank you.

15          (Whereupon, a break was had from

16          1:42 p.m. until 1:53 p.m.)

17          Q.    (BY MR. LONERGAN:)  Now, your

18   complaint -- back to the complaint.

19          A.    What number, sir?

20          Q.    Well, count three, eighty-six,

21   eighty-seven.  You sued Mr. Buckner

22   individually, okay?  And I think you have

23   already answered this, but can you tell me why

**EXHIBIT B**

1    you accused Mr. Buckner of falsely and

2    recklessly alleging that you had engaged in

3    inappropriate sexual conduct?

4            A.    Say that again, sir.

5            Q.    Allegation eighty-seven.   Based on

6    what -- your answer to my questions, that's not

7    a true allegation, is it?

8            A.    No, I don't -- I don't know -- he

9    never accused me personally of that, no.

10           Q.    Did someone -- and I think I asked

11   you.   Ms. Dortch didn't tell you who; she told

12   you about rumors; she didn't tell you who.

13           A.    Just told me rumors.

14           Q.    And he never said anything to you

15   related to that?

16           A.    No, sir.

17           Q.    Nor did Ms. Rader?

18           A.    No, sir.

19           Q.    Okay.   Same thing with

20   eighty-nine, Mr. Buckner didn't tell you --

21           A.    I don't recall Mr. Buckner saying

22   that to me, no, sir.

23           Q.    And you don't recall anybody

**EXHIBIT B**

1   telling you that Buckner said that about you?

2        A.    I don't recall that, no, sir.

3        Q.    And the only conversation you

4   recall having with Mr. Buckner was about you

5   said language made in the OR room that somebody

6   complained which was pre-deployment?

7        A.    Yes, sir.

8        Q.    No conversations related to that

9   after you came back?

10       A.    Not that I recall, sir.

11            MR. LONERGAN:  Let me just peruse

12  through my outline one more time and wrap it

13  up.

14            (Brief pause.)

15            MR. LONERGAN:  I think that's all

16  I have, Shari.

17

18  EXAMINATION BY MS. RHODE:

19       Q.    I just have a couple of just

20  little brief questions about some things that

21  Mr. Lonergan didn't ask you about.  If you will

22  look at Exhibit 11.

23            MS. RHODE:  I can show him my

**EXHIBIT B**

1    copies if that's okay with you.

2         A.    It's okay with you, sir?

3              MR. LONERGAN:  They are right

4    there.

5         A.    I have got mine.  Yes, ma'am.

6         Q.    (BY MS. RHODE:)  At the time you

7    signed document 11, were you aware of any of

8    your USERRA rights?

9         A.    No, ma'am.

10        Q.    If you will look at Exhibit 13,

11   please.

12        A.    That's through all of the emails,

13   right?

14        Q.    Correct.

15        A.    Yes, ma'am.

16        Q.    When the word "surgery" appeared

17   on any of these dates, what does that mean?

18        A.    That means that's my designated

19   surgery date.

20        Q.    Does that indicate that you

21   actually performed a surgery on any of those

22   particular dates?

23        A.    This schedule only says that this

1    is the date that I am scheduled to do

2    surgeries.  If I have anything that comes in

3    on-call or I needed to do an ankle fracture, or

4    just to make a long story short --

5         Q.    Slow down.

6         A.    Oh, okay.  Sorry.  That would be

7    the day that I could do it.  I guess we call it

8    block time.

9         Q.    Take a look at Exhibit 19, please.

10   It's about the seventh page.  It's the second

11   page of the typed version of your comments.

12        A.    Yes, ma'am.

13        Q.    There is a reference that -- the

14   fifth line starts with the word "during."

15        A.    Yes, ma'am.

16        Q.    At the time that you met with

17   Mr. Buckner on October 3rd of 2011, did he ever

18   inform you that you were going to be working in

19   the emergency room and stocking?

20        A.    Yes, ma'am, that's what he said I

21   was going to be doing.

22        Q.    But you never had to do that?

23        A.    No, ma'am, I never had to do that.

**EXHIBIT B**

1      Q.    And one more question.  If you

2  will look at Exhibit 22, please.  At any time

3  during the period that you worked with Heritage

4  or -- did Mr. Buckner discuss with you the

5  possibility of an extension?

6      A.    We discussed that when it got

7  closer to the end of the contract, then that's

8  when we would discuss whether or not we were

9  going to make it longer, make it a longer

10 contract.

11     Q.    But you never actually made any

12 agreement to extend?

13     A.    No, ma'am.

14     MS. RHODE:  I have nothing

15 further.  Thank you.

16

17 REEXAMINATION BY MR. LONERGAN:

18     Q.    When you signed Exhibit 11 --

19     A.    That's termination agreement,

20 correct?

21     Q.    Yes.  What that does -- I get to

22 come back and ask questions --

23     A.    Roger that.  Go ahead, sir.  Fire

**EXHIBIT B**

1    away.

2           Q.    When you signed Exhibit 11, you

3    knew what you were signing and that it was

4    terminating your employment agreement in ninety

5    days, correct?

6           A.    Roger that, sir.

7           Q.    And I just want -- the

8    representations in your emails that you were

9    consulting with legal counsel, you never told

10   anybody at Heritage that you didn't have the

11   opportunity to do that or did not consult legal

12   counsel before --

13          A.    No, sir.

14          Q.    -- signing that agreement?

15          A.    No, sir.

16                MR. LONERGAN:  That's all I have.

17                MS. RHODE:  Thank you.  We

18   reserve.

19

20          FURTHER THE DEPONENT SAITH NOT

21

22      (Deposition concluded at 2:01 p.m.)

23                DEPONENT'S CERTIFICATE

**EXHIBIT B**

1

2          I, RICHARD SLUSHER, D.O., the

3  witness herein, have read the transcript of my

4  testimony taken before Gail B. Pritchett, on

5  the 2nd day of March, 2014 and the same is true

6  and correct, to the best of my knowledge.  Any

7  corrections and/or additions, if any, are

8  listed separately.

9

10

11          RICHARD SLUSHER, D.O.

12          C/O Ms. Shari Rhode
           Rhode & Jackson, PC
13          1405 West Main Street
           P. O. Box 99
14          Carbondale, Illinois 62903-099

15

16          Sworn to and subscribed before me,

17  this the      day of           , 2014, to

18  certify which witness my hand and seal of

19  office.

20

21          NOTARY PUBLIC IN AND FOR

22          THE STATE OF ALABAMA

23

**EXHIBIT B**

1           C E R T I F I C A T E

2

3

4    STATE OF ALABAMA

5    JEFFERSON COUNTY

6

7           I hereby certify that the above

8    and foregoing deposition was taken down by me

9    in stenotypy, and the questions and answers

10   thereto were reduced to typewriting under my

11   supervision, and that the foregoing represents

12   a true and correct transcript of the deposition

13   given by said witness upon said hearing.

14           I further certify that I am

15   neither of counsel nor of kin to the parties to

16   the action, nor am I in anywise interested in

17   the result of said cause.

18

19

20       /s/ Gail B. Pritchett

21       COMMISSIONER-NOTARY PUBLIC

22       ACCR LICENSE NO. 116, Exp. 9/30/2014

23       Transcript Certified On 2/23/2014

**EXHIBIT B**